Page 1

1                   IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3        _____

4        ROBOCAST INC., a Delaware

5        Corporation,

6               Plaintiff,

7           v.                              Civil Action No.

8        NETFLIX INC., a Delaware           1:22-cv-00305-JLH

9        limited liability company,

10              Defendant.

11       _____

12                      VIDEOCONFERENCE HEARING

13       DATE:         Monday, July 22, 2024

14       TIME:         10:03 a.m.

15       BEFORE:       Honorable Christopher Burke

16       LOCATION:     Boggs Federal Building

17                     844 North King Street, Unit 28

18                     Wilmington, DE 19801

19       REPORTED BY:  Andrew Weader

20       JOB NO.:      6811211

21

22

23

24

Page 2

1                    A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF ROBOCAST INC.:

3          STEPHEN BRAUERMAN, ESQUIRE (by videoconference)

4          RONALD GOLDMAN III, ESQUIRE (by videoconference)

5          Bayard PA

6          600 North King Street, Suite 400

7          Wilmington, DE 19801

8          sbrauerman@bayardlaw.com

9          rgolden@bayardlaw.com

10         302-655-5000

11

12         STEVEN RIZZI, ESQUIRE (by videoconference)

13         RAMY HANNA, ESQUIRE (by videoconference)

14         GRANT JOHNSON, ESQUIRE (by videoconference)

15         MARIEL TALMAGE, ESQUIRE (by videoconference)

16         McKool Smith PC

17         One Manhattan West

18         395 9th Avenue, 50th Floor

19         New York, NY 10001

20         srizzi@mckoolsmith.com

21         rhanna@mckoolsmith.com

22         gjohnson@mckoolsmith.com

23         mtalmage@mckoolsmith.com

24         212-402-9400

Page 3

1          A P P E A R A N C E S (Cont'd)

2   ON BEHALF OF DEFENDANT NETFLIX INC.:

3        KELLY FARNAN, ESQUIRE (by videoconference)

4        SARA METZLER, ESQUIRE (by videoconference)

5        Richards, Layton & Finger PA

6        One Rodney Square

7        920 North King Street, Suite 600

8        Wilmington, DE 19801

9        farnan@rlf.com

10       metzler@rlf.com

11       302-651-7705

12       302-498-7869

13

14       LAURIE CHARRINGTON, ESQUIRE (by videoconference)

15       Netflix

16       121 Albright Way

17       Los Gatos, CA 95032

18       laurie@netflix.com

19       408-621-9213

20

21

22

23

24

```
                                                    Page 4
 1              A P P E A R A N C E S (Cont'd)
 2    ON BEHALF OF DEFENDANT NETFLIX INC.:
 3         TARA ELLIOTT, ESQUIRE (by videoconference)
 4         RACHEL COHEN, ESQUIRE (by videoconference)
 5         ASHLEY FRY, ESQUIRE (by videoconference)
 6         ALESSANDRA MY-LINH SCHASZBERGER, ESQUIRE
 7         (by videoconference)
 8         Latham & Watkins LLP
 9         555 Eleventh Street Northwest, Suite 1000
10         Washington, DC 20004
11         tara.elliott@lw.com
12         rachel.cohen@lw.com
13         ashley.fry@lw.com
14         alessandra.schaszberger@lw.com
15         202-637-2329
16         202-637-2629
17         202-350-5131
18
19    ALSO PRESENT:
20         Samantha Grimes, Courtroom Deputy
21         (by videoconference)
22         Ann Herman, Law Clerk (by videoconference)
23         Britton Ody, Summer Associate, Richards, Layton &
24         Finger PA (by videoconference)
```

Page 5

1                     E X H I B I T S

2    NO.                DESCRIPTION                    ID/EVD

3                     (None marked.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 6

1                    P R O C E E D I N G S

2                    THE REPORTER:  We're on the record at

3        10:03 a.m.

4                    THE COURT:  It says my camera's on and

5        I can see myself on screen, but anybody else having a

6        problem seeing me?  Okay.

7                    Mr. Brauerman, what color is my tie?

8                    MR. BRAUERMAN:  Red and blue.

9                    THE COURT:  You got it.  Okay.  Good.

10                    All right.  So I know we have counsel

11       for each side here with us, and we have our court

12       reporter with us.  We thank our court reporter for

13       their service.

14                    And so in light of all that, let's go

15       on the record.  Let me just say a few things for the

16       record.

17                    We're here this morning in two related

18       matters.  The first is a miscellaneous case titled

19       Rizzi, et al. vs. Netflix Inc.  That's civil action

20       number 24-MC-106 in our court.

21                    And then additionally, we're here to

22       resolve some discovery disputes in a related matter,

23       titled Robocast Inc. vs. Netflix Inc., which is civil

24       action number 22-305-JLH in our court.

Page 7

1              I should say that the miscellaneous

2    matter ends with a dash CJB, as there's a consent --

3    in that matter.

4              All right.  Before we go further, let's

5    have counsel for each side identify themselves for the

6    record.  We'll start first with counsel for the

7    plaintiff's side, and we'll begin there with Delaware

8    counsel.

9              MR. BRAUERMAN:  Good morning, Your

10   Honor.  Steve Brauerman from Bayard.  I'm joined on

11   the line by my colleague, Ronald Goldman, also from

12   Bayard.  And then from lead counsel at McKool Smith,

13   Steven Rizzi, Ramy Hanna, Grant Johnson, and Marial

14   Talmage.

15             And I believe with Your Honor's

16   permission, Mr. Rizzi, Ms. Talmage, and Mr. Johnson

17   will address the court today.

18             THE COURT:  Okay.  Thank you.

19             We'll do the same for counsel for

20   Defendant's side.  And we'll begin with Delaware

21   counsel.

22             MS. FARNAN:  Good morning, Your Honor.

23   Kelly Farnan from Richards, Layton & Finger for

24   Netflix.  From my office, I'm joined by Sara Metzler

Page 8

1    and also our summer associate, Britton Ody.

2                From Latham & Watkins today, we're

3    joined by Tara Elliott, Rachel Cohen, Ashley Fry, and

4    Alessandra Schaszberger.

5                We also have on the line today  Laurie

6    Charrington from Netflix.  And each of Ms. Elliott,

7    Ms. Cohen, Ms. Fry, and Ms. Schaszberger will handle

8    some of the issues before the court.

9                And then one last administrative

10   matter, Your Honor, this was set on our calendars till

11   1 o'clock.  I have a pretrial conference with Judge

12   Hall at 1 o'clock, and so Ms. Metzer will be on the

13   entire time, but with Your Honor's permission, I might

14   need to be excused around 12:30 if we're still going.

15               THE COURT:  Okay.  My hope is that

16   we'll be done by 12:30.  I have another -- more

17   hearings thereafter today.

18               So my hope is to go from now till no

19   later than 12:30.  Maybe, you know, do an hour on the

20   motion to quash, an hour on Defendant's discovery

21   disputes, which are many, and then maybe a half hour

22   on Plaintiff's dispute, which is pretty focused.

23   Something like that.  But I'll try to keep it moving

24   just because I've got more hearings today, and so I

Page 9

1    got to be focused.

2              Okay.  All right.  Good to be with you

3    all.

4              All right.  Let's go to the motion to

5    quash in the miscellaneous case first.  In some way,

6    some parts of that motion also relate to some parts of

7    Defendant's discovery disputes, so it makes sense to

8    do that motion first.

9              Who's going to be speaking on behalf of

10   the plaintiffs, or the movements, in that case?

11             Someone may be on mute, but --

12             MR. RIZZI:  Yes, Your Honor.  I

13   apologize.  This is Steven Rizzi.  I will be handling

14   that portion of today's hearing.

15             THE COURT:  Okay.  And I should say

16   we're on videoconference here, so for counsel who are

17   arguing, when you're arguing, I'd ask you -- unless

18   there's some technology problem -- to be on video.

19             If you're not arguing, just listening,

20   you don't have to be on video if you don't want to.

21   You can just put your screen on, you know, non-video

22   and just listen in.

23             Oh, also, I should say we got a request

24   from at least one member of the public for the dial-in

Page 10

1  for this call, so parties should assume -- parties

2  should understand, as they would with any

3  videoconference hearing, that it is public and they

4  should assume that there could be members of the

5  public listening.

6         All right.  With that said, let me turn

7  to movant's side.

8         And, Mr. Rizzi, let me just jump in

9  with some questions for you.  And I'll do the same for

10  the other side as well.

11         In my view, I wonder -- I don't know if

12  Plaintiff's side as a different view.  Obviously the

13  parties briefed the factors under Second Circuit law

14  that our court utilizes, or has utilized, I think the

15  Eighth Circuit Shelton factors.  There's a lot of

16  overlap there, et cetera.

17         But in terms of how to do the analysis,

18  I'm wondering whether you -- why it wouldn't be the

19  case that what I would do is kind of try to figure

20  out, look, what are the key buckets of

21  testimony/documents, i.e. the key topics, that the

22  defendant says they're seeking from their subpoenas to

23  you.  And then take a look at each of those key

24  buckets -- say there's three or four -- and assess;

Page 11

1    you know?  Well, to what extent -- is there a great

2    need or not a great need?  You know, to what extent

3    would this information be relevant?  To what extent

4    might it call for privileged information?

5                  Do you disagree that that's kind of a

6    fruitful way to go about this analysis?

7                  MR. RIZZI:  Your Honor, I think that's

8    a perfectly logical way to proceed.

9                  THE COURT:  Okay.  Let me just tell you

10   what I took away from the briefing, and for both

11   sides' benefit.  And again, I'll talk to Defendant's

12   counsel in a minute and they can tell me if they think

13   this list is under or overinclusive.

14                  It seems like maybe the focus and the

15   briefing was on something like, you know, four buckets

16   of information.  One bucket being information about

17   Mr. Rizzi's investment in Plaintiff.  A second bucket

18   being about, you know, information about patent

19   licensing history of the plaintiff.  A third bucket

20   being information relating to litigation funding or

21   investor-related communications/conversations, et

22   cetera.  And a fourth bucket being information

23   relating to prosecution of the patents in suit.

24                  That's what it seemed like were the top

Page 12

1   ones that were most frequently mentioned in the

2   briefing.

3                Mr. Rizzi, do you think there's a topic

4   I didn't mention there that is going to be relevant to

5   what we're talking about?

6                MR. RIZZI:  Your Honor, I think those

7   fairly capture the categories of information upon

8   which Netflix based its subpoena.

9                The only one clarification is the

10  bucket about investor relations.  You know, I --

11  there, they seem to be arguing more broadly about me

12  playing some sort of a business role beyond role as

13  counsel as justifying it.  I think it falls into that

14  bucket, but I just wanted to add that clarification.

15               THE COURT:  Okay.  And I may have some

16  questions for you about those buckets, but I think

17  maybe stepping back, one question I had that -- you

18  know, this briefing was done, you know, I think in

19  March and maybe early April.  We're now in July.  And

20  I think it's the case, tell me if I'm wrong, that an

21  interval, there have been a lot of depositions taken

22  by both sides.  I know one of our disputes today is

23  about a lingering depo, but --

24               So I guess I'll ask both sides, but

1   I'll ask you first.  Are you asserting that now that

2   we see what discovery has been taken in the interval

3   between when the briefing ended and now, that

4   Defendants have received a bunch of information about

5   certain of these buckets, such that any additional

6   information that might be gleaned from you would be

7   said to be largely cumulative, or are you not making

8   that?

9                    MR. RIZZI:  Absolutely, Your Honor.  I

10  mean, I would go further and say that discovery that's

11  occurred since has only confirmed what we alleged back

12  in February/March, that the subpoena was ill-advised

13  to begin with.

14                    And every category of information, that

15  it was asserted to be required from me personally, was

16  either provided, or certainly was available to be

17  provided through depositions and, you know, and other

18  discovery of Robocast witnesses.

19                    THE COURT:  And not to interrupt, but

20  is it probably correct that to the extent that

21  discovery was sought or asked about or obtained, or

22  wasn't, I probably don't have anything in the record

23  in front of me one way or the other about what

24  happened since the briefing ended on that front?

Page 14

1              MR. RIZZI:  Yeah.  I think that's fair,

2     Your Honor.  I'm not aware of any supplementation of

3     the record since depositions have occurred.

4              THE COURT:  Okay.  I cut you off.  What

5     else did you want to --

6              MR. RIZZI:  Oh, I was going to say in

7     addition to the depositions of Robocast witnesses,

8     also they deposed all of the Robocast prosecution

9     counsel.  So --

10             THE COURT:  And I don't know how

11    fruitful it will be since it's not part of the record,

12    and since anything said about it would essentially be

13    attorney argument, to ask you -- tell me, you know,

14    what questions were asked or what information was

15    obtained about X or Y.

16             Like, you know, it might have been

17    relevant or important to know one way or the other

18    from either side.  Like, okay.  A bucket of

19    information that's sought from Mr. Rizzi is

20    information about investment in Robocast say back in

21    '08 or whatever it was.

22             I know Plaintiff's response is, look,

23    you know, your investment was less than one percent

24    and it ended two years later.  And there's lots of

Page 15

1    other investors.  And so what you're really getting at

2    is what were people thinking when they were investing,

3    and how does it relate to Robocast's value and the

4    value of its IP.  You know, you can get that from a

5    lot of other people.

6                    You know, like one potentially helpful

7    fact that may have occurred since then is, well, do we

8    have any discovery taken on, like, you know, who

9    invested in Robocast in or around that time period,

10   and why, or anything?

11                   You know, again, I don't know how

12   fruitful it's going to be to ask you about it, but

13   I'll use it -- I'll just use that as an example, you

14   know, and ask, you know, was discovery taken about

15   that subject as the others -- other than you?  And

16   could some record be made one way or the other by

17   either side about whether there is such discovery

18   available or there isn't?

19                   MR. RIZZI:  I would say, Your Honor,

20   there certainly has been discovery -- complete

21   discovery of what we call the cap tables, or what

22   Robocast refers to as the cap tables, which are a

23   complete record of every investment in Robocast, I

24   think, going back to day one.

Page 16

```
 1                And also, the related entity, this IMU,
 2    which was a holding company, and that was the actual
 3    entity that I was briefly invested in.
 4                So complete information about all the
 5    investors has been provided.  I mean, I will note that
 6    what's also relevant here is what discovery Defendant
 7    chose not to pursue.  And that includes discovery from
 8    the major investors.
 9                There were -- as Your Honor's aware, my
10    investment was very small and very brief.  There are I
11    believe well over 100 investors, the vast majority of
12    which invested far more than I did, invested much
13    earlier than I did.  Certainly some at the same time.
14    And continued to be investors, including ones, you
15    know, prominently featured in the documents.
16                And to my knowledge, Netflix did not
17    even seek discovery from any other investor.  And I
18    would submit that's telling that the only investor
19    that they believe discovery is relevant from is me.
20                And that, to me, just speaks volumes in
21    terms of what the -- you know, the true motive here.
22    It's not about the investment.  It's about who made
23    the investment and, you know, getting to information
24    from litigation counsel.
```

Page 17

```
 1              THE COURT:  Okay.  And then another
 2     kind of framing question, and you know, this goes I
 3     think to the more general assertions about your role.
 4     You know, look, it could be the --
 5              I understand your assertion is that,
 6     you know, your role was as patent counsel, licensing
 7     counsel, litigation counsel through these years.  You
 8     know, you could think of scenarios where you have a
 9     large company with hundreds of employees.  And they,
10     you know, for all their litigation needs, hire the
11     same firm.  And largely, you know, led by the same
12     partner over a period of years.  But it's a big
13     company with lots of people, you know, who are
14     involved in lots of decisions.  And, you know, would
15     interact with outside counsel, even if it's the same
16     firm and, you know, led by the same lead partner.
17              Thinking of another scenario where
18     you've got a very small company, you know, that
19     essentially has, like, a couple of people -- two or
20     three people, you know, operating it for years.  And
21     they rely on their outside counsel as, like, one of
22     just -- one or two or three people who essentially are
23     involved in almost every conversation, make almost
24     every decision.
```

Page 18

1            You know, and it could be said that

2    lots of those decisions in some way could implicate

3    legal counsel, but, like, essentially, the company is

4    run by, like, four people, and one of them was the

5    lawyer.  An outside lawyer.  Someone who's an employee

6    of the company, but worked at a firm, but essentially

7    served, like, you know, in-house counsel and, like,

8    one of three or four people who was basically in every

9    meeting.

10           You know, the former, you know, seems

11   like more of a traditional, you know -- probably not

12   likely to be seeking discovery from that outside

13   lawyer scenario.  Where the latter, you might say it's

14   a little more unusual.  And maybe that one lawyer, you

15   know, is so omnipresent, so integrated into this tiny

16   team of people who are leading the company that it's a

17   little -- like, you might not expect that person, you

18   know, later to be, you know, litigating cases with

19   them because they were so intricately enmeshed in the

20   company's, you know, ascent.

21           I think -- suggesting that what

22   happened with you is more like the latter scenario.

23   And so, you know, what can you tell me or what do you

24   want to say is in the record about,  like -- you know,

 1    was Robocast, for these years -- from like '08 through

 2    the present -- were they, like, a couple-person

 3    company and essentially relied on you to be, like, one

 4    of their four or five people that were in on all the

 5    decisions, or was it much more vast than that, or

 6    something in-between?

 7                    MR. RIZZI:  It certainly was a small

 8    company.  And, you know -- run by Mr. Torres.  And in

 9    that time period, I believe from, you know, '08 on,

10    also included Mr. Brett Smith, in-house counsel.  So

11    they had their own in-house counsel pretty much

12    continuously more or less from that -- I think there

13    may have been a brief period where he wasn't in-house

14    and he may have been working as outside counsel.

15    But --

16                    THE COURT:  That's said to be, like,

17    two years.

18                    MR. RIZZI:  That sounds about right.

19    But at no time during that period did I ever play more

20    than the role of outside counsel advising on patent

21    enforcement, litigation strategy, and those matters.

22    I just never played anything beyond that in terms of a

23    business role.

24                    I never -- I was not participating in

Page 20

1   every single meeting by any stretch, because frankly,

2   you know, the client really didn't have the resources

3   to even seek to use me in that role.

4                I was always, during the entire time, a

5   partner at a law firm, whether it was Foley & Lardner

6   for the most part.  And then after that, King &

7   Spalding, and then -- years, McKool Smith.

8                So yes, it's a small company, but no, I

9   mean, there was never a scenario where my role went

10  beyond legal counsel.

11               And even then, you know, because they

12  had in-house counsel, it was discreet matters in which

13  my services were sought.

14               THE COURT:  And, like, I'm not holding

15  you to this, but throughout these years, approximately

16  how many people were employees at Robocast?

17               MR. RIZZI:  Many more in the early

18  days.  And I think currently, there's four employees I

19  believe.  So, I mean, look, it's always been a

20  relatively small company.

21               I think -- like I said, in the early

22  days, this is probably pre-turn of the century, around

23  there, there may have been, like, a couple dozen

24  employees at that time.  Since then, it -- yes, it had

Page 21

1   been quite small.

2               THE COURT:  Okay.  The other side shows

3   you listed on, you know, now they're assertedly

4   privileged documents on a privilege log, talking about

5   things like graphic designers or fundraising; you

6   know?  Stuff that doesn't sound too legal.  And so

7   what's your response to why that doesn't give a hint

8   that, you know, you were dealing with lots of things,

9   not just legal advice?

10              MR. RIZZI:  Sure.  So, you know, I was

11  frankly puzzled by the graphic designer one.  And I

12  actually went and looked at that document.

13  Admittedly, it's not the best description.

14              Having reviewed the document, I can

15  share a little more about that.  Obviously without

16  waiving privilege, but I was not -- and I have no

17  expertise in graphic design.  I was not recommending a

18  graphic design.

19              Their request was actually from

20  in-house counsel for legal advice with respect to

21  maintaining confidentiality in connection with hiring

22  the services of a graphic designer, specifically

23  relating to services concerning documents that would

24  have described -- I don't want to say too much here,

```
                                                    Page 22
 1   but the patent enforcement-related issues.

 2                   So it had nothing to do with

 3   recommending a graphic design.  It was all to do with,

 4   you know --

 5                   THE COURT:  Like, whether that person

 6   could be considered, like, an agent, for purposes of,

 7   like, privilege you're talking about?

 8                   And, look, I'm not trying to force you

 9   to say more than I think you should.

10                   MR. RIZZI:  I mean, legal advice

11   concerning, you know, what steps could be taken to

12   ensure confidentiality with respect to sharing, you

13   know, arguably sensitive information with this, you

14   know, outside person.

15                   THE COURT:  Okay.  Let me ask you about

16   the bucket of, you know -- my sense is, and I don't

17   have the history that the parties do -- or maybe even

18   Judge Hall does -- on the case, but my sense is that

19   over these years, there are going to be some

20   conversations that Robocast or its representatives

21   have with folks who might be considered investors

22   and/or folks who might be considered litigation

23   funders -- or potential investors or potential

24   litigation funders.  People who one way or the other
```

Page 23

 1    might give Robocast money relating to its business

 2    and/or litigation.

 3                    And that sounds like a category that

 4    involves third-party discussions.  So, you know, at

 5    least now the internal deliberations about what's

 6    going to happen in those meetings might be privileged,

 7    but certainly the -- you know, what's shared in those

 8    meetings, probably not.

 9                    And I think as it relates to the

10    discovery disputes, your side's not taking a view

11    that, you know, conversations with investors or even

12    litigation funders are privileged.  Maybe that they're

13    irrelevant, but --

14                    And that leads to the question which is

15    if I glean from the record that it's possible that and

16    maybe nobody else from Robocast would've been having

17    conversations about funding of Robocast from

18    investors, or funding of Robocast for purposes of

19    litigation, and if it could be argued capably that

20    those conversations about funding have some bearing on

21    maybe the value of Robocast's IP, including the IP at

22    issue in this litigation.  One could say maybe that's

23    information that might bear on damages, maybe

24    commercial success.  And that you might, at least on

Page 24

1   the Robocast side, have, you know, somewhat unique

2   access to what happened in those communications and

3   calls.

4                If I'm the defendant and I'm making

5   that kind of an argument -- I don't know if they are,

6   but I think maybe they're making some flavor of it in

7   their briefing -- why wouldn't that be a path?  Where

8   I'd say why don't -- you know, even as to the other

9   stuff, if I agree with you, what about, you know,

10  litigation funding?  Investor communications?  Et

11  cetera, as they go to damages and issues like

12  commercial success.

13               MR. RIZZI:  Okay.  If I can break that

14  up into, you know, investors and separately litigation

15  funders, and address those separately?

16               THE COURT:  Sure.

17               MR. RIZZI:  Okay.  So as to

18  investors -- first of all, the communications with

19  investors have been produced.  I mean, those are not

20  being held back.  And I have no unique information in

21  that respect at all.

22               My role with regard to --

23               THE COURT:  And can I stop you there

24  just to confirm?  So I think you said this maybe in

Page 25

1    the briefing for the defendant's discovery dispute,

2    but Plaintiff's position is when it comes to at least

3    third-party-related communications with investors, any

4    responsive materials, whether you agree they were

5    relevant or not, have been produced from Plaintiff's

6    side?

7                    MR. RIZZI:  From Robocast, yeah.  Yes.

8    And again, with the caveat that there was -- two

9    caveats to that.

10                    So right from the get-go, it was

11   Netflix itself that insisted that email communications

12   be outside the scope of discovery in this case.  We

13   actually disagreed with that, but ultimately

14   acquiesced, you know, just based on expediency.  So

15   there was no email collected by either side in this

16   litigation.

17                    I will say Robocast produced a very

18   large amount of email, but it's email that had been

19   collected and produced in the prior case.

20                    The second caveat is there was also an

21   agreed cutoff of 2020 for production of responsive

22   documents.  Again, Netflix took the strong position

23   that because the last-to-expire patent expired in

24   2020, they were not going to produce documents after

Page 26

1    that.  And again, we acquiesced to sort of 2020 being

2    a cutoff.

3              So with those two caveats, Robocast

4    essentially produced, you know -- did a very

5    comprehensive collection of documents, including all

6    investor communications that were provided to all

7    these prospective investors.

8              My role in that respect was very

9    limited.  To the extent that Robocast needed legal

10   advice, again specifically not on corporate matters,

11   which I'm not qualified to advise on, but legal advice

12   concerning the contents of those communications

13   vis-a-vis patent-related matters, yes.  They sought my

14   legal advice and I may well have provided comments

15   back.

16             That was the extent of my role with

17   investor communications.  And I believe --

18             THE COURT:  And I'm sorry to cut you

19   off, but -- and again, this is probably not in the

20   record before me, so again, I can only -- in resolving

21   this dispute, unless I ask for more information, I can

22   only take into account the record that's before me.

23   But I'll just ask because I think it's relevant.

24             The parties must have those documents.

Page 27

1    They must have seen these investor-related

2    communications/documents.  Do any of them show you as

3    the only Robocast employee or representative engaging

4    in communications with investors?

5                          MR. RIZZI:  No.  And again, I was never

6    an employee.  No.  No, Your Honor.

7                          THE COURT:  I just mean, like, if on a

8    particular communication, there was a Robocast

9    employee and you, you know -- you know, et cetera.

10                         MR. RIZZI:  No.

11                         THE COURT:  Okay.  So you're saying no.

12                         MR. RIZZI:  No, no.  And the other --

13   let me clarify.  So the only other role that I may

14   have played is -- and this was few and far between --

15   an investor that wanted to do due diligence and had

16   questions on patent-related -- you know, factual

17   questions relating to litigation or the patents.  You

18   know, I may have been asked to participate in a

19   conversation along those lines.  But I was not in any

20   way, shape, or form sort of consistently or routinely

21   part of those communications, or meetings, with

22   investors or potential investors.

23                         THE COURT:  Okay.  And litigation

24   funding?

Page 28

1              MR. RIZZI:  So litigation funding, I

2     mean, yes.  I mean, now that -- we have objections

3     based on relevance there.  Of course in that -- the

4     litigation funding that's at issue here all, I will

5     say, post-dates 2020, first of all.  So that's, you

6     know, again, one reason why it's outside the agreed

7     scope of discovery in this case.

8              If the question is do I have unique

9     knowledge vis-a-vis communications with litigation

10    funding?  I don't recall an instance where I was on a

11    call and I think -- I don't know -- I don't think

12    there were any personal meetings that did not also

13    include Robocast personnel, including Damon [ph]

14    and/or Brett and/or Ed Robertiello.

15             Sitting here today, I don't recall that

16    ever being the case.

17             THE COURT:  And this bleeds a little

18    bit into the next topic, but since it's related.

19    Maybe separate and apart from motion to quash.

20             Just on lit funding conversations, you

21    know, if one might plausibly infer that in those

22    conversations -- again, maybe ones where you're not

23    the only person there; you know?  Other Robocast

24    representatives, including Robocast employees, were

Page 29

 1    present, too.

 2              You know, one might infer that there's

 3    probably some conversations happening on those calls

 4    with potential funders about how strong are these

 5    patents, including the patents in suit?  How valuable

 6    might they be?  How, you know -- and I don't know.

 7    Robocast may have been careful not to share too much,

 8    or maybe -- but, you know, what are some, you know,

 9    validity-related changes they might face?  You know,

10    or infringement-related challenges, or et cetera.

11              But, you know, why wouldn't I

12    reasonably infer that at a minimum in those kind of

13    litigation funding conversations, there would be

14    communications that speak to the value of Robocast's

15    IP, including the IP in this case, either in terms of

16    dollars or in terms of the strength of that IP?

17              MR. RIZZI:  Well, I guess my first

18    response would be to the extent there were any such

19    conversations, those would be protected by work

20    product.  I can't say there weren't, you know,

21    generally topics discussed that would touch on, of

22    course, you know, the patents.  The history of

23    litigation.

24              I mean, certainly we were careful not

Page 30

```
 1   to disclose attorney-client information, but anything
 2   that was discussed, we believe is protected by work
 3   product.
 4                 THE COURT:  Including discussed and
 5   shared with a third party potential litigation funder?
 6                 MR. RIZZI:  Yes, yes.  And --
 7                 THE COURT:  How would the sharing of
 8   the information with the litigation funder not obviate
 9   any privilege or work product protection assert?
10                 MR. RIZZI:  There is case law,
11   including a decision that my colleague was -- and
12   is -- prepared to address from Judge Hall -- that
13   conversations with litigation funders are protected by
14   work product.  Because the common interests -- and of
15   course --
16                 THE COURT:  You're talking about the
17   common interest privilege?
18                 MR. RIZZI:  Yes, yes.  Because these
19   were all done, of course, an overarching
20   confidentiality agreement that recognizes that common
21   interest.
22                 THE COURT:  Okay.  And I understand
23   that other counsel, because it relates to the
24   discovery dispute, may have -- may be also prepared to
```

Page 31

1    talk about this in more detail.

2                    Okay.  I think for now, I'll just try

3    to keep it focused.  Those are the main questions I

4    had for you.  Was there anything more you want to add

5    before I turn to your colleague on the other side?

6                    MR. RIZZI:  No.  I mean, we didn't

7    really talk about patent prosecution, but you know, I

8    think that the record is clear.

9                    Back when I was still at Wyogotschell

10   [ph] -- '96, '97 timeframe -- Wyogotschell [ph] had

11   exited the patent prosecution business.  I did refer

12   Robocast and Mr. Torres to a former colleague, Jo

13   Sofer.  He and his firm had been prosecution counsel

14   ever since.  There really is no serious dispute about

15   that, and that I have not prosecuted any of the

16   patents.

17                    And in fact, since 2011 or so, after

18   the cases were filed against Microsoft and Apple, and

19   prosecution bars were put in effect, I was, you know,

20   legally -- I was court ordered, precluded, from being

21   involved in patent prosecution.  And that bar in fact

22   remained in place through issuance of the continuation

23   patent.

24                    As you may recall, cases against

Page 32

1    Microsoft and Apple involved the parent patent.  While

2    those cases were pending, the continuations were being

3    prosecuted by the Sofer & Haroun firm.  And the

4    prosecution bars relating to those cases endured until

5    those patents actually issued.

6              And I will say, I know it's not in the

7    record, but there's no testimony from prosecution

8    counsel, from Robocast counsel, that suggests

9    otherwise.

10             THE COURT:  I can't recall, but was

11   prosecution counsel deposed --

12             MR. RIZZI:  Yes.

13             THE COURT:  -- in the case?

14             MR. RIZZI:  Yes.  Both lawyers who were

15   involved in prosecuting were deposed for I believe

16   four days, or three and a half days.

17             THE COURT:  Okay.  All right.  Let me

18   keep it moving.  Let me turn to -- I'll give you a

19   chance for a brief rebuttal.

20             Let me turn to Defendant's counsel.

21   Who's going to be speaking on behalf of Defendants

22   here?

23             MS. ELLIOTT:  Good morning, Your Honor.

24   Tara Elliott with Latham & Watkins on behalf of

Page 33

1    Defendant Netflix.

2                    Are you able to hear me?

3                    THE COURT:  Yes, I can see you,

4    Ms. Elliott, and hear you.

5                    MS. ELLIOTT:  Okay.

6                    THE COURT:  Great.  All right.  Let's

7    jump in and maybe start in the same place I did with

8    Mr. Rizzi.

9                    It looked to me like in the briefing,

10   the focus -- you know, there are various requests in

11   the subpoenas at issue, but, you know, on some level,

12   parties have to focus them on, like, what categories

13   of information are we seeking here really?  And what

14   are the arguments as they relate to the -- you know,

15   either the Friedman factors or the equivalent that our

16   court has used as to why it is that, you know,

17   discovery should be sought from Mr. Rizzi, you know,

18   as to these topics.

19                   And I thought I -- I was seeing a

20   breakdown and it may be four rough areas.  Again, you

21   know, prosecution-related information, Mr. Rizzi's own

22   investment, information about communications regarding

23   investing in Robocast or in litigation funding, and

24   then patent licensing.

Page 34

1          Would you tweak or alter what you think

2     this motion's really about in terms of the kinds of

3     buckets of information that are at issue?

4               MS. ELLIOTT:  Thank you, Your Honor.  I

5     think Your Honor has captured four of I would say five

6     buckets.  So I'd tweak it slightly.

7               We'd concur that Mr. Rizzi's personal

8     investment is one category.  We concur that the

9     licensing activity of Robocast, beyond the parties

10    from whom they already have license agreements, is

11    fair game.  We think the communications to investors,

12    which Mr. Rizzi was an integral part of those

13    communications, is yet another category.  We concur

14    with Your Honor that prosecution is also a valid

15    category.

16              The fifth and new one that I would add,

17    Your Honor, is the inequitable conduct allegations at

18    issue in this case.  There was at least one motion to

19    quash in the previous litigation with respect to -- in

20    the Microsoft case.  I believe the plaintiff and

21    counsel for RatnerPrestia moved to quash the

22    subpoenaed RatnerPrestia.

23              This case is cited in the papers, but I

24    want to note it just in support of this fifth topic.

Page 35

1    Because Judge Andrews, in denying that motion to

2    quash, made a very important observation.  And for the

3    record, this is -- excuse me.  It's 2013 West Law

4    1498666.

5              And in that decision where he denied

6    counsel's motion to quash a subpoenaed RatnerPrestia,

7    not only did the court hear, consider, and dismiss the

8    privilege concerns.  Not only did the court hear,

9    consider, and dismiss the burden concerns, he made the

10   following observation, which I think is relevant here.

11             A review of the deposition topics and

12   the document requests certainly calls into question

13   Microsoft's representation that only non-privileged

14   information is sought.

15             Microsoft also represents that it

16   expects the documents the subpoena is calling for less

17   than 100 documents.  And that the deposition would

18   last two hours.

19             The court is mindful that inequitable

20   conduct allegations are in the case.  That is that

21   Mr. Torres was dishonest with the PTO, and further

22   understands Microsoft to be generally alleging in so

23   many words that Mr. Torres is an unreliable witness.

24   This is all to say the factual, non-privileged

Page 36

1    information from a witness, whose reliability is not

2    reasonably subject to dispute, could be very relevant.

3              Here in this case, one of Microsoft's

4    defenses is inequitable conduct.  And those issues

5    remain at stent.  They were covered in depositions in

6    this case as they were in earlier cases.  And

7    Mr. Rizzi's role is quite relevant there because, as

8    the attorney primarily responsible for the litigations

9    then and now, had an obligation to report to the

10   patent office what Judge Andrews found in that earlier

11   case.

12             So I would just add that fifth topic,

13   inequitable conduct, to the previous four as sort of

14   the five buckets that we think are relevant here.

15             And if I may respond -- I'm sorry.  Go

16   ahead, Your Honor.

17             THE COURT:  I just have something to

18   ask.

19             MS. ELLIOTT:  Sure.

20             THE COURT:  I thought I had understood

21   prosecution to be relevant -- asserted to be relevant.

22   That the bucket of prosecution asserted to be relevant

23   because it was going to speak to inequitable conduct.

24   But it sounds like you're breaking those up.

Page 37

1              What is it about prosecution-related

2     discussions Mr. Rizzi may have had with Mr. Sofer or

3     others that are relevant to something other than

4     inequitable conduct issues?

5              MS. ELLIOTT:  Fair question, Your

6     Honor.  Well, the recent defense that we've added from

7     Netflix's prosecution laches, so there are two

8     additional patents at issue in this case.  And those

9     patents issued later.

10             And it's actually evidenced in the

11    record, not before Your Honor yet, because as Your

12    Honor observed, there has been a fair amount of

13    discovery that's taken place since the papers on this

14    particular motion have been submitted.

15             And among the discovery -- late

16    discovery produced by Robocast, as well as deposition

17    testimony, it's become clear that Mr. Rizzi also

18    provided information and communications to investors

19    with respect to their strategy on the prosecution of

20    the later two patents, which goes to Netflix's

21    prosecution laches defense.  And that's why I separate

22    the two, Your Honor.

23             You know, inequitable conduct was in

24    the previous litigation as well.  It's in our case as

Page 38

1    a defense, and prosecution laches is yet another

2    indifference defense that's in this case.  And

3    Mr. Rizzi has been communicating with third parties,

4    not under the umbrella of privilege, about these very

5    topics.  At least with respect to the prosecution

6    laches.

7                    With respect to inequitable conduct,

8    one of our concerns is how they have promoted the

9    value of the IP asserted here without communicating on

10   the misrepresentation from Mr. Torres in earlier

11   litigation that would be relevant to value.

12                   So those two issues we see are

13   distinct, but I do hear Your Honor's point, that they

14   may have been grouped under the prosecution bucket.

15                   THE COURT:  When you mention non-

16   inequitable-conduct-related prosecution matters, you

17   talked about laches.  But when you described what

18   information the case might bear on that, it sounded

19   like you're talking about Mr. Rizzi's conversations

20   with investors, which is a separate bucket.  You know,

21   what did he say to third-party investors on behalf of

22   the plaintiff.

23                   MS. ELLIOTT:  Yes.

24                   THE COURT:  Like, it's fair, like, it

Page 39

 1    could be considered part of that bucket?

 2                    MS. ELLIOTT:  There are a lot of

 3    overlaps here for sure, Your Honor.  And I think

 4    there's certainly -- I used that as an example of

 5    where he was communicating around it, but I think the

 6    topic of prosecution laches independently is one for

 7    exploration where privilege can't be claimed and would

 8    not be appropriately claimed because Mr. Rizzi's role

 9    in communicating with prosecution counsel.

10                    He mentioned the two attorneys who were

11    deposed in this case.  The record will show -- and I

12    say "will show" because, Your Honor, I acknowledged in

13    response to your earlier question of Mr. Rizzi, there

14    is a fair amount of information that bolsters and

15    underscores the relevance of Mr. Rizzi's unique

16    testimony.  All of that -- much of that came after the

17    submission of the papers.

18                    And certainly, we were very

19    conscientious whether to add on to the court's papers

20    or whether to wait to see if we had lead to do so, and

21    to discuss these matters with the court.  We are

22    prepared to supplement as the court may find useful or

23    helpful here, but we have prepared supplements with

24    citations to the records so Your Honor can see a

Page 40

1    number of the questions the court has asked just this

2    morning already.

3                    There is precise answers in the record

4    showing that, in fact, Robocast did not provide the

5    testimony that would have potentially narrowed the

6    scope of our subpoena.

7                    In many instances, Robocast blocked

8    discovery from Robocast witnesses where it could've

9    otherwise narrowed the discovery we were seeking from

10   Mr. Rizzi.

11                   And in fact, you will hear I think in a

12   few moments, Your Honor, from my co-counsel here -- my

13   colleagues here -- on a number of the privilege

14   disputes that also sort of intertwine with this very

15   issue.

16                   You'll see, Your Honor, that they're

17   claiming work product and privilege on issues and

18   topics that have not -- that can't be supported.  And

19   in some instances, they removed or called back their

20   claim of privilege.  I don't want to get into too much

21   detail because I know that's going to be covered

22   separately, but it does relate to this particular

23   issue.

24                   And the reason it relates to this issue

Page 41

1    is because Mr. Rizzi wanted us to get discovery from

2    Robocast and its witnesses first.  And we've been

3    told, Judge, to bring in in the transfer hearing in

4    front of the Southern District of New York, that we

5    were willing to consider staging Mr. Rizzi's subpoena

6    such that we would seek the discovery from Robocast,

7    and see what remained after that.  And Mr. Rizzi did

8    not take us up on that offer.  Instead, he stood firm

9    and commanded our withdrawal of the subpoena.

10            Well, now just by the passage of time,

11   we find ourselves having concluded all of the fact

12   discovery of this case.  Having concluded our

13   depositions of Robocast witnesses.  And upon

14   concluding that discovery -- that fact discovery -- it

15   is absolutely clear that they have not produced many

16   of the topics that bear on all five of these buckets.

17            I want to be clear on one point in

18   particular, Mr. Rizzi said earlier in his remarks that

19   he did not -- that Netflix did not seek discovery from

20   any other investor, and he thought that was curious.

21   Well, that's actually not true.  We actually sought

22   discovery from Chris Dykstra, who's a big investor,

23   and from the entity Warecorp.  And Netflix faced a

24   significant amount of obstruction and blocking of that

Page 42

 1    deposition and of questions sought in that deposition.

 2                    Further, Your Honor, we have subpoenaed

 3    Ms. -- I apologize, Your Honor.  I see you want a

 4    break through --

 5                    THE COURT:  Yes.  I've got to try to be

 6    focused here.  And so, you know --

 7                    MS. ELLIOTT:  Sure.

 8                    THE COURT:  -- I'm hoping both sides

 9    will give me kind of focused answers to my number of

10    questions.

11                    MS. ELLIOTT:  Yes.

12                    THE COURT:  It just strikes me that --

13    so the briefing was completed in, like, March or

14    April.

15                    MS. ELLIOTT:  Yes.

16                    THE COURT:  It strikes me that as to

17    these buckets, like, each side -- what happened in

18    discovery here, which is largely completed -- fact

19    discovery it seems like -- it seems like it could be

20    very relevant to the outcome of the motion.

21                    Like, for example, the plaintiff's side

22    might point to -- might say, "Look, as to bucket

23    number one, they're claiming that they need discovery

24    from Mr. Rizzi.  But look at all the discovery they

Page 43

1    took on this subject matter from Robocast employees or

2    Robocast affiliated people, or look at the opportunity

3    they had to do that and look how they just gave it

4    up."

5              And on the flipside, Defendant might --

6    it seems like -- might argue or might be able to

7    argue, "Look at how we can show, by way of discovery

8    we did take, people talking about how, well, only

9    Mr. Rizzi was in those conversations about X."  Or,

10   "Look how we tried to get this discovery from other

11   people, but were shot down."

12             It all seems like what's happened

13   between the end of briefing and now, as to the various

14   of these factors, could be kind of important, but I

15   don't have that in the record before me.

16             Is that right?  And if so, like, how

17   could I credibly make a decision on the issue without

18   at least -- and I'm -- to it because there's so much

19   record, but to allow the plaintiff's at least to make

20   a brief additional supplement about these topics.  Do

21   you disagree?

22             MS. ELLIOTT:  I understand your point,

23   Your Honor, and I'll make three reactions.

24             First is Your Honor set forth some

Page 44

1    observations in your remarks at the beginning of the

2    hearing about the role of outside counsel and the role

3    of in-house counsel, and how in small entities, that

4    can be somewhat merged.  And we absolutely concur with

5    Your Honor's observation of what happened here.

6              And we submit that the papers that were

7    submitted, that are in front of Your Honor, fully

8    support this discovery with respect to Mr. Rizzi in so

9    far as we've made a showing of his unique role, his

10   unique knowledge.

11             And even in this hearing, Your Honor,

12   Mr. Rizzi just made a number of representations -- I

13   started to write them all down -- that we should be

14   able to test in discovery.  There are actual

15   representations and averments of what he did or did

16   not do, and roles he did and did not play that are

17   relevant here.  And we have documents that would

18   challenge the veracity of those things.  So that's

19   point one.

20             Point two, Your Honor, in response to

21   your query, absolutely there's things that have taken

22   place since the papers were submitted.  And we've

23   actually prepared with documentation that can be

24   submitted right now to show Your Honor the support for

Page 45

1    our position, that it's only been bolstered.  And we

2    accept that Your Honor doesn't have it and it makes it

3    difficult for you to rule on the supplemental record.

4              We do, you know, submit that that

5    record that is before Your Honor does demonstrate

6    that -- and this conversation, frankly -- that the

7    representations made by counsel certainly underscore

8    the propriety of this deposition.  But we certainly

9    don't object to -- and prepared, in fact -- to submit

10   to Your Honor supplements that would show the points

11   that we are making in our papers.  And they've only

12   gotten stronger through discovery.

13             And the third point I'll make, Your

14   Honor, is that what is in front of the court and is

15   scheduled to be heard in this proceeding are the

16   actual efforts to block discovery on the topics that

17   are laid out in that subpoena to Mr. Rizzi.

18             And so even if the court doesn't have

19   the deposition transcripts, which we have ready and

20   available to show Your Honor, even if the court

21   doesn't have the citations to the documents that

22   haven't been produced yet, we have those ready to

23   submit to Your Honor.

24             You do have in front of you the

Page 46

1    privilege log issues that show that Robocast has

2    systemically tried to shield facts -- facts in this

3    case.  Not privileged communications, but facts from

4    us in discovery.

5              Here we find ourselves in the middle of

6    expert discovery and simply do not have the things

7    that Mr. Rizzi represented have been produced.  And

8    there's a very robust record of discovery dispute

9    communications where we are consistently and

10   persistently trying to get them to produce information

11   that they were ordered to by Judge Hall on April 5th,

12   and that we've requested of them, and that they have

13   made representations to the court that they've already

14   produced.  And there's a really fulsome record to show

15   they haven't been produced.

16             THE COURT:  Okay.  Let me just --

17   because I'm running out of time on this motion.  Let

18   me ask just a couple quick-hitters about a couple of

19   buckets.

20             One is about Mr. Rizzi's personal

21   investment in Plaintiff.  It's asserted by the other

22   side, look, that's less than one percent of all

23   investment.  There's tons of other investors.  His

24   investment ended, you know, 14 years ago.  The idea

Page 47

1   that Mr. Rizzi would have, like, particularly unique

2   knowledge about why people might invest in Plaintiff

3   or the factors that related to Plaintiff's valuation

4   from an investment perspective, it doesn't make any

5   sense.

6                    Any response to that?

7                    MS. ELLIOTT:  Yes, Your Honor.  There

8   was over a 30-year period -- Mr. Rizzi has been

9   counseling Robocast since the mid-'90s.  So over --

10  almost a 30-year period, there's been about 45 to $50

11  million raised by Robocast from over 120 investors,

12  according to the testimony.  Of those investors, Your

13  Honor, only Mr. Rizzi has been paid.  At least that is

14  what the testimony that's been given under oath in the

15  record here.  And that was testimony provided by

16  Mr. Brett Smith, who is the in-house counsel.

17                   But when I asked Mr. Torres in

18  deposition, and I asked others in deposition, "Who has

19  had a return on their investment or have been paid out

20  of the proceeds of their licensing activity?"  They

21  said none have.  But with Mr. Rizzi noted by Mr. Brett

22  Smith as an exception.

23                   Mr. Rizzi has been integral and

24  involved in every aspect of this business decision as

Page 48

1    it relates to their patent enforcement, and that makes

2    him unique.  A unique investor.  And his reasoning for

3    investing during a period when they claim that they

4    were commercially successful, yet they were

5    struggling.  And Mr. Torres called that investment

6    significant.  He called it a lifeline.  That was sworn

7    testimony.  And that makes Mr. Rizzi's investment

8    quite unique in the context of the much broader role

9    he played as a business advisor.

10                   THE COURT:  And I guess my

11   understanding though about why investments and why

12   people invested are said to be relevant to the issues

13   in the case is that they might speak in some way to

14   damages issues or commercial success issues.  But I'm

15   not sure why -- and I don't know that it's in the

16   record that he's the only investor who was paid or

17   repaid -- the only one -- but whether he was or

18   wasn't, isn't the gist of why investment is supposed

19   to be relevant because it's like, well, what -- why

20   did you decide to invest?  What about their IP, you

21   know, seemed valuable?  You know, what amount of money

22   was invested?  You know, how successful the company --

23   aren't those the things that go to relevance?

24                   MS. ELLIOTT:  Absolutely, Your Honor.

Page 49

1    It's the value of the IP.  It's what a reasonable

2    person in a hypothetical negotiation would've deemed

3    appropriate as a licensing fee.  All of these things

4    are relevant to the ultimate value and to potential

5    damages.

6              And in this particular case, you have a

7    pretty robust record here of Robocast telling

8    potential investors, investors, and litigation funders

9    one thing.  When in fact, the record here says

10   something very different.

11             At the same time that they're claiming

12   commercial success, they're saying that they needed a

13   lifeline.  This is Mr. Torres' deposition testimony.

14   And that Mr. Rizzi provided that lifeline.

15             Well, it's actually Mr. Rizzi who's in

16   investor meetings.  He's representing himself and has

17   been represented in Robocast communications and to

18   investors as a key member of the executive team.  Key

19   member of the executive team.

20             They promoted Mr. Rizzi's investment.

21   It was promoted to third parties, to outsiders, to

22   bolster the value.  They promoted his resume, his role

23   in the legal industry, and then promoted his personal

24   investment as well as his business advisement role in

Page 50

1    the company.  That's all relevant to the damages and

2    to the value of the company, and what a reasonable

3    party would've been done in a hypothetical

4    negotiation, in addition to the invalidity issues of

5    commercial success.

6              THE COURT:  Can I just ask about

7    commercial success?

8              MS. ELLIOTT:  Yes.

9              THE COURT:  And there's talk about

10   products.  Did Plaintiff make any products or is the

11   success -- the commercial success -- is that, like, a

12   proxy for our success in raising money in support of

13   patent litigation with regard to this IP?

14             MS. ELLIOTT:  Your Honor just asked the

15   very questions I asked of Robocast witnesses.  And

16   it's interesting and relevant that Robocast marketed

17   themselves to third parties -- funders that they were

18   commercially successful.  And when asked why, they

19   talked about products, and they also talked about

20   their licensing revenue as garnered from the Apple and

21   Microsoft litigations, and one particular third

22   license that was outside litigation.

23             But when you asked -- when I asked

24   Mr. Torres about their products, they admitted -- he

Page 51

1    admitted -- that they have not had a sale or revenue

2    generated from the products that they have marketed.

3                   So again, this goes to the value of the

4    company, the credibility of the witnesses, the -- what

5    a hypothetical negotiation would've yielded from two

6    informed parties.  All of these representations, many

7    of which are in stark contrast to each other, are

8    relevant to our defenses and are worth of exploration

9    in discovery.

10                   THE COURT:  Okay.  And again, quickly,

11   on patent licensing, lots of outside counsel who

12   represent parties in litigation -- patent

13   litigation -- have participated in discussions with

14   potential licensees with regard to those patents.

15                   If we were having subpoenas of

16   attorneys who were attorneys in a federal patent case,

17   every time they participated in patent licensing

18   discussions either with the defendant in that case or

19   in other cases that may or may not have been filed,

20   we'd have a lot of attorney depositions.

21                   How could patent licensing be the kind

22   of, like, you know, relevant attorney-only information

23   that would kind of justify this kind of subpoena?

24                   MS. ELLIOTT:  Yes, Your Honor.  The

Page 52

 1   Robocast witnesses were asked about their licensing

 2   efforts to others.  They were obviously -- not

 3   obviously, but they were promoted.  The record shows

 4   they were promoted to investors as how the investors

 5   would get a return on their investment.

 6                    But when we asked, for example,

 7   Mr. Smith in deposition about those outreaches, he

 8   pointed to Mr. Rizzi.

 9                    Other witnesses could not provide any

10   factual testimony as to who was sought a license, who

11   they sought a license from, whether they responded,

12   how they responded, whether or not they had an

13   invalidity defense that was communicated to them.  All

14   those things are discoverable.  It should've been part

15   of the record.  They've been requested since last

16   April.  Have not been produced.

17                    And when we asked about them, we got

18   some vague recollections of one or two parties who

19   were on the receiving end of these outreaches.  And

20   when I asked the question in deposition, "What did

21   they say in response?" the witnesses from Robocast

22   pointed back to Mr. Rizzi.  And particularly said,

23   presumably, Mr. Rizzi knows.  Everyone pointed back to

24   Mr. Rizzi.

Page 53

```
 1                THE COURT:  I'm sorry to jump in --
 2                MS. ELLIOTT:  Sure.
 3                THE COURT:  -- but I think what you're
 4    saying is you've gotten some discovery which probably
 5    is not before me, which people are essentially saying,
 6    "Well, the only person affiliated with Robocast who
 7    would know what was said from our end in these
 8    licensing conversations is Mr. Rizzi"; is that right?
 9                MS. ELLIOTT:  Correct.  He's --
10                THE COURT:  But I guess just generally,
11    thinking about this longer-term, like, it's got to be
12    the case; right?  That, like, a firm's hired to
13    represent a plaintiff.  There are ten potential
14    litigation targets.  You know, maybe they sue one, but
15    then they're talking with nine others about licensing.
16                It's probably the case that, you know,
17    in a lot of -- not every case.  Sometimes you're,
18    like, separate licensing counsel, but, you know,
19    there's probably a lot of cases where the same firm
20    who's representing them in the litigation in the one
21    is also, like, sending a demand letter and having
22    calls with, you know, third-party X and the other
23    nine.
24                MS. ELLIOTT:  Yes.
```

Page 54

1                THE COURT:  And if all those -- in all

2      those kinds of cases, if you were always deposing the

3      lead lawyer, in the one, you know, you'd have a lot of

4      depositions with attorneys.  And I'm just wondering

5      why is this any different?

6                MS. ELLIOTT:  Yes, Your Honor.  So I

7      would say two things in response.  First, I don't

8      think this case requires us to -- Your Honor to make a

9      rule that goes broader.

10               This case is not just about the

11     licenses.  This particular effort to depose Mr. Rizzi

12     is so much broader than the licenses, that this is not

13     a precedent sort of case that would I think create a

14     concern about opening the floodgates of depositions

15     against -- of attorneys who handle licensing roles.

16     Moreover --

17               THE COURT:  And, Ms. Elliott, is part

18     of what you're --

19               MS. ELLIOTT:  -- I think it's --

20               THE COURT:  I'm sorry to interrupt you

21     again.  Is part of what you're saying there that

22     patent licensing -- it's a bucket, but it may not be

23     the most important bucket for us?

24               MS. ELLIOTT:  Correct, Your Honor.  And

Page 55

1    I think importantly, and I'll be brief here in making

2    this important point, they have not produced that

3    correspondence.  And most of those cases where you do

4    have litigation counsel who may be corresponding about

5    licensing efforts, it's in the record.  And our

6    damages experts can consider that correspondence.

7    They can look at what the party who sought a license

8    said in response, whether they had a noninfringement

9    position or an invalidity position.  It's relevant

10   here.

11                   We don't have those records.  They

12   refused to provide them.  In many cases, they say they

13   don't have them anymore.

14                   So that creates a unique issue for us

15   in this case, that's only one of the five buckets that

16   we've identified that make Mr. Rizzi's deposition very

17   unique and relevant here.  Because there were no

18   boundaries set here.

19                   Mr. Rizzi is all over the record on

20   business issues and legal issues alike.  And his role

21   is unique because everybody keeps pointing back to

22   Mr. Rizzi.

23                   THE COURT:  Okay.  And then last

24   question which relates to the category of

Page 56

1    communications relating to investments and litigation

2    funding, I know I may talk about this a little bit

3    more with regard to the next dispute, but -- and I

4    guess this also probably goes to, like, what's in the

5    record or not.  But it's asserted by the plaintiff

6    that when it comes to communications regarding

7    investors, that that discovery has been provided.

8                 So that, like, we know from a document

9    perspective what kind of communications there were

10   with investors.

11                So presumably, we could see, like, is

12   Mr. Rizzi the only person making these communications

13   or are there lots of Robocast employees who are part

14   of those communications?  How unique is his knowledge?

15   What would that record tell me, and then what else

16   would you say with regard to, you know, what I might

17   or might not infer from whatever record we have about

18   the issue of communications regarding litigation

19   funding.

20                MS. ELLIOTT:  Yes.  Thank you, Your

21   Honor, for the opportunity to address that, because

22   there were representations made earlier that are not

23   accurate.

24                What we have gotten from the -- at

Page 57

1    least one third-party deposition of Ms. Christine

2    Ianuzzi in particular, she was a former employee of

3    Robocast and we had to subpoena her records.  And that

4    subpoena and those depositions, frankly, Your Honor,

5    and I hate to layer on your suggestion of supplemental

6    briefing, but I think you would see -- if you saw that

7    deposition and the correspondence following, that it

8    became abundantly clear that Robocast did not produce

9    all of the relevant communications to investors about

10   these very patents and about their licensing plans and

11   representations that are clearly at issue in this

12   case.

13            In fact, we got a plethora of unique

14   information from Ms. Ianuzzi in her document

15   production, and we have since followed up numerous

16   times with Robocast asking for those productions.  And

17   it turns out they did not produce information in the

18   data room.  They did not produce all the webinars

19   where they communicated with investors.  And Mr. Rizzi

20   was, himself, a presenter, and marketed as a key

21   executive of the team in these webinars with

22   investors.

23            So there's a whole series of things,

24   and I don't want to be longwinded here.  I know Your

Page 58

 1   Honor's time limited, but this issue in particular is

 2   a real problem here based on the representations from

 3   counsel.  What hasn't been produced, and what they've

 4   admitted in meet and confers that were transcribed, as

 5   well as in the correspondence of discovery disputes

 6   that they have not produced.

 7                   So it's just simply not true, their

 8   earlier representation that they've produced

 9   everything.  This is something that counsel for

10   Robocast has said in past hearings with Judge Hall

11   that turned out to not be true.  And there's

12   well-documented discovery communications laying that

13   out.

14                   THE COURT:  Okay.  And, Ms. Elliott, I

15   do need to try to move on, but is there anything

16   further that you want to add before I turn back to

17   Mr. Rizzi for a brief rebuttal, and then try to move

18   on to our next dispute?

19                   MS. ELLIOTT:  Just briefly, Your Honor.

20   Mr. Rizzi has not once said he does not have relevant

21   documents, or that he does not have unique documents.

22   That's never been a response to any of these efforts

23   to seek his testimony and his documents.

24                   Second, Your Honor, Mr. Rizzi refused

Page 59

1    to meet and confer such that we could try to narrow

2    the information that we've sought to subpoena.  We

3    have walked through every one of the topics in the

4    subpoena and compared it to the information we

5    actually got in depositions and in documents, and have

6    noted for every category where we still have missing

7    information.

8              So I would just conclude, Your Honor,

9    by saying that this is not the usual case of seeking

10    deposition from lead counsel.  This is a case where

11    lead counsel has very much acted as an in-house lawyer

12    from an outside firm, and has blended his role in such

13    a way that it's nearly indistinguishable.  And he does

14    have facts that are not privileged, which we've

15    otherwise been blocked from getting, and we're seeking

16    his testimony for those non-privileged facts.

17              THE COURT:  Okay.  Thank you,

18    Ms. Elliott.

19              Mr. Rizzi, I'll give you a brief chance

20    for rebuttal, if there are particular statements that

21    Ms. Elliott made that you want to touch on before I

22    move on to our next motion.

23              Oh, and you're on mute.  Okay.  Happens

24    ever hearing.

```
                                                    Page 60
 1               MR. RIZZI:  Thank you, Your Honor.  I
 2    appreciate the opportunity for a brief rebuttal.
 3               I will say just categorically, nothing
 4    you heard today from Ms. Elliott in any way changes
 5    the position I or Robocast took from the get-go.
 6    Subpoena's facially improper.  There's all these
 7    accusations of misrepresentations that were made,
 8    which I really take offense to.
 9               What you didn't hear her dispute is two
10    critical facts that I mentioned earlier about
11    limitations that Netflix imposed on the scope of
12    discovery.  One, nothing after 2020.  Two, no emails.
13    So she shouldn't be hurried to say, "We're missing all
14    this stuff," when it was their own restrictions that
15    likely led to much of what they're seeking to be not
16    captured.  Including, for example, things like
17    communications with potentially licensing targets.
18               And, by the way, they do have all of
19    the letters that were sent out I believe during the
20    prior litigation.  Those have been produced.  They
21    have every license agreement that was actually entered
22    into.  And they also had the opportunity to question
23    Mr. Smith, the in-house counsel who was involved in
24    every discussion on all those topics.  So there's
```

Page 61

1    nothing unique from me that they have a basis to seek.

2                    In terms of -- she mentioned

3    Ms. Ianuzzi.  Well, that was frankly an improper --

4    around their own restriction prohibition on email

5    discovery.  They subpoenaed a third party who we

6    didn't represent.  And from her, they got email

7    communications with Robocast that they themselves said

8    were off limits in the case.

9                    So they shouldn't be heard -- rely on

10   any discovery they got from Ms. Ianuzzi.  Not that it

11   changes anything substantively, but they shouldn't be

12   heard for profit from a restriction on discovery that

13   they themselves imposed.

14                   In terms of -- she mentioned Ratner &

15   Prestia.  Ratner & Prestia was the patent prosecution

16   firm that originally was retained by Robocast to

17   represent them in prosecution.  So it was no surprise

18   that subpoena to them was allowed.

19                   In terms of the -- oh, just to clarify

20   the investment.  So I was divested in 2010, prior to

21   initiating the Microsoft and Apple litigations.  I

22   don't have all the details in front of me, but I

23   understand, that divestment involved converted

24   whatever equity interest I had into a loan.  So it was

Page 62

1    the loan that was repaid after conclusion of those

2    cases, not -- it was not a return on any investment,

3    just to clarify that.

4              And again, you didn't hear anything

5    from Ms. Elliott that explains why my personal

6    reasons, even to the extent that I could recall them

7    at this time for investing, have any relevance to any

8    issue in this case.

9              In terms of commercial success,

10   Robocast is not asserting commercial success for

11   anything post-2001.  So that's not an issue.

12              There's absolutely --

13              THE COURT:  So in terms of objective

14   indicia, commercial success is not being raised?

15              MR. RIZZI:  Not -- only for the very

16   early work done by Robocast where it did have products

17   and it was generating revenue from those services.

18   Not --

19              THE COURT:  What time period is that?

20              MR. RIZZI:  2000, 2001.  My investment

21   was in 2008.

22              And in terms of my role, communicating

23   to investors, there's nothing unique there.  We

24   actually produced -- even though there was another

Page 63

1    agreed restriction on discovery, was no videos.  And

2    again, at Netflix's insistence.  Nonetheless, we

3    produced the video which, as I recall, is the only

4    record and the only webinar that I have any

5    recollection of participating in, where I was one of

6    multiple presenters simply reporting on facts

7    concerning the litigations and the continuation

8    patents.

9                The notion that discovery from me is

10   relevant to inequitable conduct is refuted by their

11   own pleading.  And they have no basis, and they cannot

12   allege that I am an actor in terms of any inequitable

13   conduct allegations.

14                And similarly with prosecution laches.

15   Prosecution laches is based on unreasonable,

16   inexcusable delay in pursuing patents.  There's

17   nothing I have that's relevant to that.  You know,

18   much less unique to my -- and their own prejudice.  So

19   you didn't hear any reasonable connection to unique

20   knowledge of mine to their prosecution laches defense.

21                And on the last point, yes, we agree

22   that there is relevant testimony that has supplemented

23   the record.  You know, well, not yet, but I would

24   submit that if they truly believe that that moved the

Page 64

1   needle, you would've seen from them, you know, just

2   based on past history, a request to supplement that

3   record.

4               You didn't see that.  We're happy to

5   submit, you know, excerpts from depositions that we

6   think support our position.

7               I will say, I don't think that's

8   necessary.  I think Your Honor, you know, really has

9   enough information to now grant the motion.  This has

10  been a cloud hanging over Robocast for months now, and

11  it should not continue to be a distraction.

12              THE COURT:  But, Mr. Rizzi, wasn't one

13  of the points in your memos that, like, it was kind of

14  premature --

15              MR. RIZZI:  Yes.

16              THE COURT:  -- for the other side to

17  submit these subpoenas to you because all this

18  discovery was still pending, and they were going to

19  get depositions from folks like Mr. Torres and all the

20  other folks.  And that was going to cover a lot of the

21  ground that might otherwise, you know, be said that

22  you might have some knowledge about.

23              Weren't you making that point in your

24  brief?

Page 65

1              MR. RIZZI:  I did.  I did.  And I stand

2      by that.  And cover or -- or gave them the opportunity

3      to cover.  In many cases, they chose to put their head

4      in the sand, really because I think the motive was to

5      continue to pursue this -- you know, this baseless

6      subpoena against me.

7              But yes, and if Your Honor's of the

8      view that you require supplementing the record for

9      that, we're happy to do that.  I would just, again,

10     reiterate that -- a point I didn't make before, but

11     the Shelton test, if anything, is more restrictive

12     than the Friedman test.  And the factor under Shelton

13     is cruciality of the testimony.

14             Nothing you heard from Ms. Elliott even

15     comes close to rising to the level of anything being

16     crucial in terms of unique knowledge.

17             Now again, that isn't privileged.  I

18     mean, of course I have vast unique knowledge of their

19     litigation strategy, of litigation -- I mean, and

20     that's really what this is about because there's

21     nothing else unique about my knowledgebase that

22     doesn't cross the line into privileged information.

23             THE COURT:  Okay.  All right.  Thank

24     you.

Page 66

1          Thanks to you both, counsel.

2          I think what I, unfortunately, have --
3  I need to do to be, like, appropriately rigorous, is
4  allow one further brief submission.  I say that
5  because it does strike me that multiple of the key
6  factors that I'm supposed to assess when it comes to
7  subpoenas to trial counsel under the Shelton test or
8  the Friedman test -- any relevant test that any court
9  would use -- has to do on the one hand, maybe from
10  Plaintiff's perspective, with, you know, the extent to
11  which any testimony or discovery sought from counsel
12  is not really unique to counsel vis-a-vis the
13  plaintiff.  But can be sought or has been sought from
14  other Plaintiff's representatives or other parties in
15  the case.  Indeed the plaintiff made that argument in
16  the brief.

17          And on Defendant's side, you know, as
18  it relates to the cumulativeness or uniqueness issue,
19  Defendant's could assert that they sought discovery on
20  topic X, but witness has said, "I don't know.  The
21  only person who knows is Mr. Rizzi."  Or that
22  otherwise the record from the remaining discovery that
23  was taken further indicates the relevance of or the
24  unique knowledge that Mr. Rizzi has.

Page 67

1          So I think I have to provide the

2    parties with some brief ability to supplement.  On the

3    other hand, both because the record is already large

4    and the parties have been waiting a while, and

5    because, frankly, if I don't deal with this now, it

6    will continue to linger.

7          And the material's in my head and I

8    need to try to resolve this quickly.  The

9    supplementation has to be -- and it has to be quick.

10          And so instead of just saying a bunch

11    of words now, which may not be exactly what I mean,

12    what I'll do is issue a brief order today, again, on

13    the docket that we'll provide the parties for a very

14    brief chance to supplement based on what they think's

15    happened in discovery as to the factors.  And to do so

16    relatively quickly.

17          I mean, I'll give you some number of

18    dates, but relatively quickly.  So I can take it into

19    account and try to just get you a decision so that

20    you'll have it moving forward; okay?

21          So that'll be held.  You'll further

22    deal with this motion to quash.  So look for an order

23    for me on that.

24          MR. RIZZI:  Thank you, Your Honor.

Page 68

1           MS. ELLIOTT:  Thank you, Your Honor.

2           THE COURT:  All right.  Let's move on

3  to Defendant's discovery disputes.  And let's bring

4  those papers over.

5           And there are kind of a few of them.

6  Let me see if I can try to bracket them for you.  So

7  the way -- and I'll talk to arguing counsel about

8  this, but as I understand it from the letters and from

9  Defendant's letter, you know, there were -- the first

10 part of the letter kind of talks about three different

11 kind of subsets of testimony in dispute.  These are

12 the ones that were kind of, like, first, second, third

13 in Defendant's list.

14           And then the last part of the letter

15 talks about kind of privileged log disputes, and

16 whether certain information really is privileged, or

17 in the case of litigation funding -- because some of

18 those docs were logged at Judge Hall's request --

19 whether it can be said that certain litigation

20 funding-related documents that are logged on the

21 privilege log are relevant to the case.

22           So my thought was -- and I'll talk with

23 counsel who's arguing about these as we go through --

24 let's hear from the parties about the first

Page 69

1    categories.  The discovery -- different categories of

2    discovery Defendant's seeking.

3               Now there's some overlap, like -- some

4    overlap there, between this and, like, maybe

5    information regarding -- that Mr. Rizzi might have,

6    which relates to the motion to quash.  And there's

7    some overlap sometimes about litigation funding with,

8    like, docs in the privilege log.  Otherwise, you know,

9    it's discreet.

10              So the idea being that I would hear the

11   disputes about the first, second, third issues, and if

12   I can, try to resolve them here.

13              With regard to the privilege log, it

14   seems like Plaintiff's -- or Defendant is suggesting

15   that I look at these 25 docs, in camera, and I don't

16   have those docs, I don't think.  I have a list of

17   them.  I don't hear Plaintiff disputing that, but

18   that's not a way to deal with this.

19              That said -- it struck me when I was

20   reading, probably, it would give the plaintiff an

21   opportunity if it's going to -- when it gives me these

22   25 docs, it could be that in order to demonstrate, or

23   not, whether the documents are privileged, some

24   additional context might need to be provided.

Page 70

1              So, you know, typically what I would do

2    is I'd say, "Fine.  Plaintiff, submit the 25 docs to

3    me, in camera," and to the extent you need to in order

4    to articulate more fully beyond what's actually

5    included in the document, by it is work product

6    protected or subject to the attorney-client privilege,

7    you can provide a relevant declaration.  And then I

8    review them and I issue an order.

9              And so my thought as to the latter

10   grouping is that's how I deal with it.  But if you

11   disagree with that, you know, you can tell me when

12   we're talking; okay?

13             All right.  So with that as prelude,

14   who's going to be taking this for Defendant's side?

15             MS. FRY:  Good morning, Your Honor.

16   Ashley Fry of Latham & Watkins on behalf of Defendant

17   Netflix.  Can Your Honor hear me okay?

18             THE COURT:  Yeah.  I can hear you and

19   see you just fine, Ms. Fry.

20             MS. FRY:  Thank you.  I will be

21   addressing Defendant Netflix's motion to compel new

22   deposition testimony based on improper instructions at

23   deposition.

24             My colleague, Alessandra Schaszberger,

Page 71

1    will address Robocast withholding of business

2    documents and our request for in-camera review.  So,

3    Your Honor, Ms. Schaszberger will address Your Honor's

4    proposal regarding in-camera review of documents.

5                    THE COURT:  Okay.  But, like, in your

6    letter, you know, there was two roman -- roman one and

7    roman two.  Roman two was about the privilege log

8    issue.  Roman one, it was like three subcategories.

9    There was the first, the second, and the third.  You

10   know, the first was kind of about damages.  The second

11   was about a callback document.  And the third was

12   about, you know, business meetings, et cetera.

13                    Are you covering first, second, and

14   third?

15                    MS. FRY:  Correct, Your Honor.  All

16   three buckets.

17                    THE COURT:  Got it.  Okay.  Super.  All

18   right.  So for first, the first one, which from your

19   letter is, you know, testimony regarding the facts

20   underlying Robocast's alleged reasonable royalty

21   damages.

22                    The first question I have is, okay,

23   more specifically, what are we talking about?  You

24   know, like, what category of testimony is being

Page 72

1   sought?

2                       And this is what it looked like.  Tell

3   me if this is right.  Three sub-buckets there.  What

4   damages does the plaintiff contend the defendant owes

5   in the case?  And maybe, like, what factors go into

6   that damage calculation?

7                       It seems like the second bucket was why

8   didn't Plaintiff seek a license from Defendant before

9   filing the lawsuit.

10                      The third bucket was what was the

11  valuation of the plaintiff that was provided to the

12  company.

13                      Are those kind of the sub-buckets you

14  think are at issue there, or what do you think's at

15  issue with regard to first?

16                      MS. FRY:  I think Your Honor summarized

17  it correctly.  With regards to the first issue on

18  damages, Netflix is particularly looking to seek

19  deposition testimony regarding the amount of damages

20  that Robocast is seeking against Netflix.  And

21  including the amount of revenue it expects to earn

22  from its lawsuit against Netflix.

23                      So in this case --

24                      THE COURT:  And I'm sorry to jump in,

Page 73

1    but --

2                    MS. FRY:  Yes.

3                    THE COURT:  So, like, it's literally,

4    like, testimony about the amount of damages Plaintiff

5    is seeking; is that right?

6                    MS. FRY:  Correct, Your Honor.

7                    THE COURT:  Have they told you in

8    responses to your contention interrogatories what

9    they're -- how much they're seeking in damages and,

10   like, what the calculations are going into that?

11                   MS. FRY:  No, Your Honor.  At the

12   outset of the case, the parties served their Rule 26

13   disclosures and Netflix requested that Robocast

14   supplement its disclosures on damages to provide the

15   computation required under Rule 26.  Throughout

16   discovery, Robocast refused to do so.

17                   On the last day of fact discovery,

18   May 13th, Robocast supplemented its interrogatory

19   response regarding damages, but did not still provide

20   a computation.  It didn't even provide an approximate

21   reasonable royalty range that it was seeking from

22   Netflix.

23                   And so therefore, throughout fact

24   discovery, Netflix did not know the value of the case

Page 74

1    from Robocast.

2              THE COURT:  So, like, for example, you

3    asked, but they haven't told you, you know, reasonable

4    royalty is blank percentage.  Or, you know -- and if

5    you use that percentage, in our view, up until X date,

6    you know, the damages number you owe is blank.  You've

7    asked that and they haven't given it to you?

8              MS. FRY:  Correct.  That was sought in

9    our interrogatory request.  It was sought in -- that

10   we asked in correspondence regarding the Rule 26

11   disclosures.  They did not provide that information

12   regarding either the percentage or the royalty base

13   that they would use for calculating damages at all in

14   fact discovery.

15             THE COURT:  And the reason I ask is

16   because, you know, I think when it comes to a

17   deposition relating to, like, how much are you saying

18   we owe in damages.  And, like, what's the calculation

19   you're using.  You know, Judge Robinson used to talk

20   about these as contention deposition topics.  And I

21   think the idea was, look, if you're asking, like, an

22   in-house person, like Mr. Smith or somebody, about

23   essentially what's our position going to be, well, of

24   course the in-house person's going to talk to lawyers

Page 75

1    to try to figure out what's the right answer.  But

2    it's only going to be at the point where the company's

3    kind of decided, look, we're going to actually send in

4    response to a contention interrogatory, here's our

5    official position.

6                   They make the call, like, look, this

7    assertion is not something we're going to say is

8    privileged.

9                   And then I think the argument is, like,

10   well, you wouldn't have a depo about that because,

11   really, the witness would just basically be going over

12   what should be in writing in the contention response.

13                  And beyond that, to the extent it was,

14   like, well, how'd you get there; you know?  We only

15   talked about that with my lawyers.

16                  So I think the idea, at least in Judge

17   Robinson's mind, I think she was articulating what she

18   thinks is the view of our district, is let's get a

19   good interrogatory about this and let's get a good

20   answer.  If you don't like the answer, let's get them

21   to supplement the answer.  But let's not be asking,

22   like, you know, in-house counsel, you know, what

23   number are you saying?  And, like, how do you get

24   there?  You know, kind of thing.

1          Am I hearing from kind of your

2    suggestion that, look, if we got a good interrogatory

3    answer on this, we could obviate the need for

4    deposition testimony?

5          MS. FRY:  Your Honor, I think you hit

6    the nail on the head.  So we were hoping we would get

7    an interrogatory response before depositions in this

8    case that set for the amount of damages that Robocast

9    was seeking.  We did not get that until after all

10   depositions were closed.

11         We sought to get information from

12   Netflix's -- I'm sorry, Your Honor -- from Robocast's

13   executives.  Mr. Brett Smith in particular who was

14   Robocast's Rule 30(b)(6) witness on finances.  We

15   asked him questions about the amount of revenue

16   Robocast expected to earn from its lawsuit, or the

17   amount of damages sought.  We were blocked on the

18   ground of privilege and were told we needed -- that

19   that was conveyed through counsel, and we were not

20   entitled to learn that information.

21         At that time, Your Honor, we did not

22   have an interrogatory response or fulsome Rule 26

23   damages disclosures.  And so we could not assess or

24   tease out the basis for any particular reasonable

Page 77

1    royalty number at depositions.

2              So that was the situation we found

3    ourselves in --

4              THE COURT:  And I'm sorry to interrupt,

5    but did you say you've since gotten a response though?

6    Like, have they -- I think you were just telling me

7    before, they haven't told you what's the royalty rate,

8    how much in damages.  Does that equal from between --

9    whatever it is.  Like, six years prior to where we are

10   now.  You haven't gotten what you think you're

11   entitled to?

12             MS. FRY:  Correct, Your Honor.  So even

13   after the depositions were ended, on the final day of

14   fact discovery, even through their supplemental rog

15   response, we still did not get the amount of damages

16   sought either through percentage -- a reasonable

17   royalty percentage or range -- or an understanding of

18   how that calculation for damages would be performed.

19   Including, for example, the royalty base that would be

20   used to calculate damages.

21             We now have --

22             THE COURT:  I'm sorry, Ms. Fry.  Just

23   list out for me, look, what we need, at minimum, is an

24   answer to A.  And it sounds like A is what is the

Page 78

1    appropriate royalty base?

2              MS. FRY:  Correct, Your Honor.  So I

3    will mention though because we are now in July, we are

4    in expert discovery and we received Robocast's opening

5    expert report on damages.  So we know what their

6    expert has set forth as his opinion on the amount of

7    reasonable royalty.

8              So I wanted to make Your Honor aware

9    that we have that information through their expert,

10   but it was not something that we were able to obtain

11   from the witnesses during the discovery on the ground

12   of privilege.

13             THE COURT:  Okay.  But if I'm asking

14   about -- see, what I'm suggesting is that, in an ideal

15   world, we wouldn't get this from a witness.  We'd get

16   it from a good rog response.  And if Defendant is

17   saying, "Look, I'm in the dark about what the answers

18   to these key damage questions are because we never got

19   them," I think part of what you're saying now is

20   subsequently, we do have an expert report.

21             I mean, if the expert report does

22   provide royalty rate, base, et cetera, what utility

23   would there be for me to have them go back and say,

24   "Resubmit a supplemental contention interrogatory

Page 79

1    response"?

2                    MS. FRY:  Well, Your Honor, the

3    expert -- Robocast's expert relied on interviews with

4    Robocast executives Mr. Smith and Mr. Torres, on

5    topics that we were -- we had sought to ask them

6    questions on in their depositions.  Those formed the

7    basis for their expert's opinion in this case.

8                    And so one example would be how

9    Robocast would structure the royalty at a hypothetical

10   negotiation with Netflix.  And their expert relied on

11   Mr. Smith and Mr. Torres' preferences for a running

12   royalty as opposed to a lumpsum royalty.

13                   We could not ask questions regarding --

14   or get that information either through a rog --

15   interrogatory -- or through our questioning at

16   depositions.

17                   So that's one example of where we are

18   seeking the facts underlying damages that their expert

19   obtained from Robocast, but that Netflix was blocked

20   from obtaining.

21                   THE COURT:  Okay.  So that seems

22   slightly different, but related.  Which is you're

23   saying an expert report's been submitted, relies for

24   damages related principles on information provided by

Page 80

1    certain witnesses, including Mr. Smith.  And you

2    didn't have the ability to test at deposition the

3    substance of Mr. Smith's discussions with the expert,

4    that the expert is now relying on?

5                    MS. FRY:  So, yes.  We were not able to

6    obtain from Mr. Smith factual information that then

7    Robocast's expert ultimately cited in his report and

8    relied on.

9                    THE COURT:  Okay.  And I thought the

10   issue was about Mr. Smith's deposition here.  There's

11   nobody else's testimony you're seeking with regard to

12   this first issue; is there?

13                   MS. FRY:  So I would say, Your Honor,

14   to the extent -- the issue about the amount of damages

15   largely came up through questions of Mr. Smith,

16   including the amount of anticipated revenue that

17   Robocast would earn from Netflix.  That issue also

18   came up in Mr. Torres' deposition as well -- the

19   amount of damages sought.  So it wasn't just

20   Mr. Smith.

21                   THE COURT:  Smith and Torres.  Okay.

22                   MS. FRY:  Correct.

23                   THE COURT:  All right.  Then for the

24   clawback document issue, am I right here that the

Page 81

1    issue seems to be about why Plaintiff didn't send the

2    defendant a notice letter?

3              MS. FRY:  No, Your Honor.  So for the

4    clawback document, so this was a document that Netflix

5    showed to Mr. Smith --

6              THE COURT:  Oh, I'm sorry.  I'm sorry.

7    Not the clawback.  I'm jumping ahead to the next

8    bucket here.

9              MS. FRY:  Oh, okay.

10             THE COURT:  Staying in the first

11   bucket, the second sub-issue raised in the first

12   bucket is about the issue of why the plaintiff didn't

13   seek a license from the defendant.  Not the clawback

14   issue.  That'll be later.  And this is referenced on

15   page one of your letter.

16             On that issue, you know, Mr. Smith's

17   asked, "How come you guys didn't send Netflix a notice

18   letter?"  And he says, "Look, the only info I have on

19   that comes from my conversations with counsel."  And I

20   guess the question is do I have any basis to say that

21   that assertion's false?

22             MS. FRY:  Well, Your Honor, Netflix was

23   seeking the facts underlying Robocast's business

24   decision not to send a letter to Netflix.

Page 82

1              Attorney-client privilege protects the

2    communications themselves, which Netflix was not

3    seeking from Mr. Smith, but rather the facts

4    conveyed -- the facts underlying a privileged

5    communication are not themselves privileged.

6              And to the extent Mr. Smith or Robocast

7    made a decision not to send a letter to Netflix, and

8    that was a business decision and not a communication

9    from counsel, that is subject to a deposition

10   question.

11             THE COURT:  Right.  But, I mean, it

12   seems like Mr. Smith was suggesting -- tell if I'm

13   wrong.  The question is, "Why didn't you, Robocast,

14   send Netflix a licensing offer?"  It sounds like he

15   was saying, "Well, look, if I was going to tell you

16   the answer to that, what would the answer be?  It is I

17   had a conversation with my counsel.  Should we send

18   them a licensing letter?  And counsel said" -- I'm

19   just making this up -- "don't do it.  It's my legal

20   advice that if you do that, then we could have some

21   issues with venue or, you know, with regard to other

22   legal issues in the case.  It's not ultimately

23   beneficial.  Instead, we should simply sue."

24             I think he's suggesting that the only

Page 83

```
 1    answer to the why came through discussions with
 2    counsel.  And to say why would disclose the substance
 3    of the conversations with counsel.
 4              Do you understand that differently?
 5    And if not, how could requiring the provision of facts
 6    not disclose the substance of attorney-client
 7    privileged communications?
 8              MS. FRY:  So I think, Your Honor, I
 9    understand your point.  I think -- at least from
10    providing the context, Netflix was asking Mr. Smith
11    regarding prior demand letters that Robocast had sent
12    to multiple other companies before it either sought a
13    license from them or decided not to sue them.  And so
14    this was in the context of discussing those other
15    demand letters, and to understand Robocast's decision
16    just to provide notice to certain companies, while not
17    others.
18              I think one --
19              THE COURT:  I'm sorry.  Just to make
20    sure I'm following, Ms. Fry.  I'm talking about, to
21    me, it seems like it came down to the questions on
22    page 257 to 258 of Mr. Smith's depo.  Like, you know,
23    question, "Did Robocast ever send Netflix a letter
24    asking Netflix to take a license to Robocast patents?"
```

Page 84

1    Answer, "No."  "Why not"; right?

2                    And then that's the part of the depo

3    that's cited I think in the letter -- in your letter

4    as to this issue -- this sub-issue.  And Mr. Smith

5    says he can't answer because to answer would disclose

6    ethe contents of privileged communications.

7                    Isn't that the question that we're

8    really talking about here?  How come you didn't send

9    Netflix a notice letter?

10                    MS. FRY:  It is, Your Honor.  And you

11    pointed to the correct page.  I think our concern, and

12    as Ms. Elliott stated in her following question on

13    that same page, 257, of Mr. Smith's transcript.  The

14    issue for us is is Robocast then going to at trial

15    tell the jury why it didn't send a demand letter to

16    Netflix?

17                    And so --

18                    THE COURT:  No.  They can't do that

19    because they can't use privilege as a sword and

20    shield.  They know.  They got to give it up.  You

21    know, they'd have to give up the ability to do that.

22    But if they did, if they understood that, that they

23    had to give up the ability to try to use, you know,

24    like, oh, here's why we did or didn't do X or Y with

Page 85

1    regard to a notice letter, you would be okay with

2    foregoing any further questioning on this subject?

3                MS. FRY:   If Robocast can confirm it

4    will not tell the jury any bases or reason why it did

5    not send a demand letter to Netflix, we would not

6    pursue further testimony on that point based on that

7    representation, Your Honor.

8                THE COURT:   Okay.   And then thirdly,

9    this issue about valuation of Robocast.   Here it seems

10   like, you know, at issue was, like, pages 124 to 134

11   of Mr. Smith's deposition.   You know, which started

12   off with the question, "Are you aware of any

13   valuations performed by Robocast?"

14                And when I read through the whole ten

15   pages, it seemed like Smith was saying, "Look, I'm

16   aware of one valuation.   And that valuation that I'm

17   thinking of happened somewhere between 2014 and 2016.

18   And the valuation came through conversations with

19   outside counsel."   And then the other side says, look,

20   and we followed up on pages 324 to 327, and

21   established that in fact that's what happened.

22   Outside counsel provided information about valuation.

23   That's what Smith was thinking of.   That's the only

24   thing he recalled, so that's clearly privileged.

Page 86

1          How come that isn't what we've got here

2     with regard to this issue?

3          MS. FRY:  So again, Your Honor,

4     Netflix's questions were seeking the facts relating to

5     the valuation.  For example, the existence of the

6     valuation itself and the amount of the valuation of a

7     share in Robocast.  Mr. Smith refused to provide the

8     basic fact of the value of a share in the company.

9          And this is a topic that Netflix has

10    tried to understand the bases for privilege over,

11    including follow-up discussions where Netflix asked

12    whether Robocast would be willing to log -- supplement

13    its privilege log to identify the valuation and any

14    materials provided to that outside consulting company

15    regarding the valuation.

16          Robocast agreed to look into it and to

17    look to see whether those materials were logged, or to

18    then supplement and include them on the privilege log.

19    To date, they have not done so.

20          And so this is another example -- and

21    again, Your Honor, we have their opening expert report

22    on damages where he cites Brett Smith's testimony

23    regarding the valuation.  And he cites interviews with

24    Brett Smith with further -- having learned further

Page 87

1    information about the valuation from Brett Smith

2    directly, that then Netflix was not able to ask about.

3              And so this is another sword and the

4    shield situation where Robocast's expert can rely on

5    Brett Smith for information regarding the valuation,

6    but Netflix cannot explore that information in fact

7    discovery, either through a supplemental privilege log

8    or through asking Mr. Smith basic factual questions

9    underlying those valuations.

10             THE COURT:  I guess just -- because I

11   think as was the case with the first issue, I think in

12   part again you're talking about some things that are

13   now in the record with regard to expert reports that I

14   wouldn't know about until, you know, I hear the words

15   coming out of your mouth.

16             So you have to help me focus on what I

17   could've reasonably prepared for here.  Again, and I

18   forget, but I think it's in -- it'll help me if I can

19   find -- yeah.  Okay.  Smith's deposition.  The part

20   that was provided by Plaintiff, which is their

21   Exhibit 3.  And on pages 324 to 327, this is all I

22   have before me, so this is all I can prepare on is

23   what are we talking about.

24             Plaintiff's counsel says something

Page 88

1    like, "Hey, look.  You remember when you got asked

2    some questions about whether you knew anything about a

3    valuation of Plaintiff's shares?"  He says, "Yes."

4    And he says, "Look, I was thinking -- it's in the 2014

5    to 2016 range that I learned that information."  And

6    he said he couldn't be more specific than those for

7    dates.  And then it seems like the question's, like,

8    "Where'd you get that information?"  Like, about what

9    the purported value of Robocast or a share of Robocast

10   was.  And he says, "From Foley & Lardner."  And he

11   names a particular lawyer who told him the

12   information.  And he says it was an opinion of

13   counsel.  And he essentially says, you know, that's

14   it.  "Foley & Lardner, my lawyer, conveyed to me a

15   valuation.  That's the only information I have.

16   That's an attorney-client privileged communication."

17                   That's all I know based on the record.

18   Are you saying that -- and if that's all I know, that

19   sounds like a communication between lawyer and client,

20   in confidence -- arguably, but for the provision of

21   providing legal advice.  The company as it relates to,

22   you know, maybe assertions of patent value.

23                   Are you saying that there's some extra

24   or additional record in evidence that indicates that

Page 89

```
 1   whatever that valuation is they're talking about,
 2   there's information that Mr. Smith shared with
 3   somebody else?  An expert -- that showed up in an
 4   expert report that you have now?  Or what can you help
 5   me with there?
 6              MS. FRY:  So two points, Your Honor.
 7   I'll direct you back to Exhibit B, to Netflix's
 8   opening letter on page 126 of Mr. Smith's transcript,
 9   where Ms. Elliott asked Mr. Smith -- and this is lines
10   20 through 21 on page 126 -- "You can't answer what
11   the value of a share in the company was?"
12              And so this is not a communication
13   conveying legal advice.  This is a fact.  The amount
14   of a share in the company is purely factual.  And we
15   have asked and have not received authority from
16   Robocast that would protect as attorney-client
17   privilege the value of a share in their company.
18              To my second point, Your Honor, I
19   appreciate that the expert reports are not in front of
20   Your Honor.  And this is additional context given
21   where we are in the case right now.  But our concern
22   is that their -- Robocast's expert has had access to
23   information regarding this valuation, outside of this
24   transcript and what Mr. Smith was -- thought he was
```

Page 90

1    able to provide without disclosing attorney-client

2    privilege.

3                      And so we just want to make sure that

4    Netflix is on the same footing as Robocast when it

5    comes to information regarding this valuation that

6    Robocast conveyed to its expert witness.

7                      THE COURT:  Okay.  So let me see if I

8    can summarize what I think you've said.

9                      In the deposition, yes, it looks like

10   Smith is saying, "The only information I can recall

11   about the valuation of Robocast came from a

12   conversation I had with my lawyer."

13                     And even to the extent that I was later

14   asked, you know, "What's the value of Robocast?"  You

15   know, can you tell me something about the value of

16   Robocast?  The only thing Smith said was, "The only

17   information I had about that is in a conversation I

18   had with a Foley & Lardner lawyer."

19                     And what you're saying is a subsequent

20   expert report, which I don't have in front of me,

21   indicates that an expert is making assertions about

22   the value of Robocast -- or shares?  I don't know --

23   and cited as support for that statement about

24   valuation are conversations with Mr. Smith; is that

Page 91

1    correct?

2                    MS. FRY:  Robocast's expert refers to

3    the valuation that Mr. Smith testified about in his

4    deposition, through interviews with Mr. Smith.

5                    One point, Your Honor, about the value

6    of a share.  So --

7                    THE COURT:  Oh, I'm sorry.  I just

8    don't understand your answer to my question.

9                    MS. FRY:  Sure.

10                   THE COURT:  So, again, let me just try

11   to go back.  Based on what I know versus what you're

12   saying.  It looks to me from reading the materials

13   that I have before me, particularly pages 124 to 134

14   of Mr. Smith's deposition, which I understand to be

15   really at issue here, is that Smith says that he was

16   trying to convey during that deposition -- and in the

17   additional couple pages of redirect from that depo --

18   that the only information he had in his mind about the

19   value of Robocast, or valuation of a share or stock in

20   Robocast, came from a conversation with a lawyer.

21                   And I'm saying, based on what I've read

22   in there, if that were correct, it seems like possibly

23   a privileged conversation.

24                   But you're seeking more testimony from

Page 92

1    a 30(b)(6) witness, Mr. Smith or otherwise, about

2    Robocast's view of the value of a share, or the value

3    of Robocast, whatever it is, and I'm wondering, you

4    know, what's the basis for that?  You know, because

5    all I have before me from the record is Smith saying,

6    "The info I have about that's a conversation with a

7    lawyer."

8                Is there other information that you

9    have that's been provided to you through an expert

10   report that indicates that there were -- that now it's

11   been shared with you that the value of a share of

12   Robocast or the value of Robocast is drawn from

13   conversations with Mr. Smith or otherwise that you're

14   saying you didn't get to depose more on?

15               MS. FRY:  So, Your Honor, I'm hoping

16   I'm answering your question directly, but in terms of

17   their expert report, and what he's relying on, and

18   information he has, we understood his report to get

19   information regarding the value of the share from

20   businesspeople at the company.  Not from outside

21   counsel or outside consultants, providing them

22   information to Robocast.

23               I think one point I would like to make,

24   Your Honor, just because information was provided to

1    Mr. Smith from counsel does not make it automatically

2    privileged.  Just because he heard it from a lawyer

3    does not make that fact -- factual information

4    privileged.

5              Though the case law is clear that the

6    communication itself is protected, and that again is

7    not what Netflix sought from Mr. Smith in his

8    deposition.  It was just what the value of the share

9    was, even if that information was provided in a

10   communication from counsel.

11             THE COURT:  If Smith says to his

12   lawyer, "Can you give me your view about what the

13   value of a share in Robocast is?"  You know,

14   presumably vis-a-vis your thoughts about the value of

15   our IP.  And the lawyer says, "$100."  That's the only

16   conversation Smith has with anybody about the value of

17   a share of Robocast, then it's okay for you to get

18   from Smith that his view is the value of a share is

19   $100.  It's not privileged because that's a fact?

20             MS. FRY:  Correct, Your Honor.  And

21   I'll actually cite In Re: Teleglobe Communications

22   from the Third Circuit in 2007.  That's 493 F.3d 345.

23   And privilege applies to communications for the

24   purpose of obtaining or providing legal advice.  Legal

Page 94

1   advice.

2             The value of a share in Robocast is

3   business information.  This is information that would

4   be important and relative to investors of Robocast, in

5   choosing to invest in the company.  This is not, for

6   example, a patent enforcement strategy.  This is a

7   value of a share in an entity that has, to Mr. Rizzi's

8   point earlier, obtained investments from multiple

9   third parties.  So this is outside of the context of

10  when attorney-client privilege would apply in

11  Netflix's view.

12            THE COURT:  Okay.  And then the last

13  question there is are you saying -- like, when you had

14  their expert report, does the expert provide a value

15  of a Robocast share?  And when he does, or she does,

16  is there, like, a footnote that says, "Based on

17  conversations with, you know, Mr. Smith" or somebody

18  else?

19            MS. FRY:  No, Your Honor.  Robocast's

20  expert does not actually provide the value of the

21  share that Netflix sought through Mr. Smith.

22            However, such information could be

23  pertinent to Netflix's damages expert who would like

24  to take into account other information obtained in

Page 95

1   fact discovery from Robocast's witnesses that could

2   bear on his opinion on damages, in rebuttal to

3   Robocast's damages expert.

4              THE COURT:  Okay.  Let me pause there

5   because it'll help this to break these things up,

6   because there's so many of them.

7              Let me try to get Plaintiff to you on

8   this and then -- so I can try to resolve and get

9   through it.

10             Who's going to be speaking on behalf of

11  Plaintiff as to this dispute?

12             MS. TALMAGE:  Good morning, Your Honor.

13  Mariel Talmage from McKool Smith representing

14  Plaintiff Robocast on this issue.

15             THE COURT:  Okay, Ms. Talmage.  Good

16  morning.  Let's just take these one, two, three, like

17  I did with Ms. Fry.

18             So with regard to the issue of what

19  damages does Defendant owe, it's I think asserted that

20  you all didn't provide a clear answer on that up until

21  expert reports.

22             Then expert reports are provided in the

23  case and in order to -- for the expert to provide a

24  view on damages, the expert is said to have had

Page 96

1    conversations with folks, including Mr. Smith, that
2    gave rise to the expert's view about damages.
3                    Hold on one second.
4                    Mr. Fry, do I have that right?
5                    MS. FRY:  Yes, Your Honor.
6                    THE COURT:  Okay.
7                    Ms. Talmage, if that's true, if your
8    expert derived information regarding Plaintiff's
9    current damages assessment from conversations with
10   Mr. Smith, but if Mr. Smith wasn't permitted to talk
11   about his view about damages, he couldn't have been
12   asked question about, like, you know, these factors --
13   whatever he told the expert.  Should they be able to
14   get another shot at Mr. Smith for that?
15                   MS. TALMAGE:  Thanks, Your Honor.  Just
16   to kind of correct what has been represented here,
17   I -- what I heard my colleague from Netflix say is
18   that now they're concerned about the structure of a
19   royalty, which I don't recall seeing in their letters
20   at all.
21                   And as you pointed out, the questions
22   that they didn't point to in their letters asked for
23   privilege, damages, contentions.
24                   Regardless, I don't believe that this

Page 97

1    would justify any additional deposition testimony of

2    Mr. Smith, who's been deposed for seven plus hours in

3    this case.  And Mr. Torres, who's been deposed for 14

4    plus hours in this case.

5              We will be having expert depositions.

6    And to the extent Netflix is concerned about anything

7    that was communicated to our expert from Robocast

8    employees, they're free to explore those

9    communications at that time.

10             But to me, this seems like a complaint

11   about our contention interrogatories and a complaint

12   about our damages disclosures, which we disagree with.

13   But regardless, the proper vehicle isn't really a

14   motion to call a 30(b)(6) witness back to testify on

15   contentions after fact discovery is closed and after,

16   you know, seven hours of testimony already.

17             THE COURT:  And, Ms. Talmage, I

18   understand your point in terms of, look, if you don't

19   think we said enough in our contentions, you know, go

20   to the judge and get better contentions.  You know,

21   don't ask an in-house lawyer, you know, on behalf of

22   the company, like, "What's your calculation going to

23   be?"

24             You know, I think the defendant's

Page 98

1    right.  They're entitled to getting answers to these

2    key questions before expert discovery.  Of course,

3    we're already there.

4                    But now it's asserted that -- I

5    think -- that the reason why they think they should be

6    able to depose the company, i.e. Smith, is because in

7    your expert reports, in the section about damages,

8    there's, like, footnotes that say stuff like, you

9    know, "In support for this assertion about royalty" or

10   something else, "I rely on conversations I had with

11   Mr. Smith."

12                   Does your expert report say that, or

13   does it not, or to what extent?

14                   MS. TALMAGE:  Not to the extent that

15   there's information unique to Mr. Smith that was

16   blocked by Robocast's counsel's proper privilege

17   instructions.

18                   Of course, there's places where

19   interviews have been supplemental to information that

20   was already provided, but I'm not aware of our expert

21   relying solely on communications with Mr. Smith about,

22   you know, main damages contentions.

23                   I will point out that in our

24   interrogatory response, we explained that, you know,

Page 99

1    the ultimate calculation of damages is up to our --

2    you know, we'll be relying on our expert for that.  We

3    explained how our expert planned to do the analysis.

4    We've identified three potentially relevant licenses,

5    and identified that we intended to rely on the license

6    with Vevo as representative.  And -- or not

7    representative.  My apologies.  Comparable for

8    purposes of calculating a royalty.  And all of the

9    information you need to know is in that license.

10   There's nothing to add from Mr. Smith in further

11   deposition testimony.

12                   THE COURT:  Okay.  With regard to the

13   second issue about the demand letter, or lack of a

14   demand letter.  The other side says, "Look, as long as

15   the plaintiff isn't going to, like, bring up at trial

16   anything about, you know, why they didn't send a

17   demand letter or anything on that topic, you can let

18   this go."

19                   Are you going to do that or can we let

20   this go?

21                   MS. TALMAGE:  Your Honor, I think I can

22   commit to let this go.  And if Mr. Rizzi wants to jump

23   in -- it looks like he's unmuted -- to help me out on

24   this one.  But --

Page 100

1           And I would just say that, you know, if

2     that was really a concern, we can deal with it with a

3     motion in limine.  As we're heading towards trial, it

4     doesn't justify additional deposition testimony.

5               MR. RIZZI:  Yes, Your Honor.

6     Obviously, as long as Netflix doesn't open the door,

7     that's not any fact that we're going to rely on in

8     terms of any advice of counsel behind the reasoning

9     for not sending them a licensing letter.

10              And just briefly in the past, I think

11    Mr. Talmage also meant to point out that if you look

12    at their letter on the privilege instructions to

13    Mr. Smith, those are clearly privileged questions.

14    What they're complaining about now is really the fact

15    that maybe they didn't ask Mr. Smith everything they

16    wanted to ask in hindsight.  I mean, they had the

17    opportunity to ask all the factual questions.  He was

18    not blocked on any factual questions concerning

19    damages-related issues.  The only ones they point to

20    were clearly privileged.  So I just wanted to make

21    sure that was clear.

22              THE COURT:  Okay.

23              MS. TALMAGE:  Thank you.

24              THE COURT:  Ms. Talmage, on issue three

Page 101

1   with regard to, you know, a valuation of a share of

2   the plaintiff, what more do you want to say in

3   response to what you heard from Ms. Fry on that issue?

4               MS. TALMAGE:  Sure.  First of all, the

5   implication that Mr. Smith refused to answer factual

6   questions of that effect, price per share is not

7   really correct.

8               You can see in Netflix's Exhibit B,

9   which is Brett Smith's deposition transcript, on page

10  128, line 4, to page 129, line 14, that Mr. Smith

11  actually offered to tell Netflix counsel a price per

12  share that has been told to investors.  But counsel

13  refused that offer, and instead insisted on pressing

14  for disclosure of the price per share in this

15  privileged valuation that was offered -- that was

16  provided to Robocast as part of a fairness opinion by

17  its outside counsel, as Brett Smith testified.

18              THE COURT:  Well, hold on a second.

19  You said Smith was, like, ready to talk about, you

20  know, "Oh, well, what did -- have you shared anything

21  with a third-party investor about a value per share?"

22  And he was ready to do it, but just never got asked.

23              I mean, it looks like when asked the

24  question, when an investor asked Robocast what the

Page 102

1    value of a share is, the response is that it's

2    privileged.  His response was, "I can't recall a

3    specific instance where an investor asked about a

4    third-party valuation of a price of a share."  I read

5    that as Smith saying, "I've never had a conversation,

6    nor on behalf of our company am I familiar with one,

7    in which one way or the other there was a

8    communication with a third party about what the value

9    of a share of Robocast is."

10              It sounds like you're saying, no, he

11   would've been happy to talk about that subject.

12              MS. TALMAGE:  Yes, Your Honor.  I think

13   what Mr. Smith was saying was that he had not been

14   asked by an investor about the results of a

15   third-party valuation.  The record is clear that

16   Robocast performed its own in-house valuations, which

17   Brett Smith had testified to.  And price per shares

18   based on those in-house valuations, based on what

19   investors have paid for them, are included in all of

20   the cap tables that we've produced.

21              Robocast accountant, Kenneth Hicks,

22   testified as to how those were calculated, which were

23   based on, you know, Robocast's own sense of value of

24   its company, based on what investors were willing to

Page 103

1    give them.  So any publicly shared valuation is all

2    over the discovery.  The only thing not --

3                    THE COURT:  This was a 30(b)(6)

4    deposition; right?  So this is the one that was on

5    behalf of the company.

6                    MS. TALMAGE:  Yes.

7                    THE COURT:  And are you -- I guess what

8    I'm asking is, yes, it's clear that during some of

9    this discussion, Smith is saying, "Look, I'm familiar

10   with a valuation of our shares that I received from

11   counsel."  And then later, your counsel kind of

12   confirmed some of the facts about that.  Foley &

13   Lardner provided some kind of valuation to them.

14                   And then the questions are kind of

15   like, "Yeah, but I'm also wanting to know, like, is it

16   really true that you never talked to investors about

17   what your view of the value of a share was?  Well,

18   what'd you say to investors about that"; you know?

19   And Smith seems to say he doesn't have any such

20   information.

21                   Are you saying, "Oh, yeah.  There's

22   lots of information about what Robocast communicated

23   to investors about what a value of their share would

24   be in the relevant time period.  And Mr. Smith

Page 104

1    could've talked about that if people had asked him the

2    right questions"?

3                    MS. TALMAGE:  Yes, I believe so.  I

4    think that's about right.  I'm saying that there's

5    documents showing the price per share of -- based on

6    certain investments throughout the cap tables that

7    we've provided.  And I've also pointed to testimony

8    from Mr. Smith where he offered to say, "I can tell

9    you what we've told investors about prices per share,

10   presumably when they are" --

11                   THE COURT:  Where is that testimony?

12                   MS. TALMAGE:  So that's in Exhibit B

13   at -- Netflix's Exhibit B at page 128 to 129.

14                   THE COURT:  But where particularly?

15   Show me the words.

16                   MS. TALMAGE:  Sure.  Let me -- I'm so

17   sorry.  I'm sorry, Your Honor.  I'm just navigating to

18   the exhibit.

19                   So for example, the exchange on page

20   128, starting at line 17, counsel for Netflix asked,

21   "When an investor asks you for the value of a share,

22   do you tell them the response is privileged?"

23                   And Mr. Smith testified that Robocast

24   can communicate the price of a share to an investor.

Page 105

1  That since you're asking a hypothetical question, I

2  will give you a hypothetical answer.  Robocast can

3  communicate a share price to an investor without

4  revealing attorney-client privileged communications.

5            And counsel for Netflix says, "I'm

6  asking you to do the same thing in this deposition,"

7  but then proceeds to ask about only the valuation of a

8  share from the attorney-client privileged valuation.

9            THE COURT:  Okay.  So are you saying

10  that if counsel had then said, "Okay.  So let's walk

11  through the different times in which Robocast has

12  communicated to third parties the value of a Robocast

13  share, tell me the first one you recall," then

14  Mr. Smith would've been happy to walk through all that

15  Robocast had said over the relevant time period to

16  third parties about what the value of a Robocast share

17  was?  But he just wasn't asked the question?

18            MS. TALMAGE:  Well, yes.  I believe

19  that, you know, he would be prepared to testify to the

20  documents concerning prices per share, and how those

21  prices were determined, and how those prices were

22  communicated to investors who paid them.

23            THE COURT:  Okay.  And then with regard

24  to this valuation that apparently was done by Foley &

Page 106

1    Lardner, I think the other side says, "Well, just

2    because that valuation came from a lawyer and was

3    communicated in confidence, that's not enough to

4    demonstrate that that subject matter is privileged

5    because it doesn't relate to legal advice."  It's

6    simply a fact, that's nonlegal advice.

7                    What's your response to that?

8                    MS. TALMAGE:  My response would be

9    that, respectfully, I disagree with counsel for

10   Netflix's understanding of attorney-client privileged

11   communications.

12                   As we've included in our opposition,

13   the facts are clear that this valuation was

14   communicated from outside counsel solely for the

15   purposes of advising on a stock transaction, and

16   providing a fairness opinion on that transaction.  It

17   was not shared outside of Robocast.  It's part and

18   parcel of the legal advice they're received.  And I

19   don't see any basis for requiring its disclosure.

20                   THE COURT:  Okay.  Ms. Talmage,

21   anything further about this bucket of issues?

22                   MS. TALMAGE:  Sure.  Yes.  I would just

23   like to correct the record about what has been

24   included in expert reports about this valuation.  I

Page 107

1   could pull up the paragraph, the single paragraph that

2   discusses it if you would like, or read the content to

3   you, or provide it to the court separately.  But --

4                   THE COURT:  I mean, the truth is,

5   Ms. Talmage, I think it's probably not worth it.  All

6   this stuff's extra record to me.  You know, I can't

7   make some conclusion that would grant or deny relief

8   based on the content of some report I haven't seen.

9   So --

10                  MS. TALMAGE:  Sure.

11                  THE COURT:  I mean, if there's

12  something you want to put briefly on the record, you

13  can, but --

14                  MS. TALMAGE:  Sure, Your Honor.  Yes.

15  I would just note that the only mention of this

16  valuation in our damages expert's report summarizes

17  Mr. Smith's testimony on the matter.  There are

18  footnotes that there was additional conversations with

19  Mr. Smith, but nothing indicates that any additional

20  information outside of what was communicated in his

21  deposition was communicated to our expert.  And it

22  certainly wasn't included or relied on in his report.

23  And Netflix can depose our damages expert about those

24  communications if they would like.

```
 1                THE COURT:  Okay.  Thank you.
 2                All right.  Ms. Fry, is there anything
 3    further on this first bucket before I resolve the
 4    issue?
 5                MS. FRY:  Yes.  A couple of points,
 6    Your Honor.  So the valuation performed, Mr. Smith
 7    confirmed on redirect that it was by a consulting
 8    firm, Dahl Consulting.  And I don't believe
 9    Ms. Talmage was able to point to any statement in
10    Mr. Smith's transcript that gave Netflix's counsel an
11    invitation to ask questions about the value of a share
12    that was communicated to investors.
13                It was pretty clear that such questions
14    would just be hypotheticals, and that he would not
15    provide information regarding the value of a share
16    because that was purely within the realm of
17    attorney-client privilege.
18                So we were not able to ask follow-up
19    questions regarding that value of a share from a
20    2014-2015 Dahl Consulting valuation.  I just wanted to
21    clarify the record.  It wasn't Foley, it was Dahl
22    Consulting that provided that valuation.
23                THE COURT:  Okay.  So this reference to
24    Dahl Consulting, never seen it in any papers.  Don't
```

Page 109

1    know that I've ever seen it in any deposition

2    transcript.

3                    The redirect I was pointed to by

4    Plaintiff in the letters says that the valuation they

5    were talking about was provided by Foley & Lardner as

6    to a fairness opinion, and was for the purpose of

7    providing legal advice regarding that fairness

8    opinion.  I don't know anything about Dahl Consulting

9    or any -- I don't know what you're -- is there

10   something more you want to tell me about what's in the

11   record about what you're saying?

12                   MS. FRY:  Yes, Your Honor.  So this is

13   Exhibit 3 to Robocast's opposition letter.  And this

14   is Mr. Smith's testimony on redirect, and it's on page

15   330, Your Honor.  Line 16.  And Mr. Smith was asked,

16   "Mr. Smith, who was the third-party expert that you

17   just testified that did the valuation?"  Mr. Smith's

18   answer, "I believe the name was Dahl, D-A-H-L,

19   Consulting."

20                   And he was then asked, "What's the name

21   of individuals with whom Robocast interacted for

22   purposes of providing that valuation?"  His answer,

23   "Mr. Kantaros.  I don't recall if there was any direct

24   communication between Robocast and the expert."

Page 110

1              So the valuation itself was performed

2      by a consulting firm.

3                      THE COURT:  Would I have a basis to

4      conclude that Robocast's lawyers did not engage an

5      agent to provide legal advice, and the agent was this

6      consulting firm?

7                      MS. FRY:  If that's the case, Your

8      Honor, that's fine, but that does not -- that's

9      Robocast's burden to show that privilege would apply

10     to the factual underpinnings for a valuation.  I mean,

11     in particular, the value of a share as I've stated

12     earlier.  And Robocast has never made an agency

13     argument with respect to Dahl Consulting.

14                     THE COURT:  Right.  But didn't you --

15     you had a reply brief where, if you wanted to --

16     unlimited space, could've said, "Hey, look, they said

17     that, you know, this was a legal opinion, fairness

18     opinion provided by counsel.  But look at page 330;

19     you know?  It's provided by an outside entity.  We're

20     taking the view that that's not an agent."  You didn't

21     do that; right?  That wasn't mentioned in your reply

22     letter.

23                     MS. FRY:  I don't believe so, Your

24     Honor.  But we also pointed out that Robocast has the

Page 111

1    burden on privilege and hasn't shown any or pointed to

2    any case that supports prohibiting testimony regarding

3    the value of a share, regardless of whether that value

4    was provided in a communication from counsel.

5                    THE COURT:  And regardless of this Dahl

6    Consulting issue, I think I understand you -- but tell

7    me if I'm wrong -- to say, "Look, in the deposition,

8    the 30(b)(6) depo, we wanted answers and we were

9    asking questions that we thought should provide

10   answers about communications Robocast had with third

11   parties about the value of a Robocast share.  We think

12   we were asking those questions.  And Smith we think

13   said he didn't have such information.

14                   "And if we could, we'd love to take

15   another depo where we start talking to him on behalf

16   of the company about times Robocast communicated with

17   third parties about the value of a Robocast share"; is

18   that correct?  Do you want to take that further

19   testimony?

20                   MS. FRY:  Yes, Your Honor.  We would

21   like to ask Mr. Smith further questions regarding

22   information conveyed to investors as to the value of

23   the share.  Information that Robocast has had in its

24   possession regarding the value of a share in its

Page 112

1    company.

2                    THE COURT:  Got it.  Okay.  All right.

3    Ms. Fry, anything else?  Because I need to move so we

4    make sure we get through all your issues.  Anything

5    further?

6                    MS. FRY:  I believe that covers the

7    first set of questions, Your Honor, in that first

8    bucket.

9                    THE COURT:  Okay.  On this first bucket

10   of issues regarding damages, I'm going to give you my

11   decision.  I'm going to try to do that to the extent I

12   can here on our call, so the transcript of the --

13   today's teleconference -- or videoconference will

14   serve as the substance of the court's order.

15                   With regard to the motion as it relates

16   to the category of issues that we're labeling as

17   first, on page one and two of Defendant's opening

18   brief, these relate roughly to damages.

19                   In my view, there were three

20   sub-issues.  First, the defendant wanted to seek

21   further testimony about the amount of damages that the

22   plaintiff contends it owed, and perhaps the factors

23   going into that number.

24                   On that ground, I'm going to deny the

Page 113

1    request for further testimony for the reasons that

2    follow, I think ultimately, as it happened at the

3    deposition, what was really in dispute were questions

4    about Plaintiff's position on damages, what was the

5    damages number.  I think the right way to get that

6    testimony -- or to get that information is to get it

7    through contention interrogatories.  I think questions

8    like that are questions that Judge Robinson, in the

9    past, has called "contention deposition topics," which

10   are generally disfavored for reasons that I've

11   suggested here.

12              And so I think really, what that

13   dispute was about was whether Robocast had previously

14   provided sufficient information in its contentions

15   about their damages position.  The best way to have

16   gotten that information would have been the

17   appropriate way to have sought more information by

18   supplementation.

19              Today on this call, I think there's

20   been a suggestion that, well, additionally or separate

21   and apart from that, something in an expert report

22   that was provided suggests that testimony from

23   Mr. Smith may or may not have contributed to the

24   expert's calculation of damages.

                                                    Page 114

 1              Whether that's true or not true, it's
 2    simply not part of the record I have.  I can't be
 3    making decisions on issues based on records I haven't
 4    seen.  And I need to make decisions because the
 5    parties need to be moving forward with regard to these
 6    issues.  They have a chance to make the best record
 7    they can.
 8              And so I don't have a basis for some
 9    other reason to grant the request as to the issue of
10    what's Robocast's position on damages.
11              With regard to the second issue, which
12    related to testimony about why Plaintiff didn't seek a
13    license from the defendant before the case was filed,
14    I'm going to deny that as moot in light of the
15    representations that have been made on this call.  The
16    defendant has acknowledged that to the extent
17    Plaintiff is not going to attempt to rely, absent
18    opening the door, on any assertions about why a demand
19    letter was or wasn't set at trial, it will withdrawal
20    its request for further testimony.  And so I think the
21    issue is moot there.
22              With regard to the third issue about
23    valuation.  I think it's -- I'm going to grant it in
24    part and deny it in part.  With regard to questions

Page 115

1    about information that Mr. Smith discussed, about that

2    valuation that was provided between 2014 and 2016,

3    which on redirect, it was established came from

4    lawyers at Foley & Lardner, related to a fairness

5    opinion as to which those lawyers were providing legal

6    advice to the client.  I think that the plaintiff has

7    established the predicates to demonstrate that that

8    information was protected by the attorney-client

9    privilege.

10                 Now on today's call, though it could've

11   been raised in an earlier order, but it wasn't,

12   Defendant has suggested that something about the fact

13   that the information in that opinion was provided to

14   Foley & Lardner by an entity called Dahl Consulting,

15   in some way alters the idea that this could be

16   attorney-client privileged communications.

17                 As I said, I think the plaintiff made,

18   in the briefing, a sufficient record to demonstrate

19   privilege.  I don't have enough information about the

20   substance of that consultant's role to suggest that

21   what seems to be the case, which is the information

22   that's privileged, is not.  Parties do work with

23   agents in order to provide legal advice to clients.

24                 So facially, at least based on what I

Page 116

1   have, there's nothing that would sufficiently alter my

2   view about the record Plaintiff has made on the issue.

3                   And so I'll deny the request for

4   further information about valuation as it relates to

5   that particular report.

6                   That said, the defendant says, "Look,

7   we did want to ask, and we're asking Mr. Smith, about

8   whether and to what other degree Robocast has

9   information about the valuation of a share of the

10  plaintiff that was -- that is or could be provided to

11  investors."

12                  On that front, I agree that the

13  substance of the defendant's questions were getting to

14  that issue, and were seeking that.  And I think Mr.

15  Smith's testimony suggested that he didn't have any

16  information, or couldn't think of any information,

17  about Robocast's share information that was provided

18  to third parties.

19                  And so because I think the defendant

20  was fairly attempting to ask about that information,

21  which would not be privileged -- at least there's no

22  basis to believe it would be -- I think the defendant

23  should get a chance to have a further 30(b)(6)

24  deposition on the topic of Robocast's valuation of its

Page 117

1    shares, to the extent that they were communicated to

2    third parties outside solely the presence of

3    communications with is counsel.

4              And so to the extent Plaintiff wishes

5    to further reopen the 30(b)(6) deposition for that

6    purpose, I'll grant the request.  And the parties can

7    discuss how that will work in the future.

8              All right.  Let's try to move on here.

9    The next issue, which is in the paragraph called

10   "second" from the defendant --

11             MR. RIZZI:  Your Honor, I apologize.

12   Can I just get a clarification?  I would submit that

13   that information is largely going to come from the

14   documents as opposed to Mr. Smith's memory and --

15   we're happy to have him prepare on those documents,

16   but can I just ask that Your Honor put a very short

17   limit on the timeframe for that supplemental

18   deposition?

19             THE COURT:  Well, let's see what

20   happens as we get through the rest of these issues,

21   some of which additionally relate to testimony.

22             So -- okay.  With regard to the issue

23   about the clawback document, Ms. Fry, it looks like

24   you're -- just for the record, you know, it appears

Page 118

1    that the plaintiff is no longer claiming that this

2    information is privileged.  Is that your

3    understanding?

4              MS. FRY:  Yes, Your Honor.  From the

5    reply -- I'm sorry -- the opposition letter from

6    Robocast.

7              THE COURT:  Okay.  And do we have -- I

8    think -- can you remind me, what's the exhibit number

9    for this -- for the document at issue?

10             MS. FRY:  It's Exhibit J to Netflix's

11   opening letter.

12             THE COURT:  Okay.  And I think the

13   issue here is, you know, your assertion that among

14   other things, this document is relevant because it

15   speaks to the issue of damages?  You should get to ask

16   questions about it.  And the other side's assertion

17   is, "The document speaks for itself."  Is that kind of

18   how you see things playing out so far?

19             MS. FRY:  Yes, Your Honor.

20             THE COURT:  Okay.  Anything you want to

21   say about why you think that assertion is no good?

22             MS. FRY:  So, Your Honor, documents do

23   not supplant testimony.  This is a document that the

24   damages experts relied on in the prior litigation.

Page 119

1    And on its face is not privileged, and as Your Honor

2    noted, Robocast has withdrawn its privileged claim

3    over it.

4                    Now the document is highly relevant to,

5    in particular, Robocast licensing strategy and its

6    desire to obtain a precedent setting license to gain

7    immediate revenue.  That issue goes directly to

8    Georgia-Pacific factor.

9                    The number of Georgia-Pacific factors

10   and to Robocast's desire to structure its royalty as a

11   running royalty as opposed to a lumpsum.

12                   Now whether Robocast wanted immediate

13   revenue from licensing bears on whether it would

14   prefer a lumpsum or a running royalty.  That issue is

15   something that the -- is relevant to the expert's

16   decisions on how to structure royalty.  And we were

17   not -- Netflix was not allowed to ask any questions to

18   Mr. Smith regarding the structure of the royalty based

19   on this document.

20                   And no, it's not before Your Honor, but

21   Robocast's expert points to interviews with Mr. Smith

22   regarding the structure of the royalty.  And so this

23   is another situation where Robocast has used privilege

24   as a sword and the shield where Netflix was not

Page 120

1   allowed to ask any questions regarding this document

2   to Mr. Smith.  Nonetheless, its expert's relying on

3   information from Mr. Smith on this very topic.

4                 And so we --

5                 THE COURT:  Okay.

6                 MS. FRY:  Oh, thank you, Your Honor.

7                 THE COURT:  Okay.  I think I've heard

8   enough there.

9                 Ms. Talmage, they wanted to ask

10  questions about this doc.  Seems like it goes to

11  damages.  In the depo, there was an objection on

12  privilege grounds.  Even you all aren't suggesting

13  that that's a valid objection any further.

14                You say that the doc speaks for itself,

15  but you get to ask questions about documents in

16  30(b)(6) depos.  That's what they're for.  What's the

17  company's view about what this means?  Is there any

18  basis not to permit further questioning about this

19  document with regard to a 30(b)(6) witness?

20                MS. TALMAGE:  Yes, Your Honor.  The

21  document -- Netflix itself admits in the second page

22  of its opening letter brief that this document is

23  simply consistent with what Robocast told potential

24  licensees in its demand letters about the first-mover

Page 121

1    advantage, and cites an additional document that

2    corroborates that.

3              And I apologize to bring up this expert

4    report again, but Netflix's expert cites this document

5    and gleans exactly that from it, and does not indicate

6    that any additional information's needed to understand

7    its contents or how it relates to damages in this

8    case.

9              It just seems like insisting on keeping

10   a resolved dispute alive at this point.

11             THE COURT:  Okay.  Fair enough.  I

12   don't need any rebuttal questioning.

13             So on this issue, I'm going to grant

14   the request for further 30(b)(6) testimony.  The

15   document for all the reasons Defendant says seems

16   relevant at a minimum to damages issues in the case.

17   The witness should have been permitted to answer

18   questions about it, instead, an objection for

19   privilege was made that isn't viable.

20             And so it, too, will be among the

21   categories of information that a further 30(b)(6)

22   deposition can address.  Okay.  And reasonable

23   questions relating to it and the answers given.

24             Okay.  The third category here, kind of

Page 122

1    like a -- it's like a hodgepodge of stuff that is said

2    to overall relate to the substance of -- or subject of

3    business meetings and activities related to

4    investments, perspective investments, and fundraising.

5                    Okay.  Ms. Fry, I had to break it down.

6    Here's what I thought was being discussed or still at

7    issue with regard to this third bucket.  It seems like

8    maybe three categories.

9                    Category one is information about a fee

10   arrangement between the plaintiff and Foley.  Category

11   two seems like it'd be about questions about business

12   meetings relating to proposed investments, including

13   the identity of any litigation funders.  And category

14   three seemed to be about questions -- testimony

15   relating to Mr. Rizzi's involvement in reviewing

16   investor materials and maybe related issues.

17                   Do I have it right in terms of what's

18   kind of at issue with regard to your third category?

19                   MS. FRY:  Yes, Your Honor.

20                   THE COURT:  Okay.  Let's just talk

21   about them then.  Again, we'll try to be focused here.

22                   Category one, fee arrangement between

23   the plaintiff and Foley.  I think the defendant is no

24   longer claiming that subject matter is privileged, but

Page 123

1    I think it is asserting that the info's not relevant.

2    Whereas I think you're saying you think it is relevant

3    to "how much Robocast netted from the prior cases

4    after paying counsel when Robocast cites the licenses

5    to show its success."

6                    Is that how this is playing out here?

7    Is this a dispute about relevance about this --

8    questions about this information?

9                    MS. FRY:  I believe so, Your Honor.  I

10   agree Robocast appears to have withdrawn its privilege

11   assertion over the existence of the fee arrangement.

12   They are saying that the amount Foley & Lardner was

13   paid following the prior settlement agreements is

14   irrelevant, but we -- as Netflix put in its letter

15   briefing to you at the court, those issues bear

16   directly on damages.

17                    Robocast prevented Netflix from

18   obtaining testimony as to how much Robocast netted

19   from prior cases after paying its counsel, where

20   Robocast has touted those same agreements to its

21   investors.  And so I think Netflix is entitled to

22   probe those inconsistencies that Robocast has taken

23   with its investors and the facts of the amount of

24   money it actually earned from those prior agreements,

Page 124

1   which it's now in expert discovery seeking to distance

2   itself from.  And that all bears on the calculation of

3   the reasonable royalty in this case.

4                 And so, again, the threshold for

5   relevance is not an incredibly high burden here.  And

6   so this is something that Netflix should be allowed to

7   explore through 30(b)(6) deposition testimony as it

8   does bear on damages, and there are no privilege

9   assertions over it.

10                THE COURT:  I just need to better

11  understand what you're talking about.  So is what

12  you're saying, "Look, Robocast had prior cases in

13  which the patents in suit were asserted," or related

14  patents?

15                MS. FRY:  So, Your Honor, Robocast had

16  two prior cases in which one of the patents in suit

17  that's at issue in this case was asserted, and was the

18  only one that had issued at the time of those prior

19  litigations.

20                THE COURT:  Okay.  So they've got some

21  prior cases where at least one of the patents here was

22  asserted.

23                MS. FRY:  Correct.

24                THE COURT:  And they settled the

Page 125

1   litigations; is that right?

2              MS. FRY:  Yes, Your Honor.

3              THE COURT:  And they got an amount of

4   money for that settlement.  And the amount of money is

5   said to be relevant to damages issues in this case; is

6   that right?

7              MS. FRY:  Yes, Your Honor.

8              THE COURT:  And you know the amount of

9   money that they got from the settlements, but what you

10  don't know is how much related to attorneys' fees and

11  how much they had to pay their lawyers out of that

12  money.

13             And so what you're saying is you need

14  to understand what the fees were so you can understand

15  what nonfee payments were made to get a better sense

16  of the value of those settlement agreements?

17             MS. FRY:  Correct, Your Honor.  We want

18  to understand what Robocast earned after paying its

19  counsel.  We do know that they were not able to pay

20  back their investors on the amount of money that they

21  netted, only its executives and its lawyers made any

22  money from those agreements.  We want to understand

23  the breakdown there.

24             THE COURT:  Okay.  Let me pause on that

Page 126

1    then and turn to Plaintiff's counsel.

2                    Ms. Talmage, are you taking these as

3    well?

4                    MS. TALMAGE:  Yes, Your Honor.  Thanks.

5                    THE COURT:  So what's your response

6    there?

7                    MS. TALMAGE:  Yeah.  My response is

8    that Netflix's own exhibits contain plenty of

9    information about Robocast's fee arrangement.  For

10   example, Exhibit P, at page three, discloses that

11   investors were not paid back from those settlements.

12   And we've also produced profit and loss statements

13   that include line items for legal fees, including

14   contingency fee arrangements, which Netflix's damages

15   expert has since relied on and included as exhibits to

16   his report.

17                    And we still --

18                    THE COURT:  Can I just stop you there?

19   Just to make sure I'm understanding.

20                    MS. TALMAGE:  Sure.

21                    THE COURT:  So page three of that

22   exhibit talks about settlements with Microsoft and

23   Apple; is that right?

24                    MS. TALMAGE:  Yes, Your Honor.

Page 127

```
 1                    THE COURT:  Okay.  And is your side or
 2       the defendant's side so far in this case relying on
 3       the value of those settlements as being relevant to
 4       damages?
 5                    MS. TALMAGE:  We have -- we are not
 6       relying on those as comparable to -- for damages
 7       purposes.  Netflix's expert is.
 8                    THE COURT:  Is relying?  Okay.  And are
 9       you saying that there's somewhere in the record where
10       it's otherwise clearly asserted how much of the monies
11       paid to -- from those entities to Plaintiff in turn
12       went to pay Plaintiff's attorneys' fees?
13                    MS. TALMAGE:  Yes, Your Honor.  Profit
14       and loss statements that we've produced include that
15       information.  And we still don't --
16                    THE COURT:  So essentially you're
17       saying that if the questions were asked about this, it
18       would be cumulative to other information that's
19       already clearly in the record?
20                    MS. TALMAGE:  Yes, Your Honor.  In
21       addition to being irrelevant to damages.
22                    THE COURT:  Why irrelevant?  Why
23       wouldn't it speak to, you know, if the settlements are
24       said to be indicative of value, why wouldn't taking
```

Page 128

1   out attorneys' fees help to get to more of the core of

2   what the IP itself was worth?

3                MS. TALMAGE:  Because the

4   counterparties to those settlements didn't decide what

5   to pay based on what Robocast attorneys would

6   ultimately receive.  It has no bearing on the actual

7   ideas of values of the patents or the value of using

8   those patents.

9                THE COURT:  And in showing me that it's

10  cumulative, did you point me in your letter to the

11  place in the record that clearly indicates what's, you

12  know -- what's the number for fee --

13               MS. TALMAGE:  -- that we have provided

14  that.  And I apologize for that oversight.

15               THE COURT:  Okay.  Fair enough.  Okay.

16               Ms. Fry, back to you.  It's asserted,

17  nevertheless, that somewhere in the record we do know

18  what the amount of monies paid to counsel were with

19  regard to these settlement payments.  You already have

20  that.  What's your response to that?

21               MS. FRY:  So, Your Honor, Robocast did

22  not include that information in its letter or pointed

23  us to that during Mr. Smith's or Mr. Torres'

24  deposition on this topic.  Rather, they blocked the

Page 129

1    questions for privilege, not as cumulative of

2    information in the record.

3              And again, documents do not supplant

4    testimony on this topic.

5              And I'll also note that Ms. Talmage

6    pointed Your Honor to Exhibit P to Netflix's opening

7    letter, but this is one example where Robocast touted

8    its prior settlement agreements to its investors, and

9    how much they were -- in a way so that they could

10   secure new investors.

11             And so this is another situation where

12   the amount of actual revenue earned from those prior

13   agreements is relevant to damages, and to the

14   representations to investors.

15             THE COURT:  Okay.  But just to be

16   clear, are you saying -- when Ms. Talmage says that

17   the amount of fee payments relating to these two

18   settlements is in the record.  You're saying, like, "I

19   don't know what they're talking about.  Not as far as

20   we know"; is that right?

21             MS. FRY:  That's correct.  I mean, I

22   haven't seen them pointing to -- Netflix to specific

23   P&L statements from specifically the 2014 to 2016 time

24   period in which Robocast earned any revenue from prior

Page 130

 1   license agreements.  So it's unclear to us how this

 2   could be cumulative of information in the record.

 3                  THE COURT:  Okay.  All right.  So with

 4   regard to this issue, I'll grant the request for

 5   further testimony.  First, with regard to the

 6   substance.  I think the defendant has made a showing

 7   that the information can be relevant.  It's undisputed

 8   that the defendant is pointing to payments relating to

 9   these two settlement agreements as being a relevant

10   component to damages here.

11                  And although neither side provided any

12   case law, it does strike me that understanding

13   information relating to those components, including

14   how much of that payment was ultimately allocated

15   towards attorneys' fees, an issue not asserted to be

16   privileged or work product protected, can possibly be

17   relevant to an understanding of what the value of

18   those settlements were.

19                  And then additionally, to the extent

20   that Plaintiff argues that the testimony would be

21   cumulative because there is some place in the record

22   where the information sought is adequately disclosed

23   in a matter that wouldn't require further questioning.

24   I don't have that before me.  It wasn't provided.

Page 131

1    Could've been, but wasn't.  And so therefore, I'll

2    grant the request with regard to this additional

3    category.

4              Okay.  Let me talk about category two,

5    and that relates to seems like questions about

6    business meetings relating to proposed investments in

7    Plaintiff and the identity of litigation funders.

8              Ms. Fry, to you.  Again, it looks like

9    here the defendant is no -- or the plaintiff is no

10   longer claiming privilege, but it's arguing lack of

11   relevance.  And it says, in part, "To the extent we're

12   talking about investor communications, we've provided

13   all information about investor communications," at

14   least documents I suppose.

15             So we're just focusing on these

16   meetings relating to investors.  Is your view we may

17   have got docs, but we'd like to ask questions about

18   what happened during those meetings?

19             MS. FRY:  Your Honor, I would actually

20   like to clarify one point about the litigation funders

21   and communications with investors and funders.

22             We do not have those communications as

23   Ms. Elliott pointed out earlier.  We understand that

24   those are in the form of emails or saved to a database

Page 132

 1   called MailChimp, which is not emails, but is a
 2   service that -- where a company can input information
 3   to then create an email that goes out to multiple
 4   recipients.
 5              And so Mr. Rizzi made the point earlier
 6   that Netflix somehow took the position that email
 7   discovery was inappropriate.  That's not true.
 8   Netflix's position that email discovery from Netflix
 9   has -- is unduly burdensome and not relevant given
10   that Judge Andrews, earlier in this case, dismissed
11   claims of willfulness and inducement.
12              So I just wanted to clarify the record
13   as to what Netflix has and does not have with respect
14   to communications with investors.  We do not have all
15   the communications with investors.
16              With respect to --
17              THE COURT:  Can I just ask on that
18   point --
19              MS. FRY:  -- of funders --
20              THE COURT:  I'm sorry to interrupt.  I
21   want to make sure I understand.  It was asserted I
22   think by Plaintiff's side that both parties agreed
23   that no email would be provided.  That we just weren't
24   going to have email discovery.  You're saying no?

Page 133

```
 1    What we agreed to is that the defendant wasn't going

 2    to provide email?

 3                    MS. FRY:  Just to clarify, Your Honor.

 4    Correct that we disagree with how Robocast has

 5    characterized the record, but no in the sense of the

 6    parties reached an agreement on emails.  Rather the

 7    parties earlier in this case disagreed as to the scope

 8    of email discovery.  And Netflix took the position

 9    that email discovery was relevant from Robocast, would

10    be unduly burdensome from Netflix because the court

11    dismissed willfulness and inducement.  So there were

12    no pending live issues from which emails would have

13    relevance.

14                    Now Robocast has not pushed further

15    from email discovery from Netflix, but Netflix has

16    always maintained that emails from Robocast are

17    relevant.  And have asked Robocast to produce emails

18    given that through these depositions and through

19    Ms. Ianuzzi's document production, we learned that

20    there are highly relevant communications with

21    third-party investors in the form of emails.

22                    And so this is subject matter that

23    we've asked for targeted requests from Robocast based

24    on information we learned from a third party, and
```

Page 134

1    through depositions of Robocast witnesses.

2                    THE COURT:  Okay.  In any event, what's

3    at issue here is testimony.  And I guess in my mind,

4    am I wrongly -- I'm thinking of on the one hand,

5    what's being sought here could be testimony about

6    communications with what I'm calling investors.  On

7    the other hand, communications with what I'm calling

8    litigation funders.

9                    Am I right to be thinking of those as

10   two separate categories of kind of business-related

11   communications, or do you think of them as all one?

12                   MS. FRY:  It is hard to see how

13   Robocast is drawing the line between investors and

14   litigation funders.  I think we can treat them all in

15   one as business-related communications, Your Honor.

16                   THE COURT:  Okay.  And then to

17   understand the argument about relevance, so I mean,

18   presumably, not every aspect of a communication with a

19   potential funder is necessarily relevant to claims or

20   defenses at issue in the case; right?  I mean, if

21   they're talking about what they're going to have for

22   lunch, that's not relevant.  But if they're --

23                   I think I understand your focus to be

24   if the discussion is on the value of Robocast's IP,

Page 135

1    particularly the intellectual property at issue in

2    this case, and it relates to that, then we think it is

3    relevant to damages; is that correct?  And is there

4    anything more you want to say to flush out your

5    damages-related relevance argument?

6                    MS. FRY:  Yes, Your Honor.

7    Communications with investors and litigation funders

8    as to the patents at issue here are highly relevant to

9    damages and alleged commercial success.  They go to

10   the value of the patents, the perceived strengths and

11   weaknesses of those patents.

12                   The identities of funders is also

13   relevant, and there's been no assertion that that's

14   protected by work product or attorney-client

15   privilege.  And so that's where the -- Netflix tried

16   through its questioning Ms. Frantom, one of Robocast's

17   executives, and Mr. Torres.  Asked them for the

18   identities of the funders with whom they have

19   communicated and sought money, and were blocked either

20   on the grounds of relevance, which is improper under

21   Rule 30, or blocked on the ground of attorney work

22   product, but had pointed to no case that supports

23   blocking the identity of a funder.  That is log-level

24   information.  It should've been provided through a

Page 136

1   privilege log, at a minimum.

2               And so in addition to relevance of

3   litigation funding communications, investor

4   communications, the identities of the funders is not

5   protected by work product.  And it also goes to the

6   issue of witness bias.  Who has a financial interest

7   in the outcome of this case?  Is it one of the third

8   parties we have subpoenaed?  Is it someone else?  We

9   don't have that information and it does bear on

10  witness bias and witness credibility, Your Honor.

11              THE COURT:  With regard to damages

12  though, you mentioned commercial success is another

13  factor.  The plaintiff has said on this call that it

14  is not making an objective indicia argument as to

15  commercial success for other than, like, a couple

16  years back in the early 2000s.

17              And so I guess I'm wondering if that's

18  true, how could commercial success be a relevance

19  argument?

20              MS. FRY:  Oh, so, Your Honor, we also

21  learned through Robocast's witnesses that the products

22  that they were developing and alleged to have made

23  revenue on in the early existence of the company are

24  the same sort of line of products that they have not

Page 137

1    been able to earn any revenue on today.

2                    So it's not just the pre-2000 timeframe

3    that Robocast is pointing to as relevant to commercial

4    success.  It's the entire span of the company's

5    existence regarding these products that have not

6    substantively changed.  At least what we understood

7    from their lawyers.

8                    So information on a product's

9    commercial success post-2020 is relevant.  But also

10   Georgia-Pacific factor eight for damages, all about

11   Robocast's profitability and commercial success.

12   Which again is not limited to their products pre-2020.

13   That's success from licensing.  That's success from

14   post-2020 sales.

15                   And so that, Your Honor, in addition to

16   obviousness, is relevant -- the commercial success is

17   relevant to Georgia-Pacific factor eight for damages

18   as well.

19                   THE COURT:  When you say "commercial

20   success," I just want to make sure I understand what

21   you're saying or what you're talking about.

22                   Like, say the plaintiff is having a

23   conversation with a potential funder of litigation.

24   And the funder said -- and there's a conversation

1    about, "Well, how much do we think this patent is

2    worth?  How much do we think the value of the patent

3    could be in litigation against, you know, a

4    defendant?"  Or, you know, if there's a conversation

5    about what do we think is the strength of the patent

6    vis-a-vis validity issues?  You know, there's a way of

7    talking about the value of the patent.  Its value.

8    What could be recouped in a suit against an entity

9    like Netflix.

10              I mean, I think I understand the

11   assertions that to the extent there's a reasonable

12   inference that such conversations likely would've

13   happened, that could be relevant to damages issues.

14              You are making that assertion; am I

15   right?

16              MS. FRY:  Yes, Your Honor.

17              THE COURT:  But beyond that, I'm just

18   trying to figure out when you say, "Well, information

19   about commercial success," what do you mean beyond

20   what I've just described?  And I should say I would so

21   far describe these as -- I'm trying to think about if

22   I were to permit testimony, but if I weren't to

23   necessarily agree that, like, every conversation with

24   an investor or litigation funder is in its entirety

Page 139

1   necessarily relevant, but I'm trying to figure out if

2   the relevant material that's potentially in there, the

3   value of the IP -- questions that go to the value of

4   the IP in this litigation.  I understand the relevance

5   assertion there.

6              Is there something more you're talking

7   about when you say "commercial success"?

8              MS. ELLIOTT:  May I jump in just

9   briefly, Your Honor?  If I may.

10             THE COURT:  Sure.

11             MS. ELLIOTT:  And not that Ms. Fry

12  needs any help here, but I did take the deposition of

13  Mr. Torres.  I think one point is important which is

14  the narrowing that Mr. Rizzi spoke of as to what --

15  their claims of commercial success, we have not seen

16  in their papers, in their documents, or

17  correspondence.  That's the first time I'm hearing of

18  this narrowing.

19             Moreover, I asked Mr. Torres in

20  deposition exactly what Your Honor's querying about.

21  I said, "Do you think your company's been successful?

22  And if so, how so?"  And the two things he cited was

23  his product and the litigation successes.

24             He touted the success they derived from

Page 140

1    being able to get money from Microsoft and Apple and

2    Vevo.  And all of that is information that they are

3    also communicating to investors.  In fact, Mr. Rizzi

4    presented to investors touting these very same

5    principles and datapoints of commercial success.

6              And in doing so, he received questions.

7    There was a Q&A period in one of those webinars where

8    investors are asking the very questions that we are

9    asking because this is our right to assert this

10   defense at trial, that in fact this company was not

11   successful.

12             And what they're claiming to be a

13   commercial success to the extent that they're

14   referencing litigation results, the only people who

15   make money are the lawyers.  That is something we

16   should be able to explore in discovery and tell a

17   jury.  And to be blocked by that with privilege

18   instructions and other failure to product documents is

19   precisely why we're here today.

20             THE COURT:  And I guess, Ms. Elliott,

21   if I were to rule that I think questions relating to

22   communications with investors, you know, actual or

23   potential investors, or actual or potential litigation

24   funders, to the extent the questions have some tie to

Page 141

1    the issue of the value of the patents in suit in this

2    case would be appropriate.  And that was the

3    instruction I gave.

4               Would that be an appropriate guidance

5    from your perspective?

6               MS. ELLIOTT:  I do think, Your Honor,

7    that's appropriate.  To the extent they're relying on

8    those two elements that Mr. Torres testified to, their

9    product development and any so called success of

10   products, and their value of their IP, which is what

11   they're mostly leaning on, that's fair game in our

12   view.

13              THE COURT:  Okay.  All right.  Thank

14   you.  Let me turn to Plaintiff's counsel.

15              So, Ms. Talmage, on this issue, if I

16   could make the inference -- a reasonable inference

17   based on the record I have, that if the plaintiff has

18   had communications with investors or potential

19   investors, including litigation funders or potential

20   litigation funders, and that I could make the

21   inference that it is likely or reasonable that in

22   those communications, there would be discussion of --

23   one way or another -- of the value of the patents that

24   are in suit in this case.  If I were to conclude,

Page 142

1    look, I think questions about that subject matter at

2    least.  Questions with regard to these third parties

3    about the value of intellectual property at issue in

4    this case is fair game.  What would be wrong with that

5    kind of conclusion?

6                    MS. TALMAGE:  I would just respond that

7    those questions have been asked and answered.  The

8    portions of deposition testimony that Netflix points

9    to in its letters despite kind of going into document

10   discovery now and all sorts of other things, show that

11   the questions were about what legal advice they

12   received on draft communications before they were sent

13   out to investors.

14                    And we've provided in Exhibits 5 to 14

15   examples of testimony elicited about communications to

16   investors.  We've provided documents.  Netflix may not

17   be thrilled with the consequences of their position

18   against email discovery, but just to correct that

19   point, Robocast has never understood that limits on

20   email discovery would be a one-way street.  And

21   there's plenty of case law that discovery from a

22   defendant is much more important than discovery from a

23   plaintiff in patent litigation.

24                    THE COURT:  I'm going to make no

Page 143

1    decision today about whether email discovery of some

2    type or another should be permitted.  I don't have any

3    clue what the parties' agreement was or wasn't.  This

4    is only about 30(b)(6) testimony.  So --

5                    MS. TALMAGE:  Okay.

6                    THE COURT:  I understand you want to

7    put your view on the record.  I just want to tell you

8    that in case it helps you.

9                    MS. TALMAGE:  Sure.  Absolutely.  So I

10   will leave that point there.

11                   And it seems now that counsel for

12   Netflix is contending that commercial success after

13   the year 2020 is somehow relevant, but the patents

14   expired in 2020.  And again, the parties have agreed

15   that discovery post expiration of the patents is not

16   relevant.

17                   THE COURT:  Well, I'm just looking at

18   the transcript portions that were highlighted by the

19   other side; right?  Because that's all that I have is

20   what they've told me about what's really at issue

21   here.

22                   And, like, one is a conversation with

23   Mr. Torres about a term sheet for a $10 million

24   investment.  The other was questions to Ms. Frantom

Page 144

1    about the identity of a litigation funder.  The third

2    was some of the testimony from Mr. Robertiello in his

3    deposition appeared to relate to conversations about

4    round B fundraising or investments.  I have objections

5    made in each case.

6                Aren't those questions and lines of

7    questioning that could well have gotten into the

8    testimony about what was discussed or communicated

9    with regard to these issues about the patents and the

10   value of the patents?

11              MR. RIZZI:  Your Honor, if I could just

12   jump in quickly, and Ms. Talmage can correct me if I'm

13   wrong.  I believe there's already testimony in the

14   record to the effect that there was no discussion of

15   the value of the cases, or the value of the patents,

16   or what amount might be recovered from any litigations

17   with respect to any potential investors or investment.

18              THE COURT:  But again, like, you know,

19   these are -- I think you're talking about testimony in

20   30(b)(1) depos.  This is a 30(b)(6) depo.  And do we

21   have 30(b)(6) deposition testimony about that?

22              MR. RIZZI:  I believe so, and I'll let

23   Ms. Talmage correct me in terms of confirm that, in

24   terms of who was actually designated on those topics.

Page 145

1    I think it was Mr. Smith.

2                    MS. TALMAGE:  I believe it would've

3    been Mr. Smith.  And I am not aware of any places

4    where we have blocked that testimony with a privilege

5    instruction concerning information actually provided

6    to third parties and not legal advice on draft

7    communications.

8                    And I would just point out also that

9    the documents that Netflix has relied on as examples

10   of these highly relevant allegedly communications to

11   damages are email blasts to investors that give

12   general contours of the litigation and the patents.

13   And there's no reason to think that there's been

14   anything more specific than that.  And if it has,

15   we've produced it.

16                    THE COURT:  Ms. Talmage, I'm sorry to

17   interrupt, but just to get to what's before me.  Like,

18   again --

19                    MS. TALMAGE:  Yes, Your Honor.

20                    THE COURT:  -- like, the first thing

21   that the other side teed up was questions to

22   Mr. Torres about a term sheet for a $10 million

23   investment.  It sounds like somebody was investing

24   money in the plaintiff.

Page 146

 1                    MR. RIZZI:  Your Honor, I can clarify
 2      that.  That was a litigation funding term sheet, and
 3      that was the reason.  And again, I would submit we
 4      need to keep separate regular investors and
 5      discussions with litigation funders.  So that was -- I
 6      was at that deposition and that was the reason for the
 7      instruction there, is we maintain that, you know,
 8      litigation funding is -- should be completely off
 9      limits here.  It's not relevant to anything.  It's
10      outside the scope of the agreed 2020 cutoff on
11      discovery.  And it's only going to create a whole host
12      of privilege fights and needless disputes that are not
13      relevant to anything in this case.
14                    THE COURT:  I guess, Mr. Rizzi, with
15      regard to litigation funding, are you asserting the
16      only litigation funding communications that were had
17      are post-2020, and that the parties have agreed that
18      no discovery from that time period is permitted?
19                    MR. RIZZI:  I would say certainly the
20      only communications that resulted in an actual
21      agreement with a funder are post-2020.
22                    THE COURT:  Okay.  But I'm not limiting
23      myself to that.  We could have discussions about value
24      of IP and conversations that don't relate to -- you

Page 147

1   know, don't end up in an agreement.

2               MR. RIZZI:  Agreed.  And I can't

3   represent that there weren't prior discussions that

4   may have taken place, you know, as is common with

5   potential litigation funders.

6               But again, you know, those would've all

7   been subject to nondisclosure common interest

8   agreements, work product protection, and with the same

9   restriction on no discussion of amounts, value of the

10  patents, or prospects of what could be recovered in

11  litigation.

12              MS. ELLIOTT:  Your Honor, may I respond

13  just briefly to that?

14              THE COURT:  Just one second, Ms.

15  Elliott.

16              MS. ELLIOTT:  Okay.

17              THE COURT:  Because, Mr. Rizzi, I'm

18  focused on relevance because -- unless I'm

19  misremembering.  In your letter -- in your responsive

20  letter, when we were talking about these issues, did

21  you assert that a reason why information may not be

22  provided about litigation funding was a work product

23  basis or a privilege basis?

24              MR. RIZZI:  I believe we did, both

Page 148

1    relevance and work product based on, you know, at

2    least Judge Hall's decision, which Ms. Talmage can

3    provide you with the cases.

4                    MS. TALMAGE:  That's ELM 3DS

5    Innovations LLC v. Samsung.  Civil action number 1430

6    at docket number 372.

7                    THE COURT:  Okay.  And, Ms. Talmage,

8    I'm just looking at your letter.

9                    MS. TALMAGE:  Yes.

10                   THE COURT:  Because, you know, again,

11   the part where you are responding.  There's a

12   paragraph that starts regarding questions on page two,

13   on Robocast business meetings, et cetera.  Netflix

14   mischaracterizes the depositions in amidst that

15   Robocast has maintained that information related to

16   litigation funding, including efforts to secure it,

17   are not relevant and not discoverable.

18                   And so I'm looking in here for where --

19   I see we think they're not relevant.  Where is there a

20   privilege or work product objection that's being made

21   with regard to litigation funding communications?

22                   MS. TALMAGE:  Fair enough, Your Honor.

23   It does not come through clearly in that portion of

24   the papers.

Page 149

1              THE COURT:  And didn't otherwise,

2    like -- in the privilege log issue was that, like,

3    there's stuff logged about lit funding that's -- it's

4    logged, but it's logged not as privilege or work

5    product, but just as not relevant; right?  Like, isn't

6    in the 25 --

7              MS. TALMAGE:  Right.  Yes, Your Honor.

8    Our major concern with litigation funding is that it

9    is not relevant.  There could be documents in that

10   subset that are also work product, but our main

11   consideration all along is that it's not relevant.

12   And this court has even characterized discovery into

13   litigation funding as gambling.  And I could pull the

14   citation up for you.

15              THE COURT:  Hasn't Judge Andrews though

16   also gone on to say, "Look, there could be

17   circumstances in which discussions about value of the

18   IP could well be relevant if they were had in the

19   context of discussions with litigation funders"?  Am I

20   misremembering that or didn't any other cites -- to

21   that case say that?

22              MS. TALMAGE:  Courts have certainly

23   split on this issue, and some judges do believe that

24   there are circumstances where it may be relevant.  And

Page 150

1    I would submit to you that the case for relevance here

2    is based on speculation.  And we don't think that you

3    need to review the documents to be able to realize

4    that, but if you'd like to, we're prepared to provide

5    them in camera.

6                    THE COURT:  Okay.  But can I also ask,

7    now you might say, like, well, with a party that makes

8    a bunch of products, et cetera, occasionally has

9    litigation; you know?  How relevant or how likely is

10   it that they're having discussions about the value of

11   their patents and how central is that to the nature of

12   the discussions?  How likely is it to infer that

13   that's going to happen?

14                   But with the plaintiff who I gather is

15   not making any products, its whole business is about

16   licensing or litigating patents, it could be said it's

17   more likely conversations about the value of the IP

18   might be had with regard to these litigation funding

19   communications.  What would be wrong with that

20   inference?

21                   MS. TALMAGE:  I would just note that

22   while Robocast has not earned revenue from products in

23   recent years, it is still very much engaged in

24   research and development, and developing products, and

Page 151

1      trying to find an angel for its business to flourish

2      outside of litigation.  So to characterize them as

3      solely in the business of litigation is not quite

4      accurate.

5                      And I would just submit that to the

6      extent that information is in any communications with

7      funders, it's also in communications that we have

8      produced, including to investors, including internal

9      discussions.  I mean, we've produced thousands of

10     pages of documents and I haven't heard anything from

11     Netflix that they're actually missing that is

12     essential to their damages, or even would add color

13     beyond what they have already asserted.

14                     THE COURT:  Okay.  Fair enough.

15                     All right.  Ms. Fry, is there anything

16     more you want to say with regard to this

17     communications with investors and/or litigation

18     funders issue?

19                     MS. FRY:  I'll just add, Your Honor,

20     that Robocast has taken the position that its products

21     practice the patents.  So communications with funders

22     and investors regarding its products also sheds light

23     on the value of the IP that is practiced by those

24     products.  I just wanted to note that as well.

Page 152

1                THE COURT:  Didn't we agree that they

2     haven't had products for, like, 15, 20 years or

3     something?

4                MS. FRY:  They have attempted multiple

5     relaunches of their products, and Ms. Talmage did just

6     state that they have products under development, but

7     they have taken the position that their products do

8     practice their patents.

9                THE COURT:  Okay.

10               MS. ELLIOTT:  Your Honor, may I just

11    briefly respond to just a couple points that Plaintiff

12    has made?

13               THE COURT:  Yes, Ms. Elliott.

14               MS. ELLIOTT:  First, I just want to

15    direct the court to the Leader Techs v. Facebook case.

16    That's a 2010 District of Delaware matter where the

17    court found that privilege does not apply to

18    communications concerning litigation funding

19    arrangements, particularly before a deal's consummated

20    or with potential investors.

21               Also note that it is black letter law

22    that the only basis to instruct a witness not to

23    answer is for privilege.  And here, we have admissions

24    from counsel in this proceeding and in the context of

Page 153

1    the privilege law dispute that Your Honor has before

2    the court, that Robocast has consistently blocked

3    discovery on relevance grounds.  And specifically has

4    instructed witnesses not to answer on relevance

5    grounds, which is wholly inappropriate under Rule 30,

6    Rule 37, and is the reason why we are seeking

7    testimony for this subject matter.

8                   I think it's more than reasonable to

9    infer, Your Honor, that when you have a business

10   that's solely being touted for its success in

11   generating licensing revenue, while admitting that

12   it's struggling to produce a product that earns any

13   revenue, that an investor who's going to invest

14   hard-earned money, whether it's $35,000 from Mr. Rizzi

15   or $10 million from a funder, would want to know what

16   is the value of this IP and how -- will I get a return

17   on that investment and when.

18                  Those are without a doubt reasonable

19   discovery for us to get in something that would be

20   covered by the communications under these

21   circumstances.

22                  I'll pause there, Your Honor.  I know

23   your time is short.

24                  THE COURT:  Okay.  Thank you.

Page 154

1              MR. RIZZI:  Your Honor, can I just very

2     briefly make one point?

3              THE COURT:  Very quickly.

4              MR. RIZZI:  The litigation funding at

5     issue here is I believe entered in 2022.  And again,

6     this is another instance where there's a double

7     standard here.  Netflix itself took the position that

8     nothing post-2020 was even relevant in this case.

9     They refused to produce anything post-2020.

10             I know that's not before you, but

11    that's just another reason why none of this litigation

12    funding material, you know, should be relevant or

13    discoverable.

14             THE COURT:  Okay.  Thank you.

15             MS. ELLIOTT:  Your Honor?

16             THE COURT:  I have to cut it off there.

17    I'm sorry.

18             Okay.  So with regard to this issue,

19    let me state the following.  First, nothing that I

20    say -- to the extent that the parties have an

21    agreement, that certain categories of discovery should

22    not be sought, like for example, if it is the case

23    that the parties have mutually agreed that information

24    relating to the -- and that could potentially relate

Page 155

1  to the case after a certain date is not going to be

2  pursued or provided by both sides.  Nothing that I say

3  is meant to interfere with prior agreements about the

4  parties about the scope of discovery, temporal or

5  otherwise.

6              But within the possible scope of

7  discovery, with regard to this issue, I'll order as

8  follows.  And that is I'll grant the request in part

9  for additional testimony, to the extent that the

10 questions have some tie to the subject matter of

11 communications with actual or potential investors

12 and/or actual or potential litigation funders

13 regarding the value of the patents at issue in this

14 litigation.

15             So again, the general topic within the

16 realm of the parties' prior agreements with regard to

17 discovery.  That information can be pursued in a

18 further deposition regarding the issue of

19 communications with actual or potential investors or

20 litigation funders, to the extent that the questions

21 can be fairly said to get to discussions about the

22 value of the intellectual property at issue in this

23 case.

24             I think that if such communications

Page 156

1    were had, the defendant has -- demonstrated why it

2    could bear on and be relevant at least to the issue of

3    damages, the reasons they've set out in their papers.

4                I understand the case law that writ

5    large in all circumstances, you know, courts are

6    hesitant to suggest that all or any discovery about

7    litigation funding, for example, is necessarily fair

8    game.

9                But I think under the circumstances of

10   this particular case, particularly, we have a

11   plaintiff who I think at least it's undisputed that

12   their primary business, if not a sole business for

13   many of the years in question, has been focused on

14   licensing and litigating patents.  It's a fair

15   inference that in meetings with actual or potential

16   investors or litigation funders, that there may well

17   have been discussions that bear in some way on the

18   value of the intellectual property at issue in this

19   case.  And that kind of subject matter does seem like

20   it could be relevant, at a minimum, to the issue of

21   damages.

22               It could also potentially be relevant

23   to other liability issues in the case, but at a

24   minimum, the damages as well.  I think that it is fair

Page 157

1   game for Defendant to be able to ask those questions.

2              Relatedly, to the extent that I, with

3   regard to a privilege log dispute, am asked to review

4   certain documents that were logged because they

5   implicate communications about litigation funding.  I

6   think it would be appropriate for those kind of

7   communications to be produced if they relate to the

8   subject matter that I've just described.  That is

9   communications about the value of the IP in this case.

10             And so I'll grant the request for

11  further testimony in that regard, and otherwise deny.

12  The other parties may have to --

13             But again, this is going to be a

14  deposition.  So as Ms. Elliott said, as long as

15  there's a good faith basis to ask a question, even if

16  there's a view that it's not relevant or goes beyond

17  the relevance sphere, the question can be asked and

18  answered.  You know, in that scenario, you understand

19  that counsel are going to make good faith decisions to

20  attempt to stay within the confines of the court's

21  order.  Could be disagreements about whether a

22  question goes beyond that scope.  An objection could

23  be made in that regard, but the question will be asked

24  and answered.  And only if the defendant's side

Page 158

1    thought that the questions were so beyond the scope of

2    the court's order, that some further relief should be

3    granted could be raised in the future.  So that's my

4    decision with regard to this issue.

5              Let me just briefly tell you, in the

6    trial, I'll ask if you have any objection to this.

7    With regard to the remaining subject matter of your

8    motion, the last category in the third category really

9    seems to relate to Mr. Rizzi's involvement in certain

10   subject matter.  My thought, in light of the fact that

11   I'm going to assume make a decision about the

12   relevance and/or appropriateness of discovery with

13   regard to requests related to Mr. Rizzi and his role,

14   that I should deny without prejudice to renew this

15   dispute until I resolve the motion to quash issue.

16   And then parties can see what the court's decision is

17   there.  I suspect it'll have great relevance with

18   regard to this issue.

19              And then lastly, with regard to what's

20   in the privilege log-related disputes here, my

21   suggestion was going to be that, administratively, as

22   a separate motion -- I'll have the parties file a

23   one-page motion -- that I ask the plaintiff to provide

24   me with the 25 documents that you've identified at

1   issue.  I would give the plaintiff a chance if they

2   wished to make any other record by way of declaration

3   as to their privilege assertion or work product

4   assertion with regard to a doc.  Then I would review

5   the material and make a decision as to whether or not

6   I thought it should be produced.  Would you have a

7   dispute with me addressing the remainder of the issues

8   that way?

9               MS. FRY:  No objection in the way you

10  propose, Your Honor.  I just want to ask one question

11  for clarification because appendix one to Netflix's

12  reply letter included the 89 documents that Brett

13  Smith -- that were logged in Robocast's privilege log.

14  And that Netflix has sought production, not in camera

15  review.

16              And so I just wanted to see if Your

17  Honor had a ruling on that issue or would like -- or

18  that was encompassed within your order regarding in

19  camera review.

20              THE COURT:  Well, I think, like, isn't

21  it true also that some of your 25 documents in your

22  list implicated Smith-related communications that

23  would -- I guess what I was thinking is I think some

24  of those 25 involve communications where it's Smith's

Page 160

1    involvement on the communication is asserted to be the

2    only reason as to why the communication could be

3    privileged.

4                    And so, like, I was thinking that the

5    plaintiff would have to tell me, among other things,

6    like, you know, why it is -- you know, provide

7    sufficient record to demonstrate, like, you know, is

8    this communication happening between 2017 and 2019 or

9    otherwise?  And if it is happening from 2017 to 2019,

10   like, you know, why is he a lawyer providing legal

11   advice during that time.  And then I might be able to

12   resolve all the matters that way.  Do you disagree?

13                   MS. FRY:  I think that approach seems

14   reasonable, Your Honor.  Appendix one and two, they're

15   supposed to be mutually exclusive.  The 89 documents

16   in appendix one were set aside as the Brett Smith 2017

17   to 2019 documents.  The in camera review 25 documents

18   do include Brett Smith's name on them, but they're

19   undated.  Such that we don't know if it falls within

20   that time period, Your Honor.  So I just wanted to

21   clarify that point.

22                   THE COURT:  All right.  Well, let me

23   ask Plaintiff's counsel briefly.

24                   Who's addressing these remaining

Page 161

1    issues?  Who's addressing the privilege log issue for

2    Plaintiff?

3                 MS. TALMAGE:  That's me, Your Honor.

4                 THE COURT:  Okay.  So, Ms. Talmage, the

5    gist in the letters was, look, Smith's not a lawyer

6    giving legal advice between 2017 and 2019.  So any doc

7    where it's on the privilege log where his

8    participation's said to be the reason why it's

9    privileged can't be because he's not a lawyer giving

10   legal advice.  They say appendix one are those docs.

11                Do you have any dispute there?  Do you

12   have a reason to dispute that appendix one, those docs

13   shouldn't be produced?

14                MS. TALMAGE:  Yes, Your Honor.  So I

15   think it really comes down to some metadata confusion,

16   at least for the documents where Brett Smith is an

17   author.

18                So the vast majority of ESI we've

19   collected and produced in this case came from a sort

20   of project management platform called Basecamp, which

21   preserves metadata only as of the last edit and not

22   when the document was created.  It is not the best at

23   preserving authorship necessarily.

24                But I have gone through each of these

Page 162

1    documents with Mr. Smith, and we can submit a

2    declaration from him if that would be appropriate.

3    But the documents in which he's an author were

4    authored in part at least by him while he was still at

5    Robocast providing legal advice.  And subsequent edits

6    may have changed the date that appears on the log, but

7    they don't change the fact that he was involved in the

8    preparation of those documents.

9              And documents -- some of the documents

10   that we've identified as work product based on being

11   done at the direction of Brett Smith, and based on his

12   advice to prepare for litigation, Mr. Smith has

13   confirmed with me that he's provided direction and

14   assignments to Robocast employees before his departure

15   that they acted on after he departed and before he

16   came back.

17             THE COURT:  I'm just -- I'm sorry.  I'm

18   just trying to understand what you're saying.  Are you

19   saying that, you know, they pulled out these docs and

20   said, "Look, these are all from 2017 to 2019," and

21   Smith seems to be the reason for the privilege

22   assertion.  But you're saying that due to some

23   metadata issue, they're really not all from 2017 to

24   2019?

Page 163

1                    MS. TALMAGE:  They are from 2017 to

2        2019, but they include content added by Brett Smith

3        before that date.  So all we have is the date that it

4        was last edited, not the date it was originally

5        created.

6                    THE COURT:  Okay.  Have you talked to

7        the other side about this metadata issue and how it

8        impacts appendix one?

9                    MS. TALMAGE:  No, we have not.  And

10       that may have been oversight on our part.  But we also

11       were not -- did not really meaningfully discuss the

12       date issue before these papers were submitted.

13                    THE COURT:  Okay.  So, look, here's

14       what I would say.  On the remaining issue in the third

15       category with regard to Mr. Rizzi's communications,

16       I'll deny that request without prejudice to renew.

17       Because it seems to me that my future forthcoming

18       decision about the motion to quash issue will probably

19       shed great light on the resolution of that issue.  And

20       if for some reason after I make that motion to quash

21       decision there's still some unresolvable dispute as to

22       this subcategory, it could always be brought back and

23       raised.  My hope is it won't.

24                    With regard to the privilege log

Page 164

1   issues, first, with regard to appendix one and what

2   Ms. Talmage is saying, the parties should further meet

3   and confer.  Because they haven't.  The defendant's

4   hearing what Ms. Talmage is saying for the first time

5   apparently, and they're not on the same page as to

6   what's going on with those documents.

7            And what I'll do is I'll review 25 docs

8   in camera, but they should be inclusive of all the

9   issues that are raised in the briefing.  And it does

10  seem like maybe, after you further meet and confer,

11  it's not going to be as neat as, well, every doc in

12  appendix one is said to be from 2017 or 2019, or not,

13  or what.

14           So maybe the parties in that meet and

15  confer can figure out how to include some subset of

16  those appendix one documents as part of a set of 25 so

17  that I can resolve maybe that issue representatively.

18           In the near term, I'll commit to you,

19  I'll try to resolve in camera privilege, work product,

20  or lit funding disputes with regard to 25 docs as a

21  representative sample to be able to give the parties

22  guidance.

23           But I need you to get me a universe

24  that is no larger than that.  And it sounds like

Page 165

1    appendix one is not going to be easily separatable

2    out, so I'll ask you to meet and confer further,

3    figure out a process which you can get me -- here's

4    the 25 docs.  Here are -- to the extent that Plaintiff

5    seeks to add anything to the record about the basis

6    for a privilege or work product assertion as to those

7    docs, they can -- that way declaration or otherwise,

8    they can do it.  And then some instructions can be

9    provided to me as to the subcategories of issues that

10   I'm looking at as to each -- as to the various 25

11   docs.  That's what I would ask you to do.

12              So if I were to ask you to further meet

13   and confer to see if you can come up with a plan for

14   that and report back to me, say, no later than seven

15   days from today's date.

16              Ms. Fry, does that seem reasonable to

17   you?

18              MS. COHEN:  Your Honor, this is Rachel

19   Cohen.  Good afternoon.  Sorry I haven't had the

20   chance to speak more today.  I also represent Netflix

21   and I've been a party to all of the correspondence and

22   the meet and confers on this issue.  It has been going

23   on for six months.  We have received five different

24   iterations of their privilege log, each time with

Page 166

1    things changing and moving around.

2                We've had multiple meet and confers.

3    This is the first time this is being addressed for the

4    court, and it's the first time it's being addressed to

5    us.  It's this type of ongoing moving target,

6    everchanging descriptions, rationale, reasons.

7                The last iteration of this, we said we

8    were going to go to the court.  There were no more --

9    there was nothing else to discuss.  And they did not

10   oppose -- they did not contend there was any reason

11   why the mid-2017 to the mid-2019, where Mr. Smith

12   testified under oath that he was not representing

13   Robocast in this case.  He was not offering any legal

14   advice.  And all of those 89 documents, after they've

15   had five chances of getting this right and assured us

16   they were going document by document to ensure that

17   the descriptions were in fact accurate, they have

18   never contended those are work product.  They've never

19   contended the dates on those are incorrect.  They have

20   just admitted that those documents were just

21   Mr. Smith's documents and should be produced.  They've

22   never challenged that.  And we submitted the appendix

23   one to show which are affected by that particular

24   issue, and then separate the ones that are under

Page 167

1    dispute, which we really do appreciate the court

2    taking the time to review those in camera given the

3    longstanding dispute between the parties that have

4    needlessly multiplied these proceedings.

5                    THE COURT:  Okay.  Ms. Cohen, I need

6    solutions though, not argument.  So what is your

7    solution to this problem?  Did I just rule for you and

8    say, "Appendix one docs go to you"?  Is that the idea?

9                    MS. COHEN:  Well, I think the appendix

10   one documents really haven't been challenged as being

11   anything other than documents that were created in a

12   period where there was no attorney-client

13   relationship.

14                   And the only claim of privilege as it

15   relates to those documents is attorney-client

16   privilege.  So if they're now coming in at the

17   eleventh hour, after having multiple opportunities to

18   meet and confer together, having multiple

19   iterations -- five iterations of their privilege log.

20   And we did send the court redlines that we put

21   together of all the different changing descriptions,

22   that should be produced.

23                   And if they have some reason why they

24   need to move for a protective order, why certain of

Page 168

1    those documents really should've been marked privilege

2    from the outset, then they should -- the onus should

3    be on them to establish privilege.  That's their

4    burden.  One that -- only they have access to those

5    documents, but they should've made that showing months

6    ago, not at this stage, Your Honor.

7                    THE COURT:  Okay.

8                    MS. COHEN:  And then as it relates to

9    the second set, we do appreciate Your Honor taking the

10   time to look at those.  And they're representative of

11   the issues we've seen.

12                   THE COURT:  Okay.

13                   Ms. Talmage, just, you know, what about

14   the assertion we're just hearing about, this date

15   problem for the first time now.  Should've heard about

16   it well before, et cetera.

17                   MS. TALMAGE:  If you review the

18   extensive back-and-forth we've had on these issues,

19   that Ms. Cohen represents have been going on for

20   months, the date issue is a very recent addition, and

21   reflective of the constantly evolving complaints that

22   we have tried to address with the iterations of our

23   privilege log.

24                   And just if you look at some of the

1   track changes in Netflix's exhibits, I think Ms. Cohen

2   is trying to imply that there's some nefarious attempt

3   to shield documents that should be produced.  And a

4   lot of these are -- one of them was a formatting mix-

5   up that, you know, it's embarrassing and it's not

6   great to do, but it's not attempting to hide anything,

7   and we corrected that as soon as we were aware of it.

8             Another iteration was that Netflix's

9   insistence to take off documents that we've produced,

10  even though they are aware of what's been produced.

11  So we did that.

12            THE COURT:  Ms. Talmage, let me just --

13  they raised in their opening letter brief.  Smith's

14  not a lawyer from 2017 to 2019.  You in your

15  responsive brief said zero about that issue.  You even

16  had some extra space, but you said nothing about it.

17  They in their reply said, "Hey, it's undisputed."

18  2017 to 2019, he's a lawyer -- he's not a lawyer.  So

19  here's the docs that that impacts.

20            I guess what's the assertion?  Like,

21  yeah, we don't quarrel that if a doc was created

22  relating to Smith from 2017 to 2019, there's no

23  privilege assertion?  But we're asserting that every

24  single document in appendix one, which they only

Page 170

1    attach to their reply brief, isn't that?  And every

2    single one of them was created or relates to stuff

3    Smith did other than in that 2017 to 2019 timeframe?

4              MS. TALMAGE:  Yes, Your Honor.  That is

5    the assertion.  And I think in our opposition letter,

6    we didn't address the date issue directly.  And again,

7    I apologize for that.  We should have, obviously.  But

8    we've -- we extensively discussed the reasons why the

9    documents that we are withholding are properly

10    privileged or work product.

11              And not withstanding that they may have

12    been subsequently edited after legal advice was

13    included in them by Brett Smith while he was counsel

14    for Robocast.

15              THE COURT:  Okay.  So here's what we'll

16    do.  And I'll try to -- I'm saying this on the record,

17    so I'm just extemporaneously saying it, but I'll try

18    to be clear enough.

19              Okay.  So what we will do is I'm going

20    to consider this privilege log issue to be one that's

21    not part of the live, prior discovery dispute motion

22    that's been raised.  Because it needs additional work

23    from me and I didn't have the ability to resolve it

24    before this call because I didn't have the docs.

Page 171

1            So what I'm going to do is I'll

2    consider the disputes regarding Defendant's motion to

3    have been resolved.  But with regard to this privilege

4    log issue, I'll ask the parties to do the following.

5                First, I want them to further meet and

6    confer, and no later than one week from today, report

7    back to me ideally with an agreement about how they

8    can put before me no more than 25 representative

9    documents that I can review in camera relating to the

10   issues raised in the final part of Defendant's brief.

11               And that will include the various

12   issues that were said to be teed up by the 25 docs

13   Defendant identified in their appendix two.  But

14   you'll have to cut out a couple because included in

15   this submission -- it's going to be no more than 25

16   docs.  I'm not going to review any more than that, but

17   I'll need to have at least a couple that is also

18   representative about this issue that's arisen here

19   with regard to appendix one.  That is are certain of

20   the documents listed in appendix one, although they

21   were asserted to have a date between 2017 and 2019.

22   There's an assertion that nevertheless, that doesn't

23   convey the full reality of why it is that they're

24   protected by privilege or work product.

Page 172

1           And the idea is that the plan's going

2    to be -- 25 docs.  So it's basically going to include

3    almost all the docs that are in the current 25 in

4    appendix two, but there'll have to be some culling

5    because we'll need to have a couple that'll tee up the

6    issue that's now been raised about appendix one.

7           And I think it's appropriate to include

8    appendix one in there because on the one hand, I agree

9    with Defendant that Plaintiff has waived any argument

10   that a document created by Mr. Smith or created and

11   then sent to and from him in the 2017 to 2019 period

12   is privileged or otherwise protected by work product.

13           Now because Defendant made the

14   assertion that it was in their opening brief, and the

15   plaintiff didn't respond, but it was only in the reply

16   brief that Defendant identified the exhibits in

17   appendix one that they thought amounted to these.

18           And Plaintiff asserts that it has an

19   argument that because of the metadata issue, what is

20   included in that appendix are documents that include

21   communications relating to counsel in some way that

22   predate that 2017 to 2019 time period.

23           I'll need to decide whether that's so,

24   and a good basis for permitting discovery as to those

Page 173

1    docs were not.  If I'm going to do that relatively

2    soon, that'll attempt to resolve that issue.

3                    So no later than a week from today, I'd

4    like the parties to give me a status report about

5    whether they've come to an agreement on how I can tee

6    this up.

7                    And again, the thing I'm thinking of is

8    we have 25 docs that represent all the issues that

9    Defendant was raising, including this appendix one

10   issue, that are representative.  I'd have a submission

11   date by which the plaintiff would give me those

12   documents.  And I'd allow the plaintiff to add, if

13   they wish to, a declaration that would provide any

14   further support for their privilege or work product

15   assertions that isn't otherwise evident from the face

16   of the documents themselves.  And then I would review

17   and resolve.  And that's how I would resolve these

18   privilege issues.

19                    Ideally, when they report back to me a

20   week from today, the parties would have agreed on the

21   process, and would simply tell me when they're going

22   to be making the relevant submission.

23                    If for some reason in that report,

24   there's not a total agreement, I can figure out any

Page 174

1    issue I need to figure out, but I'm really asking you

2    to try to get together to do that so I can get this

3    done in that time.

4              Okay.  So I'll look for something

5    further from the parties -- in a week from today.  And

6    when I get a new submission of these 25 docs, I'll

7    also be asking the parties to jointly file a one-page

8    discovery dispute motion that'll appropriately say on

9    the record, "This is a new dispute that you can now

10   resolve, Judge, about these 25 privileged documents --

11   or assertedly privileged documents"; okay?

12             So that's how we'll resolve that issue,

13   which is the remainder of the issues discussed in

14   Defendant's letter.

15             All right.  I got a 2 o'clock call that

16   I need to further prepare for.

17             There's one further that was raised.

18   This is an issue raised by Plaintiff.  I know a

19   newer -- it's about the deposition.  I know a newer

20   attorney was going to argue it, and so I want to give

21   that counsel a chance to make an argument, but I have

22   to keep this brief because I got to finish preparing

23   for that 2 o'clock call.

24             And so who's going to be addressing

Page 175

1    this issue for Plaintiff's side?

2                    MR. JOHNSON:  That would be me, Your

3    Honor.  Grant Johnson.

4                    THE COURT:  Okay, Mr. Johnson.

5                    And who's going to be addressing this

6    issue for Defendant's side?

7                    MS. COHEN:  Me, Your Honor.  Rachel

8    Cohen.

9                    THE COURT:  Okay.  All right.  So I

10   know Plaintiff's counsel is said to be a newer

11   attorney.  I want to try to provide at least a brief

12   chance for some argument here.

13                   And so, Mr. Johnson, let me turn to you

14   with regard to this dispute.  And so it's Ms. Ponce

15   who is at issue here.  And I guess an initial question

16   to you is, you know, one of the gripes the defendant

17   has is, although the original discovery period was

18   supposed to end on April 11th, you guys didn't notice

19   Ms. Ponce's deposition, or any other depositions,

20   until very late in the game -- March 27th.  How come

21   you did that?

22                   MR. JOHNSON:  Your Honor, I think the

23   record in that case is fairly clear.  So there was a

24   whole dispute regarding how depositions were going to

Page 176

1   go forward in that case, including regarding Netflix's

2   failure to coordinate with Google.  At that time, in

3   light of that, it became fairly evident that an

4   extension of discovery of some sort was going to be

5   necessary.

6            Robocast noticed its depos when it was

7   able and sure to do so within the fact discovery

8   period, nonetheless.

9            THE COURT:  So essentially what you're

10  saying is everyone kind of understood by late March

11  that at least there was going to be -- that was the

12  dispute; right?  Whether the discovery schedule's

13  going to get pushed back.  It wasn't, like, agreed to;

14  right?

15           MR. JOHNSON:  No, it wasn't agreed to,

16  but it was clear from -- given how many depositions

17  that were going to need to be done, as well as the

18  factual discovery that remained outstanding, that that

19  was going to be somewhat necessary.  And that's what

20  the court ultimately did is granted a month -- or I

21  believe it was a five-week extension of the discovery

22  period.

23           And that I was, I believe, necessary to

24  go -- the case both because of Robocast's depositions,

Page 177

1    but also because of the noticed depositions by

2    Netflix, as well as the third-party subpoenaed

3    depositions.

4              THE COURT:  But was it possible that

5    Judge Hall would say, "No, I'm not going to extend the

6    deadline," at the time in which you issued these

7    notices on March 27th?

8              MR. JOHNSON:  Of course.  Judge Hall of

9    course had total discretion to do that.  Nonetheless,

10   that is why Robocast did notice those depositions

11   within two weeks of the close of fact discovery as,

12   you know, was considered reasonable under the

13   applicable case law.

14             Ultimately though --

15             THE COURT:  So you all -- so,

16   Mr. Johnson, you all had -- you all were, like, aware

17   of the reality that you noticed all these depositions

18   on the 27th of March.  They might have to all be

19   completed by April 11th if Judge Hall doesn't agree

20   with you about the extension.  I mean, could they have

21   been reasonably completed by then?

22             MR. JOHNSON:  So, I mean, obviously

23   Robocast was aware that was a potential outcome.

24   Obviously if that had -- Judge Hall had not extended

Page 178

1    discovery, Robocast would've done its utmost to ensure

2    that all the applicable depositions were scheduled as

3    necessary.

4                    THE COURT:  Okay.  What more do you

5    want to tell me about your position on this issue?

6                    MR. JOHNSON:  Sure, Judge.  So we

7    really think that the -- this is a fairly simple

8    issue.  The fact is that Netflix received a duly

9    noticed deposition notice for Ms. Helen Ponce, and

10   Netflix declined to comply with that deposition

11   notice.

12                   Ultimately, everything before the

13   court's extension of the April 5th discovery deadline

14   is ultimately beside the point for this dispute.  The

15   fact is that the court extended discovery for five

16   weeks.  Netflix had in hand a valid deposition notice.

17   And immediately after Judge Hall extended the

18   discovery schedule, Robocast reached out to Netflix

19   and sought to schedule all of the depositions that

20   would need to be had -- occur within the short

21   remaining period to occur.

22                   Netflix refused to participate in those

23   discussions despite repeated attempts by Robocast to

24   ensure it occurred.  Instead, Netflix insisted on

Page 179

1  scheduling each one of its noticed depositions within

2  the first two weeks of the remaining fact discovery

3  period.

4          Robocast largely acquiesced to that

5  decision, including the scheduling of the depositions

6  of Mr. Joseph Sofer, Mr. Gregory Andrew, which

7  occurred over four days.  That schedule was agreed to

8  on April 9th.

9          It was only on April 10th, after those

10  depositions were scheduled, that Netflix informed

11  Robocast that Ms. Ponce would be available exclusively

12  on April 17th.  Robocast immediately reached out and

13  asked for clarification about whether or not she would

14  be a 30(b)(6) witness.  Netflix declined to answer

15  that email.

16          Netflix then, on April 15th, released

17  Ms. Ponce and indicated that they would not be

18  producing her in discovery.  There's no precedent for

19  that kind of unilateral decision to release a witness,

20  particularly in light of Robocast's repeated offers of

21  compromise to accommodate the witness' schedule,

22  including out of time deposition.

23          THE COURT:  And, Mr. Johnson, you know,

24  one thing I know you say is let's not, you know, only

Page 180

1    give one date for her depo, and we could not do it

2    because the questioning attorney wasn't going to be

3    available.  And the other side says you guys proposed

4    dates for a bunch of depos in this remainder of fact

5    discovery period, and you only offered one date for

6    them.

7                    I mean, is what happened you offered

8    one date and they took it, or did you offer one date

9    and they said, "We can't do that one," and you said,

10   "Well, you're not getting any other ones"?  Or what's

11   your response to that assertion about those four depos

12   where you only offered one date?

13                   MR. JOHNSON:  Your Honor, where we

14   offered one date, I believe the record reflects that

15   Netflix accepted those dates.  And where there were --

16                   THE COURT:  What if they had said,

17   "Sorry, we can't do one of those"?  There's a

18   conflict.

19                   MR. JOHNSON:  Then Robocast would've

20   worked with Netflix to schedule alterative dates.

21   Frankly, it's what we did with respect to these third

22   parties that our counsel also represent, and

23   Mr. Sofer, Mr. Andrew, we had also allowed for a out

24   of time deposition of Mr. Kenneth Hicks, who was also

Page 181

1    a third party that counsel represented.

2                    It simply never occurred to Robocast

3    counsel that it was an option to simply refuse to

4    schedule a deposition.

5                    THE COURT:  All right, Mr. Johnson.

6    Anything further you want to add before I turn to your

7    colleague on the other side?

8                    MR. JOHNSON:  Just to note that the

9    fact that we were unable to depose Ms. Ponce was

10   seriously prejudicial to Robocast's damages case.

11   Ms. Ponce was the only witness identified in both the

12   interrogatory responses and initial disclosures, with

13   relevant information related to Netflix's revenue and

14   costs.  Both of which were key issues in the damages

15   reports of Mr. Martinez and Mr. Holzen [ph], and

16   doubtlessly would've also been -- Ms. Ponce

17   doubtlessly would've also been the 30(b)(6) designee

18   on three topics for which Netflix never designated any

19   witness.

20                    So the prejudice is clear to

21   Robocast -- denied the ability to present a key part

22   of its damages case.

23                    THE COURT:  Okay.  Thank you.

24                    Let me turn to the other side.

```
 1              Ms. Cohen, on your end, I understand
 2      your gripe about when they noticed the depo, as well
 3      as others.  In the end though they say, "Look, you
 4      offered one date.  Said you don't like it, you know,
 5      pound sand.  She'll never be available again."  And
 6      they couldn't do the date, and you said, "Sorry.  No
 7      more deposition of Ms. Ponce" who they say is a fairly
 8      relevant witness.  Isn't that what happened?
 9              MS. COHEN:  Your Honor, I think that's
10      not -- it's close, but it's not quite the full story.
11              So to be clear, and I think the record
12      bears this out.  It's a long and well-documented
13      history.  And Judge Hall had the same question you
14      asked of Robocast counsel, Mr. Rizzi, and said, you
15      know, "Why did you wait so long?  Was there any reason
16      why you couldn't serve any of these notices sooner?"
17      They waited until after they already moved to notice
18      the schedule to even notice any of our witnesses.  And
19      all of the witnesses were served with a defective
20      notice.
21              They could not -- I think they
22      recognize they couldn't actually complete those
23      noticed depositions by the April 11th deadline.  And
24      the court recognized that and that's why we stipulated
```

Page 183

1    to additional time of the close of fact discovery to

2    allow for additional time to take all of the noticed

3    depositions.

4                    As it relates to Ms. Ponce, there is no

5    dispute that Netflix identified Ms. Ponce as a

6    relevant, and the only relevant witness as it relates

7    to financial information in February of 2023.  And

8    repeatedly through the course of discovery through rog

9    responses, ESI disclosures, production of her

10   documents, and so on.

11                   And then Ms. Ponce was the very first

12   witness that either side identified for a deposition

13   at all in this case.  Any party deposition was

14   Ms. Ponce.  She was the very first person we

15   noticed -- that was provided a date for, rather.

16                   She was -- the date was provided one

17   week before her deposition, and it was made very, very

18   clear.  Ms. Ponce had very limited availability left

19   in the deposition in the period of fact discovery.  If

20   the deposition were to proceed, it needed to proceed

21   on April 17th.

22                   At that point, there was never a

23   representation by counsel that they could not cover

24   the deposition.  They never said they weren't

Page 184

1    available.  They just said that they didn't have

2    enough time.

3                    And, Your Honor, this isn't enough time

4    on a short runway.  The accused functionality was

5    introduced by Netflix in 2012.  The patents expired no

6    later than 2020.  This lawsuit was brought in 2022 and

7    we're talking about April of 2024.

8                    There's no dispute that they had --

9    they acknowledge they knew about Ms. Ponce and her

10   relevance to this case and what information they had.

11                   And as it relates to the experts in

12   this case, as you have heard today, both sides have

13   submitted expert reports.  Netflix's expert has not

14   relied on Ms. Ponce in offering his opinion in this

15   case.  And the information that they purportedly, if

16   they needed it, they had ample opportunity to take her

17   deposition.

18                   So what we said is not that you can

19   never have her.  We said if you want to take her

20   deposition, you should seek leave of the court.  We

21   understood Judge Hall's order to allow a limited

22   extension of time, but that she expected the parties

23   to get the depositions done in that window.  She

24   recognized that trials occur in less than time.

Page 185

1          And we proceeded with haste.  We

2    expected Robocast to do the same.  Unfortunately, they

3    elected, for whatever strategic choice, not to take

4    that deposition.  They had 11 attorneys on their side

5    who could've taken that deposition, only one was tied

6    up in a deposition on a third-party matter in the

7    Google case, not in our case.

8          So, Your Honor, we submit that if the

9    really couldn't have done it, the response should've

10   been that they couldn't do it.  They didn't say they

11   couldn't do it because the answer is what they said,

12   which is they just didn't feel like they had enough

13   time.  After this long record, that is lack of

14   diligence.  That is not showing good cause justice

15   Judge Hall recognized.

16          THE COURT:  Okay.  And on the notice

17   issue, I see that you noticed two depositions.  The

18   Frantom deposition and the Robertiello deposition on

19   March 5th.  Not March 27th, but March 5th.  How long

20   had you all known about the relevance of those

21   witnesses?

22          MS. COHEN:  So if my memory serves me

23   correctly, Your Honor, Ms. Frantom and Mr. Robertiello

24   were not identified in the initial disclosures.  They

Page 186

1    were only identified as I think potential ESI

2    custodians.  A lot of the --

3              And to be clear, Your Honor, March 5th

4    is more than a month of time before the April 11th

5    close of fact discovery.  We were ready, willing, and

6    able to meet the fact discovery deadlines, which is

7    what we told them when they first told us they needed

8    an extension in February.  Which is why we opposed the

9    extension.

10             We said, "We are ready, willing, and

11   able to complete the deadlines in this case.  We are

12   ready to proceed," and they sat.  And they waited.

13   And you know what?  They didn't notice any of the

14   Netflix's 30(b)(1) or 30(b)(6) depositions until two

15   weeks before the April 11th close of fact discovery.

16   That is representative of lack of diligence.  That's

17   why Judge Hall presumably found that they lacked good

18   cause to extend the schedule for the three and a half

19   months that they requested.

20             And she only, I believe, gave an

21   extension of time at all because the reality was that

22   it wasn't possible to do the 30 noticed depositions in

23   six days, which is all the parties had remaining.

24             But she also cautioned that she

1    expected the parties to work together to get this

2    done.  And rather than tell us that they couldn't do

3    it because they didn't have coverage, they just said

4    it wasn't enough time.  They had a week's notice and

5    they said -- a week's notice after filing this case in

6    March of 2022.  That's more than two years to get

7    their selves together on the witness they now contend

8    is a critical witness for their damages case.

9              THE COURT:  Okay.  But for Frantom and

10   Robertiello, you said they were ESI custodians.  Were

11   they identified as ESI custodians, like, pretty close

12   in time to March 5th, or, like, many, many, many

13   months before, or something in-between?

14             MS. COHEN:  My understanding is they

15   were disclosed as ESI custodians in September, but

16   that there were no documents that were provided for

17   Mr. Robertiello.  So there wasn't actually, like, ESI

18   particular documents that were produced that were his

19   documents.

20             So it was more of a belts and

21   suspenders, make sure we had all of the, you know,

22   potential witnesses that would be potentially coming

23   to trial, but not that there was a key missing

24   document, because we didn't get any documents.  We

Page 188

1    would've assumed that if he were a crucial witness, we

2    would've received documents for him, but we didn't

3    receive those documents for him.

4                    THE COURT:  I take your point that you

5    noticed all your depos between January and March --

6    early March, and they noticed all theirs in late

7    March.  That's what you're saying.

8                    MS. COHEN:  And we took their order

9    seriously.  To be clear, the majority of their

10   witnesses were offered for one date.  And even if that

11   meant we had to dual track or even triple track, we

12   made it happen and our team is half the size.

13                   THE COURT:  Okay.  All right.  Thank

14   you.

15                   Mr. Johnson, is there anything further

16   you'd like to say by way of rebuttal?

17                   MR. RIZZI:  Your Honor, this is Steven

18   Rizzi.  I believe he may have dropped off somehow.  I

19   don't see him.

20                   THE COURT:  Oh, okay.  All right.

21   Well, as I said, I do need to wrap up.  So, all right.

22                   Well, I appreciate the arguments that

23   were made here.  In the end, I'm going to grant the

24   plaintiff's motion and the plaintiff's going to be

Page 189

1    able to take Ms. Ponce's deposition; okay?  And I'll

2    explain the reasons why very briefly.

3                   I acknowledge, it's true, Plaintiff

4    noticed the deposition and its other depos late in the

5    game.  I understand Defendant's gripe about that.

6    They noticed them on March 27th.  The original

7    discovery deadline was April 11th.  That's very late.

8    I get very difficult, if not impossible, to complete

9    all those depos between then and April 11th.

10                  But ultimately, Judge Hall did extend

11   the discovery deadline to May 13th.  And so although

12   Plaintiff was late, in some respects, Judge Hall has

13   dealt with that issue and allowed a certain period to

14   actually take the depo.

15                  So the real question is, you know, what

16   was the process for taking the depo, and was it fair

17   to Plaintiff in this case?

18                  And here, the defendant provided

19   Ms. Ponce's availability on April 10th to the

20   plaintiff.  They said she was available on one date,

21   April 17th.  Was traveling and would not be available

22   thereafter.  That was the one day.  Take it or leave

23   it.

24                  Plaintiff did respond and say that its

Page 190

1   attorney who wasn't able to take the deposition, a

2   conflict, or has told me that that was the case.  But

3   had responded and said that it asked some questions

4   about the deposition, including whether she would be a

5   30(b)(6) witness.  Didn't get a response in the next

6   few days, and ultimately said that the date did not

7   work for them, and they told me now that the reason is

8   because the lawyer who was going to handle the depo on

9   that subject matter was not available on that one

10  date.

11              And ultimately, look, it's -- you can't

12  just offer one date and say, "Take this date," or not.

13  At least as to a witness who has really relevant

14  testimony.  And, indeed, Defendant's letter, in the

15  second paragraph of it, you know, makes the case as to

16  why Ms. Ponce is relevant, and so does Plaintiff's

17  letter.

18              And so, I mean, ultimately if the date

19  didn't work, Defendant should offer at least one more.

20  And Plaintiff should've tried to do it, but they

21  didn't.  And so Ms. Ponce's depo should be taken.

22              And in truth, frankly, this issue

23  should've never got to my desk.  You know, this depo

24  should've been taken long ago.

Page 191

1           So I'm going to grant the motion and
2   the parties can discuss the scheduling of Ms. Ponce's
3   deposition.  I'll trust that they'll do so amicably.
4           With regard to the further 30(b)(6)
5   depo topics that I have ordered, you know, that sounds
6   like two hours maybe.  Maybe a little more, maybe a
7   little less.  I'm sure the parties can come to some
8   agreement on the relevant timeframe for the universe
9   of topics that I've discussed today that'll be
10  permitted for further depositions.
11          All right.  With that said, I've now
12  been at it for 3 hours and 45 minutes with the
13  parties.  I really tried to give you as much of my
14  time as I possibly can, because I see the parties had
15  lots of disputes.  And I've attempted to do as much as
16  I can to try to resolve as many as I can today.
17          I've provided instructions for what
18  we'll do going forward in the future to try to get the
19  rest of the disputes resolved.
20          That said, look for a further order
21  from me on the motion to quash.  Otherwise, the
22  parties have instructions and I'll look forward to
23  hearing from them a week from today.
24          With all that said, the court will end

Page 192

1    our videoconference today and go off the record.  I

2    wish everybody a good day and a good week; okay?  Take

3    care.

4                      MULTIPLE SPEAKERS:  Thank you, Your

5    Honor.

6                      THE REPORTER:  We are off the record at

7    1:44 p.m.

8                      (Whereupon, at 1:44 p.m., the

9                      proceeding was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 193

CERTIFICATE

1

2           I, ANDREW WEADER, the officer before whom

3     the foregoing proceedings were taken, do hereby

4     certify that any witness(es) in the foregoing

5     proceedings, prior to testifying, were duly sworn;

6     that the proceedings were recorded by me and

7     thereafter reduced to typewriting by a qualified

8     transcriptionist; that said digital audio recording of

9     said proceedings are a true and accurate record to the

10    best of my knowledge, skills, and ability; that I am

11    neither counsel for, related to, nor employed by any

12    of the parties to the action in which this was taken;

13    and, further, that I am not a relative or employee of

14    any counsel or attorney employed by the parties

15    hereto, nor financially or otherwise interested in the

16    outcome of this action.

17                                *Andrew Weader*

18                                        ANDREW WEADER

19                                Notary Public in and for the

20                                Commonwealth of Pennsylvania

21

22

23

24

Page 194

1            CERTIFICATE OF TRANSCRIBER

2            I, JACOBEY RADTKE, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                                   JACOBEY RADTKE

16

17

18

19

20

21

22

23

24

[& - 26323]                                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&**  3:5 4:8,23 7:23 8:2 20:5,6 32:3,24 61:14 61:15 70:16 88:10,14 90:18 103:12 105:24 109:5 115:4,14 123:12 | **126**  89:8,10 **128**  101:10 104:13,20 **129**  101:10 104:13 **12:30**  8:14,16 8:19 **134**  85:10 91:13 **13th**  73:18 189:11 **14**  46:24 97:3 101:10 142:14 **1430**  148:5 **1498666**  35:4 **15**  152:2 **15th**  179:16 **16**  109:15 **17**  104:20 **17th**  179:12 183:21 189:21 **19801**  1:18 2:7 3:8 **1:22**  1:8 **1:44**  192:7,8 | **2008**  62:21 **2010**  61:20 152:16 **2011**  31:17 **2012**  184:5 **2013**  35:3 **2014**  85:17 88:4 115:2 129:23 **2014-2015** 108:20 **2016**  85:17 88:5 115:2 129:23 **2017**  160:8,9,16 161:6 162:20 162:23 163:1 164:12 166:11 169:14,18,22 170:3 171:21 172:11,22 **2019**  160:8,9,17 161:6 162:20 162:24 163:2 164:12 166:11 169:14,18,22 170:3 171:21 172:11,22 **202-350-5131** 4:17 **202-637-2329** 4:15 **202-637-2629** 4:16 | **2020**  25:21,24 26:1 28:5 60:12 137:9,12 137:14 143:13 143:14 146:10 146:17,21 154:8,9 184:6 **2022**  154:5 184:6 187:6 **2023**  183:7 **2024**  1:13 184:7 **21**  89:10 **212-402-9400** 2:24 **22**  1:13 **22-305**  6:24 **24**  6:20 **25**  69:15,22 70:2 149:6 158:24 159:21 159:24 160:17 164:7,16,20 165:4,10 171:8 171:12,15 172:2,3 173:8 174:6,10 **25386**  193:17 **257**  83:22 84:13 **258**  83:22 **26**  73:12,15 74:10 76:22 **26323**  194:14 |
| **0** | **2** | | |
| **00305**  1:8 **08**  14:21 19:1,9 | **2**  174:15,23 **20**  89:10 152:2 **2000**  62:20 137:2 **20004**  4:10 **2000s**  136:16 **2001**  62:11,20 **2007**  93:22 | | |
| **1** | | | |
| **1**  8:11,12 144:20 186:14 **10**  143:23 145:22 153:15 **100**  16:11 35:17 93:15,19 **1000**  4:9 **10001**  2:19 **106**  6:20 **10:03**  1:14 6:3 **10th**  179:9 189:19 **11**  185:4 **11th**  175:18 177:19 182:23 186:4,15 189:7 189:9 **120**  47:11 **121**  3:16 **124**  85:10 91:13 | | | |

**[27th - activity]**

**27th** 175:20
177:7,18
185:19 189:6
**28** 1:17

**3**

**3** 87:21 109:13
191:12
**30** 47:8,10
76:14 92:1
97:14 103:3
111:8 116:23
117:5 120:16
120:19 121:14
121:21 124:7
135:21 143:4
144:20,20,21
153:5 179:14
181:17 186:14
186:14,22
190:5 191:4
**302-498-7869**
3:12
**302-651-7705**
3:11
**302-655-5000**
2:10
**324** 85:20
87:21
**327** 85:20
87:21
**330** 109:15
110:18
**345** 93:22
**35,000** 153:14

**37** 153:6
**372** 148:6
**395** 2:18
**3ds** 148:4

**4**

**4** 101:10
**400** 2:6
**408-621-9213**
3:19
**45** 47:10
191:12
**493** 93:22

**5**

**5** 142:14
**50** 47:10
**50th** 2:18
**555** 4:9
**5th** 46:11
178:13 185:19
185:19 186:3
187:12

**6**

**6** 76:14 92:1
97:14 103:3
111:8 116:23
117:5 120:16
120:19 121:14
121:21 124:7
143:4 144:20
144:21 179:14
181:17 186:14
190:5 191:4
**600** 2:6 3:7

**6811211** 1:20

**8**

**844** 1:17
**89** 159:12
160:15 166:14

**9**

**90s** 47:9
**920** 3:7
**95032** 3:17
**96** 31:10
**97** 31:10
**9th** 2:18 179:8

**a**

**a.m.** 1:14 6:3
**ability** 67:2
80:2 84:21,23
170:23 181:21
193:10 194:7
**able** 33:2 43:6
44:14 78:10
80:5 87:2 90:1
96:13 98:6
108:9,18
125:19 137:1
140:1,16 150:3
157:1 160:11
164:21 176:7
186:6,11 189:1
190:1
**absent** 114:17
**absolutely** 13:9
41:15 44:4,21
48:24 62:12
143:9

**abundantly**
57:8
**accept** 45:2
**accepted**
180:15
**access** 24:2
89:22 168:4
**accommodate**
179:21
**account** 26:22
67:19 94:24
**accountant**
102:21
**accurate** 56:23
151:4 166:17
193:9 194:5
**accusations**
60:7
**accused** 184:4
**acknowledge**
184:9 189:3
**acknowledged**
39:12 114:16
**acquiesced**
25:14 26:1
179:4
**acted** 59:11
162:15
**action** 1:7 6:19
6:24 148:5
193:12,16
194:8,12
**activities** 122:3
**activity** 34:9
47:20

[actor - alessandra.schaszberger]                                    Page 3

**actor** 63:12
**actual** 16:2
  44:14 45:16
  128:6 129:12
  140:22,23
  146:20 155:11
  155:12,19
  156:15
**actually** 21:12
  21:19 25:13
  32:5 37:10
  41:21,21 44:23
  49:15 59:5
  60:21 62:24
  70:4 75:3
  93:21 94:20
  101:11 123:24
  131:19 144:24
  145:5 151:11
  182:22 187:17
  189:14
**add** 12:14 31:4
  34:16 36:12
  39:19 58:16
  99:10 151:12
  151:19 165:5
  173:12 181:6
**added** 37:6
  163:2
**addition** 14:7
  50:4 127:21
  136:2 137:15
  168:20
**additional** 13:5
  37:8 43:20

69:24 88:24
  89:20 91:17
  97:1 100:4
  107:18,19
  121:1,6 131:2
  155:9 170:22
  183:1,2
**additionally**
  6:21 113:20
  117:21 130:19
**address** 7:17
  24:15 30:12
  56:21 71:1,3
  121:22 168:22
  170:6
**addressed**
  166:3,4
**addressing**
  70:21 159:7
  160:24 161:1
  174:24 175:5
**adequately**
  130:22
**administrative**
  8:9
**administrativ...**
  158:21
**admissions**
  152:23
**admits** 120:21
**admitted** 50:24
  51:1 58:4
  166:20
**admittedly**
  21:13

**admitting**
  153:11
**advantage**
  121:1
**advice** 21:9,20
  22:10 26:10,11
  26:14 82:20
  88:21 89:13
  93:24 94:1
  100:8 106:5,6
  106:18 109:7
  110:5 115:6,23
  142:11 145:6
  160:11 161:6
  161:10 162:5
  162:12 166:14
  170:12
**advise** 26:11
**advised** 13:12
**advisement**
  49:24
**advising** 19:20
  106:15
**advisor** 48:9
**affected** 166:23
**affiliated** 43:2
  53:6
**afternoon**
  165:19
**agency** 110:12
**agent** 22:6
  110:5,5,20
**agents** 115:23
**ago** 46:24
  168:6 190:24

**agree** 24:9 25:4
  63:21 116:12
  123:10 138:23
  152:1 172:8
  177:19
**agreed** 25:21
  28:6 63:1
  86:16 132:22
  133:1 143:14
  146:10,17
  147:2 154:23
  173:20 176:13
  176:15 179:7
**agreement**
  30:20 60:21
  133:6 143:3
  146:21 147:1
  154:21 171:7
  173:5,24 191:8
**agreements**
  34:10 123:13
  123:20,24
  125:16,22
  129:8,13 130:1
  130:9 147:8
  155:3,16
**ahead** 36:16
  81:7
**al** 6:19
**albright** 3:16
**alessandra** 4:6
  8:4 70:24
**alessandra.sc...**
  4:14

alike 55:20
alive 121:10
allegations
34:17 35:20
63:13
allege 63:12
alleged 13:11
71:20 135:9
136:22
allegedly
145:10
alleging 35:22
allocated
130:14
allow 43:19
66:4 173:12
183:2 184:21
allowed 61:18
119:17 120:1
124:6 180:23
189:13
alter 34:1 116:1
alterative
180:20
alters 115:15
amicably 191:3
amidst 148:14
amount 25:18
37:12 39:14
41:24 48:21
72:19,21 73:4
76:8,15,17
77:15 78:6
80:14,16,19
86:6 89:13

112:21 123:12
123:23 125:3,4
125:8,20
128:18 129:12
129:17 144:16
amounted
172:17
amounts 147:9
ample 184:16
analysis 10:17
11:6 99:3
andrew 1:19
179:6 180:23
193:2,18
andrews 35:1
36:10 132:10
149:15
angel 151:1
ann 4:22
answer 75:1,20
75:20,21 76:3
77:24 82:16,16
83:1 84:1,5,5
89:10 91:8
95:20 101:5
105:2 109:18
109:22 121:17
152:23 153:4
179:14 185:11
answered
142:7 157:18
157:24
answering
92:16

answers 40:3
42:9 78:17
98:1 111:8,10
121:23
anticipated
80:16
anybody 6:5
93:16
anymore 55:13
apart 28:19
113:21
apologies 99:7
apologize 9:13
42:3 117:11
121:3 128:14
170:7
apparently
105:24 164:5
appeared 144:3
appears 117:24
123:10 162:6
appendix
159:11 160:14
160:16 161:10
161:12 163:8
164:1,12,16
165:1 166:22
167:8,9 169:24
171:13,19,20
172:4,6,8,17,20
173:9
apple 31:18
32:1 50:20
61:21 126:23
140:1

applicable
177:13 178:2
applies 93:23
apply 94:10
110:9 152:17
appreciate 60:2
89:19 167:1
168:9 188:22
approach
160:13
appropriate
49:3 78:1
113:17 141:2,4
141:7 157:6
162:2 172:7
appropriately
39:8 66:3
174:8
appropriaten...
158:12
approximate
73:20
approximately
20:15
april 12:19
42:14 46:11
52:16 175:18
177:19 178:13
179:8,9,12,16
182:23 183:21
184:7 186:4,15
189:7,9,19,21
areas 33:20
arguably 22:13
88:20

| | | | |
|---|---|---|---|
| **argue** 43:6,7 174:20 | 50:23 52:1,6 52:17,20 74:3 | 127:10 128:16 130:15 132:21 | **assume** 10:1,4 158:11 |
| **argued** 23:19 | 74:7,10 76:15 | 151:13 160:1 | **assumed** 188:1 |
| **argues** 130:20 | 81:17 86:11 | 171:21 | **assured** 166:15 |
| **arguing** 9:17 | 88:1 89:9,15 | **assertedly** 21:3 | **attach** 170:1 |
| 9:17,19 12:11 | 90:14 96:12,22 | 174:11 | **attempt** 114:17 |
| 68:7,23 131:10 | 101:22,23,24 | **asserting** 13:1 | 157:20 169:2 |
| **argument** | 102:3,14 104:1 | 62:10 123:1 | 173:2 |
| 14:13 24:5 | 104:20 105:17 | 146:15 169:23 | **attempted** |
| 66:15 75:9 | 109:15,20 | **assertion** 17:5 | 152:4 191:15 |
| 110:13 134:17 | 127:17 133:17 | 75:7 98:9 | **attempting** |
| 135:5 136:14 | 133:23 135:17 | 118:13,16,21 | 116:20 169:6 |
| 136:19 167:6 | 139:19 142:7 | 123:11 135:13 | **attempts** |
| 172:9,19 | 157:3,17,23 | 138:14 139:5 | 178:23 |
| 174:21 175:12 | 179:13 182:14 | 159:3,4 162:22 | **attorney** 14:13 |
| **arguments** | 190:3 | 165:6 168:14 | 30:1 36:8 |
| 33:14 188:22 | **asking** 57:16 | 169:20,23 | 51:20,22 70:6 |
| **arisen** 171:18 | 74:21 75:21 | 170:5 171:22 | 82:1 83:6 |
| **arrangement** | 78:13 83:10,24 | 172:14 180:11 | 88:16 89:16 |
| 122:10,22 | 87:8 103:8 | **assertion's** | 90:1 94:10 |
| 123:11 126:9 | 105:1,6 111:9 | 81:21 | 105:4,8 106:10 |
| **arrangements** | 111:12 116:7 | **assertions** 17:3 | 108:17 115:8 |
| 126:14 152:19 | 140:8,9 174:1 | 88:22 90:21 | 115:16 135:14 |
| **articulate** 70:4 | 174:7 | 114:18 124:9 | 135:21 167:12 |
| **articulating** | **asks** 104:21 | 138:11 173:15 | 167:15 174:20 |
| 75:17 | **aspect** 47:24 | **asserts** 172:18 | 175:11 180:2 |
| **ascent** 18:20 | 134:18 | **assess** 10:24 | 190:1 193:14 |
| **ashley** 4:5 8:3 | **assert** 30:9 | 66:6 76:23 | 194:10 |
| 70:16 | 66:19 140:9 | **assessment** | **attorneys** 39:10 |
| **ashley.fry** 4:13 | 147:21 | 96:9 | 51:16,16 54:4 |
| **aside** 160:16 | **asserted** 13:15 | **assignments** | 54:15 125:10 |
| **asked** 13:21 | 36:21,22 38:9 | 162:14 | 127:12 128:1,5 |
| 14:14 27:18 | 46:21 56:5 | **associate** 4:23 | 130:15 185:4 |
| 40:1 47:17,18 | 95:19 98:4 | 8:1 | **audio** 193:8 |
| 50:14,15,18,23 | 124:13,17,22 | | 194:3 |

[author - beyond]                                                          Page 6

| | | | |
|---|---|---|---|
| **author**  161:17 162:3 | 179:14 181:17 186:14,14 190:5 191:4 | 148:1 150:2 162:10,11 | 97:21 102:6 103:5 111:15 |
| **authored**  162:4 | **back**  12:17 | **baseless**  65:5 | **believe**  7:15 |
| **authority**  89:15 | 13:11 14:20 | **bases**  85:4 | 16:11,19 19:9 |
| **authorship** 161:23 | 15:24 24:20 26:15 31:9 | 86:10 | 20:19 26:17 30:2 32:15 |
| **automatically** 93:1 | 40:19 52:22,23 | **basic**  86:8 87:8 | 34:20 60:19 |
| **availability** 183:18 189:19 | 55:21 58:16 78:23 89:7 | **basically**  18:8 75:11 172:2 | 63:24 96:24 104:3 105:18 |
| **available**  13:16 15:18 45:20 | 91:11 97:14 125:20 126:11 | **basis**  61:1 63:11 76:24 | 108:8 109:18 110:23 112:6 |
| 179:11 180:3 182:5 184:1 | 128:16 136:16 162:16 163:22 | 79:7 81:20 92:4 106:19 | 116:22 123:9 144:13,22 |
| 189:20,21 190:9 | 165:14 168:18 171:7 173:19 | 110:3 114:8 116:22 120:18 | 145:2 147:24 149:23 154:5 |
| **avenue**  2:18 | 176:13 | 147:23,23 152:22 157:15 | 176:21,23 180:14 186:20 |
| **averments** 44:15 | **bar**  31:21 | 165:5 172:24 | 188:18 |
| **aware**  14:2 | **bars**  31:19 32:4 | **bayard**  2:5 | **belts**  187:20 |
| 16:9 78:8 | **base**  74:12 | 7:10,12 | **beneficial** 82:23 |
| 85:12,16 98:20 | 77:19 78:1,22 | **bayardlaw.com** 2:8,9 | **benefit**  11:11 |
| 145:3 169:7,10 177:16,23 | **basecamp** 161:20 | **bear**  23:23 | **best**  21:13 |
| **b** | **based**  12:8 | 38:18 41:16 | 113:15 114:6 |
| **b**  5:1 76:14 | 25:14 28:3 | 95:2 123:15 | 161:22 193:10 |
| 89:7 92:1 | 58:2 63:15 | 124:8 136:9 | 194:6 |
| 97:14 101:8 | 64:2 67:14 | 156:2,17 | **better**  97:20 |
| 103:3 104:12 | 70:22 85:6 | **bearing**  23:20 | 124:10 125:15 |
| 104:13 111:8 | 88:17 91:11,21 | 128:6 | **beyond**  12:12 |
| 116:23 117:5 | 94:16 102:18 | **bears**  119:13 | 19:22 20:10 |
| 120:16,19 | 102:18,23,24 | 124:2 182:12 | 34:9 70:4 |
| 121:14,21 | 104:5 107:8 | **beginning**  44:1 | 75:13 138:17 |
| 124:7 143:4 | 114:3 115:24 | **behalf**  2:2 3:2 | 138:19 151:13 |
| 144:4,20,20,21 | 119:18 128:5 | 4:2 9:9 32:21 | 157:16,22 |
| | 133:23 141:17 | 32:24 38:21 | 158:1 |
| | | 70:16 95:10 | |

| | | | |
|---|---|---|---|
| **bias** 136:6,10 | **brett** 19:10 | 160:23 189:2 | **burdensome** |
| **big** 17:12 41:22 | 28:14 47:16,21 | **bring** 41:3 68:3 | 132:9 133:10 |
| **bit** 28:18 56:2 | 76:13 86:22,24 | 99:15 121:3 | **burke** 1:15 |
| **black** 152:21 | 87:1,5 101:9 | **britton** 4:23 | **business** 12:12 |
| **blank** 74:4,6 | 101:17 102:17 | 8:1 | 19:23 23:1 |
| **blasts** 145:11 | 159:12 160:16 | **broader** 48:8 | 31:11 47:24 |
| **bleeds** 28:17 | 160:18 161:16 | 54:9,12 | 48:9 49:24 |
| **blended** 59:12 | 162:11 163:2 | **broadly** 12:11 | 55:20 71:1,12 |
| **block** 45:16 | 170:13 | **brought** 163:22 | 81:23 82:8 |
| **blocked** 40:7 | **brief** 16:10 | 184:6 | 94:3 122:3,11 |
| 59:15 76:17 | 19:13 32:19 | **bucket** 11:16 | 131:6 134:10 |
| 79:19 98:16 | 43:20 55:1 | 11:17,19,22 | 134:15 148:13 |
| 100:18 128:24 | 58:17 59:19 | 12:10,14 14:18 | 150:15 151:1,3 |
| 135:19,21 | 60:2 64:24 | 22:16 36:22 | 153:9 156:12 |
| 140:17 145:4 | 66:4,16 67:2 | 38:14,20 39:1 | 156:12 |
| 153:2 | 67:12,14 | 42:22 54:22,23 | **businesspeople** |
| **blocking** 41:24 | 110:15 112:18 | 72:7,10 81:8 | 92:20 |
| 135:23 | 120:22 169:13 | 81:11,12 | **c** |
| **blue** 6:8 | 169:15 170:1 | 106:21 108:3 | **c** 2:1 3:1 4:1 6:1 |
| **boggs** 1:16 | 171:10 172:14 | 112:8,9 122:7 | **ca** 3:17 |
| **bolster** 49:22 | 172:16 174:22 | **buckets** 10:20 | **calculate** 77:20 |
| **bolstered** 45:1 | 175:11 | 10:24 11:15 | **calculated** |
| **bolsters** 39:14 | **briefed** 10:13 | 12:16 13:5 | 102:22 |
| **boundaries** | **briefing** 11:10 | 34:3,6 36:14 | **calculating** |
| 55:18 | 11:15 12:2,18 | 41:16 42:17 | 74:13 99:8 |
| **bracket** 68:6 | 13:3,24 24:7 | 46:19 55:15 | **calculation** |
| **brauerman** 2:3 | 25:1 33:9 | 71:16 72:3,13 | 72:6 74:18 |
| 6:7,8 7:9,10 | 42:13 43:13 | **building** 1:16 | 77:18 97:22 |
| **break** 24:13 | 57:6 115:18 | **bunch** 13:4 | 99:1 113:24 |
| 42:4 95:5 | 123:15 164:9 | 67:10 150:8 | 124:2 |
| 122:5 | **briefly** 16:3 | 180:4 | **calculations** |
| **breakdown** | 58:19 100:10 | **burden** 35:9 | 73:10 |
| 33:20 125:23 | 107:12 139:9 | 110:9 111:1 | **calendars** 8:10 |
| **breaking** 36:24 | 147:13 152:11 | 124:5 168:4 | **call** 10:1 11:4 |
| | 154:2 158:5 | | 15:21 28:11 |

[call - challenged]                                                    Page 8

75:6 97:14
112:12 113:19
114:15 115:10
136:13 170:24
174:15,23
**callback** 71:11
**called** 40:19
48:5,6 113:9
115:14 117:9
132:1 141:9
161:20
**calling** 35:16
134:6,7
**calls** 24:3 29:3
35:12 53:22
**camera** 69:15
70:3 71:2,4
150:5 159:14
159:19 160:17
164:8,19 167:2
171:9
**camera's** 6:4
**cap** 15:21,22
102:20 104:6
**capably** 23:19
**capture** 12:7
**captured** 34:5
60:16
**care** 192:3
**careful** 29:7,24
**case** 6:18 9:5
9:10 10:19
12:20 22:18
25:12,19 28:7
28:16 29:15

30:10 32:13
34:18,20,23
35:20 36:3,6
36:11 37:8,24
38:2,18 39:11
41:12 46:3
48:13 49:6
51:16,18 53:12
53:16,17 54:8
54:10,13 55:15
57:12 59:9,10
61:8 62:8
66:15 68:17,21
72:5,23 73:12
73:24 76:8
79:7 82:22
87:11 89:21
93:5 95:23
97:3,4 110:7
111:2 114:13
115:21 121:8
121:16 124:3
124:17 125:5
127:2 130:12
132:10 133:7
134:20 135:2
135:22 136:7
141:2,24 142:4
142:21 143:8
144:5 146:13
149:21 150:1
152:15 154:8
154:22 155:1
155:23 156:4
156:10,19,23

157:9 161:19
166:13 175:23
176:1,24
177:13 181:10
181:22 183:13
184:10,12,15
185:7,7 186:11
187:5,8 189:17
190:2,15
**cases** 18:18
31:18,24 32:2
32:4 36:6
51:19 53:19
54:2 55:3,12
62:2 65:3
123:3,19
124:12,16,21
144:15 148:3
**categorically**
60:3
**categories** 12:7
33:12 69:1,1
121:21 122:8
134:10 154:21
**category** 13:14
23:3 34:8,13
34:15 55:24
59:6 71:24
112:16 121:24
122:9,10,13,18
122:22 131:3,4
158:8,8 163:15
**cause** 185:14
186:18

**cautioned**
186:24
**caveat** 25:8,20
**caveats** 25:9
26:3
**central** 150:11
**century** 20:22
**certain** 13:5
68:16,19 80:1
83:16 104:6
154:21 155:1
157:4 158:9
167:24 171:19
189:13
**certainly** 13:16
15:20 16:13
19:7 23:7
29:24 35:12
39:4,18 45:7,8
107:22 146:19
149:22
**certificate**
193:1 194:1
**certify** 193:4
194:2
**cetera** 10:16
11:22 24:11
27:9 29:10
71:12 78:22
148:13 150:8
168:16
**challenge** 44:18
**challenged**
166:22 167:10

[challenges - comments]                                                    Page 9

**challenges**
  29:10
**chance**  32:19
  59:19 67:14
  114:6 116:23
  159:1 165:20
  174:21 175:12
**chances**  166:15
**change**  162:7
**changed**  137:6
  162:6
**changes**  29:9
  60:4 61:11
  169:1
**changing**  166:1
  167:21
**characterize**
  151:2
**characterized**
  133:5 149:12
**charrington**
  3:14 8:6
**choice**  185:3
**choosing**  94:5
**chose**  16:7 65:3
**chris**  41:22
**christine**  57:1
**christopher**
  1:15
**circuit**  10:13,15
  93:22
**circumstances**
  149:17,24
  153:21 156:5,9

**citation**  149:14
**citations**  39:24
  45:21
**cite**  93:21
**cited**  34:23
  80:7 84:3
  90:23 139:22
**cites**  86:22,23
  121:1,4 123:4
  149:20
**civil**  1:7 6:19
  6:23 148:5
**cjb**  7:2
**claim**  40:20
  48:3 119:2
  167:14
**claimed**  39:7,8
**claiming**  40:17
  42:23 49:11
  118:1 122:24
  131:10 140:12
**claims**  132:11
  134:19 139:15
**clarification**
  12:9,14 117:12
  159:11 179:13
**clarify**  27:13
  61:19 62:3
  108:21 131:20
  132:12 133:3
  146:1 160:21
**clawback**  80:24
  81:4,7,13
  117:23

**clear**  31:8
  37:17 41:15,17
  57:8 93:5
  95:20 100:21
  102:15 103:8
  106:13 108:13
  129:16 170:18
  175:23 176:16
  181:20 182:11
  183:18 186:3
  188:9
**clearly**  57:11
  85:24 100:13
  100:20 127:10
  127:19 128:11
  148:23
**clerk**  4:22
**client**  20:2 30:1
  70:6 82:1 83:6
  88:16,19 89:16
  90:1 94:10
  105:4,8 106:10
  108:17 115:6,8
  115:16 135:14
  167:12,15
**clients**  115:23
**close**  65:15
  177:11 182:10
  183:1 186:5,15
  187:11
**closed**  76:10
  97:15
**cloud**  64:10
**clue**  143:3

**cohen**  4:4 8:3,7
  165:18,19
  167:5,9 168:8
  168:19 169:1
  175:7,8 182:1
  182:9 185:22
  187:14 188:8
**colleague**  7:11
  30:11 31:5,12
  70:24 96:17
  181:7
**colleagues**
  40:13
**collected**  25:15
  25:19 161:19
**collection**  26:5
**color**  6:7
  151:12
**come**  81:17
  84:8 86:1
  117:13 148:23
  165:13 173:5
  175:20 191:7
**comes**  25:2
  56:6 65:15
  66:6 74:16
  81:19 90:5
  161:15
**coming**  87:15
  167:16 187:22
**commanded**
  41:9
**comments**
  26:14

**commercial**
23:24 24:12
48:14 49:12
50:5,7,11 62:9
62:10,14 135:9
136:12,15,18
137:3,9,11,16
137:19 138:19
139:7,15 140:5
140:13 143:12
**commercially**
48:4 50:18
**commit** 99:22
164:18
**common** 30:14
30:17,20 147:4
147:7
**commonwealth**
193:20
**communicate**
104:24 105:3
**communicated**
52:13 57:19
97:7 103:22
105:12,22
106:3,14
107:20,21
108:12 111:16
117:1 135:19
144:8
**communicating**
38:3,9 39:5,9
62:22 140:3
**communication**
27:8 82:5,8

88:16,19 89:12
93:6,10 102:8
109:24 111:4
134:18 160:1,2
160:8
**communicati...**
11:21 24:2,10
24:18 25:3,11
26:6,12,17
27:2,4,21 28:9
29:14 33:22
34:11,13 37:18
46:3,9 49:17
56:1,6,9,12,14
56:18 57:9
58:12 60:17
61:7 82:2 83:7
84:6 93:21,23
97:9 98:21
105:4 106:11
107:24 111:10
115:16 117:3
131:12,13,21
131:22 132:14
132:15 133:20
134:6,7,11,15
135:7 136:3,4
140:22 141:18
141:22 142:12
142:15 145:7
145:10 146:16
146:20 148:21
150:19 151:6,7
151:17,21
152:18 153:20

155:11,19,24
157:5,7,9
159:22,24
163:15 172:21
**companies**
83:12,16
**company** 1:9
16:2 17:9,13
17:18 18:3,6
18:16 19:3,8
20:8,20 48:22
50:1,2 51:4
72:12 86:8,14
88:21 89:11,14
89:17 92:20
94:5 97:22
98:6 102:6,24
103:5 111:16
112:1 132:2
136:23 140:10
**company's**
18:20 75:2
120:17 137:4
139:21
**comparable**
99:7 127:6
**compared** 59:4
**compel** 70:21
**complaining**
100:14
**complaint**
97:10,11
**complaints**
168:21

**complete** 15:20
15:23 16:4
182:22 186:11
189:8
**completed**
42:13,18
177:19,21
**completely**
146:8
**comply** 178:10
**component**
130:10
**components**
130:13
**comprehensive**
26:5
**compromise**
179:21
**computation**
73:15,20
**concern** 54:14
84:11 89:21
100:2 149:8
**concerned**
96:18 97:6
**concerning**
21:23 22:11
26:12 63:7
100:18 105:20
145:5 152:18
**concerns** 35:8,9
38:8
**conclude** 59:8
110:4 141:24

**concluded**
41:11,12 192:9
**concluding**
41:14
**conclusion** 62:1
107:7 142:5
**concur** 34:7,8
34:13 44:4
**conduct** 34:17
35:20 36:4,13
36:23 37:4,23
38:7,16 63:10
63:13
**confer** 59:1
164:3,10,15
165:2,13
167:18 171:6
**conference**
8:11
**confers** 58:4
165:22 166:2
**confidence**
88:20 106:3
**confidentiality**
21:21 22:12
30:20
**confines** 157:20
**confirm** 24:24
85:3 144:23
**confirmed**
13:11 103:12
108:7 162:13
**conflict** 180:18
190:2

**confusion**
161:15
**connection**
21:21 63:19
**conscientious**
39:19
**consent** 7:2
**consequences**
142:17
**consider** 35:7,9
41:5 55:6
170:20 171:2
**consideration**
149:11
**considered**
22:6,21,22
39:1 177:12
**consistent**
120:23
**consistently**
27:20 46:9
153:2
**constantly**
168:21
**consultant's**
115:20
**consultants**
92:21
**consulting**
86:14 108:7,8
108:20,22,24
109:8,19 110:2
110:6,13 111:6
115:14

**consummated**
152:19
**cont'd** 3:1 4:1
**contain** 126:8
**contend** 72:4
166:10 187:7
**contended**
166:18,19
**contending**
143:12
**contends**
112:22
**content** 107:2,8
163:2
**contention** 73:8
74:20 75:4,12
78:24 97:11
113:7,9
**contentions**
96:23 97:15,19
97:20 98:22
113:14
**contents** 26:12
84:6 121:7
**context** 48:8
69:24 83:10,14
89:20 94:9
149:19 152:24
**contingency**
126:14
**continuation**
31:22 63:7
**continuations**
32:2

**continue** 64:11
65:5 67:6
**continued**
16:14
**continuously**
19:12
**contours**
145:12
**contrast** 51:7
**contributed**
113:23
**conversation**
17:23 27:19
45:6 82:17
90:12,17 91:20
91:23 92:6
93:16 102:5
137:23,24
138:4,23
143:22
**conversations**
11:21 22:20
23:11,17,20
28:20,22 29:3
29:13,19 30:13
38:19 43:9
53:8 81:19
83:3 85:18
90:24 92:13
94:17 96:1,9
98:10 107:18
138:12 144:3
146:24 150:17
**converted**
61:23

[convey - court]                                                              Page 12

| | | | |
|---|---|---|---|
| **convey** 91:16 | **corresponding** | 103:11,11 | 9:15 10:14 |
| 171:23 | 55:4 | 104:20 105:5 | 11:9 12:15 |
| **conveyed** 76:19 | **corroborates** | 105:10 106:9 | 13:19 14:4,10 |
| 82:4 88:14 | 121:2 | 106:14 108:10 | 17:1 19:16 |
| 90:6 111:22 | **costs** 181:14 | 110:18 111:4 | 20:14 21:2 |
| **conveying** | **could've** 40:8 | 117:3 123:4,19 | 22:5,15 24:16 |
| 89:13 | 87:17 104:1 | 125:19 126:1 | 24:23 26:18 |
| **coordinate** | 110:16 115:10 | 128:18 141:14 | 27:7,11,23 |
| 176:2 | 131:1 185:5 | 143:11 152:24 | 28:17 30:4,7 |
| **core** 128:1 | **counsel** 6:10 | 157:19 160:23 | 30:16,22 31:20 |
| **corporate** | 7:5,6,8,12,19 | 170:13 172:21 | 32:10,13,17 |
| 26:10 | 7:21 9:16 | 174:21 175:10 | 33:3,6,16 35:7 |
| **corporation** | 11:12 12:13 | 180:22 181:1,3 | 35:8,19 36:17 |
| 1:5 | 14:9 16:24 | 182:14 183:23 | 36:20 38:15,24 |
| **correct** 13:20 | 17:6,7,7,15,21 | 193:11,14 | 39:21,22 40:1 |
| 53:9 54:24 | 18:3,7 19:10 | 194:7,10 | 42:5,8,12,16 |
| 71:15 73:6 | 19:11,14,20 | **counsel's** 35:6 | 45:14,18,20 |
| 74:8 77:12 | 20:10,12 21:20 | 98:16 | 46:13,16 48:10 |
| 78:2 80:22 | 30:23 31:13 | **counseling** 47:9 | 50:6,9 51:10 |
| 84:11 91:1,22 | 32:8,8,11,20 | **counterparties** | 53:1,3,10 54:1 |
| 93:20 96:16 | 34:21 39:9 | 128:4 | 54:17,20 55:23 |
| 101:7 106:23 | 40:12 44:2,3 | **couple** 17:19 | 58:14 59:17 |
| 111:18 124:23 | 45:7 47:16 | 19:2 20:23 | 62:13,19 64:12 |
| 125:17 129:21 | 51:11 53:18 | 46:18,18 91:17 | 64:16 65:23 |
| 133:4 135:3 | 55:4 58:3,9 | 108:5 136:15 | 66:8 68:2 |
| 142:18 144:12 | 59:10,11 60:23 | 152:11 171:14 | 70:18 71:5,17 |
| 144:23 | 66:1,7,11,12 | 171:17 172:5 | 72:24 73:3,7 |
| **corrected** 169:7 | 68:7,23 75:22 | **course** 28:3 | 74:2,15 77:4 |
| **correctly** 72:17 | 76:19 81:19 | 29:22 30:15,19 | 77:22 78:13 |
| 185:23 | 82:9,17,18 | 65:18 74:24 | 79:21 80:9,21 |
| **corresponden...** | 83:2,3 85:19 | 98:2,18 177:8 | 80:23 81:6,10 |
| 55:3,6 57:7 | 85:22 87:24 | 177:9 183:8 | 82:11 83:19 |
| 58:5 74:10 | 88:13 92:21 | **court** 1:1 6:4,9 | 84:18 85:8 |
| 139:17 165:21 | 93:1,10 100:8 | 6:11,12,20,24 | 87:10 90:7 |
| | 101:11,12,17 | 7:17,18 8:8,15 | 91:7,10 93:11 |

| | | | d |
|---|---|---|---|

94:12 95:4,15
96:6 97:17
99:12 100:22
100:24 101:18
103:3,7 104:11
104:14 105:9
105:23 106:20
107:3,4,11
108:1,23 110:3
110:14 111:5
112:2,9 117:19
118:7,12,20
120:5,7 121:11
122:20 123:15
124:10,20,24
125:3,8,24
126:5,18,21
127:1,8,16,22
128:9,15
129:15 130:3
132:17,20
133:10 134:2
134:16 136:11
137:19 138:17
139:10 140:20
141:13 142:24
143:6,17
144:18 145:16
145:20 146:14
146:22 147:14
147:17 148:7
148:10 149:1
149:12,15
150:6 151:14
152:1,9,13,15

152:17 153:2
153:24 154:3
154:14,16
159:20 160:22
161:4 162:17
163:6,13 166:4
166:8 167:1,5
167:20 168:7
168:12 169:12
170:15 175:4,9
176:9,20 177:4
177:15 178:4
178:15 179:23
180:16 181:5
181:23 182:24
184:20 185:16
187:9 188:4,13
188:20 191:24
**court's**   39:19
112:14 157:20
158:2,16
178:13
**courtroom**   4:20
**courts**   149:22
156:5
**cover**   64:20
65:2,3 183:23
**coverage**   187:3
**covered**   36:5
40:21 153:20
**covering**   71:13
**covers**   112:6
**create**   54:13
132:3 146:11

**created**   161:22
163:5 167:11
169:21 170:2
172:10,10
**creates**   55:14
**credibility**   51:4
136:10
**credibly**   43:17
**critical**   60:10
187:8
**cross**   65:22
**crucial**   65:16
188:1
**cruciality**
65:13
**culling**   172:4
**cumulative**
13:7 127:18
128:10 129:1
130:2,21
**cumulativeness**
66:18
**curious**   41:20
**current**   96:9
172:3
**currently**   20:18
**custodians**
186:2 187:10
187:11,15
**cut**   14:4 26:18
154:16 171:14
**cutoff**   25:21
26:2 146:10
**cv**   1:8

**d**   6:1 109:18
**dahl**   108:8,20
108:21,24
109:8,18
110:13 111:5
115:14
**damage**   72:6
78:18
**damages**   23:23
24:11 48:14
49:5 50:1 55:6
71:10,21 72:4
72:18,19 73:4
73:9,14,19
74:6,13,18
76:8,17,23
77:8,15,18,20
78:5 79:18,24
80:14,19 86:22
94:23 95:2,3
95:19,24 96:2
96:9,11,23
97:12 98:7,22
99:1 100:19
107:16,23
112:10,18,21
113:4,5,15,24
114:10 118:15
118:24 120:11
121:7,16
123:16 124:8
125:5 126:14
127:4,6,21
129:13 130:10

[damages - deny]                                                                        Page 14

135:3,5,9
136:11 137:10
137:17 138:13
145:11 151:12
156:3,21,24
181:10,14,22
187:8
**damon** 28:13
**dark** 78:17
**dash** 7:2
**data** 57:18
**database**
131:24
**datapoints**
140:5
**date** 1:13 74:5
86:19 155:1
162:6 163:3,3
163:4,12
165:15 168:14
168:20 170:6
171:21 173:11
180:1,5,8,8,12
180:14 182:4,6
183:15,16
188:10 189:20
190:6,10,12,12
190:18
**dates** 28:5
67:18 88:7
166:19 180:4
180:15,20
**day** 15:24
73:17 77:13
189:22 192:2

**days** 20:18,22
32:16,16
165:15 179:7
186:23 190:6
**dc** 4:10
**de** 1:18 2:7 3:8
**deadline** 177:6
178:13 182:23
189:7,11
**deadlines** 186:6
186:11
**deal** 67:5,22
69:18 70:10
100:2
**deal's** 152:19
**dealing** 21:8
**dealt** 189:13
**decide** 48:20
128:4 172:23
**decided** 75:3
83:13
**decision** 17:24
30:11 35:5
43:17 47:24
67:19 81:24
82:7,8 83:15
112:11 143:1
148:2 158:4,11
158:16 159:5
163:18,21
179:5,19
**decisions** 17:14
18:2 19:5
114:3,4 119:16
157:19

**declaration**
70:7 159:2
162:2 165:7
173:13
**declined**
178:10 179:14
**deemed** 49:2
**defective**
182:19
**defendant** 1:10
3:2 4:2 10:22
16:6 24:4 33:1
43:5 51:18
69:14 70:16,21
72:4,8 78:16
81:2,13 95:19
112:20 114:13
114:16 115:12
116:6,19,22
117:10 121:15
122:23 130:6,8
131:9 133:1
138:4 142:22
156:1 157:1
171:13 172:9
172:13,16
173:9 175:16
189:18 190:19
**defendant's**
7:20 8:20 9:7
11:11 25:1
32:20 66:17,19
68:3,9,13 69:2
70:14 97:24
112:17 116:13

127:2 157:24
164:3 171:2,10
174:14 175:6
189:5 190:14
**defendants**
13:4 32:21
**defense** 37:6,21
38:1,2 52:13
63:20 140:10
**defenses** 36:4
51:8 134:20
**degree** 116:8
**delaware** 1:2,4
1:8 7:7,20
152:16
**delay** 63:16
**deliberations**
23:5
**demand** 53:21
83:11,15 84:15
85:5 99:13,14
99:17 114:18
120:24
**demonstrate**
45:5 69:22
106:4 115:7,18
160:7
**demonstrated**
156:1
**denied** 35:5
181:21
**deny** 107:7
112:24 114:14
114:24 116:3
157:11 158:14

163:16
**denying** 35:1
**departed**
162:15
**departure**
162:14
**depo** 12:23
75:10 83:22
84:2 91:17
111:8,15
120:11 144:20
180:1 182:2
189:14,16
190:8,21,23
191:5
**depos** 120:16
144:20 176:6
180:4,11 188:5
189:4,9
**depose** 54:11
92:14 98:6
107:23 181:9
**deposed** 14:8
32:11,15 39:11
97:2,3
**deposing** 54:2
**deposition**
35:11,17 37:16
42:1,1 45:8,19
47:18,18 49:13
52:7,20 55:16
57:1,7 59:10
70:22,23 72:19
74:17,20 76:4
80:2,10,18

82:9 85:11
87:19 90:9
91:4,14,16
93:8 97:1
99:11 100:4
101:9 103:4
105:6 107:21
109:1 111:7
113:3,9 116:24
117:5,18
121:22 124:7
128:24 139:12
139:20 142:8
144:3,21 146:6
155:18 157:14
174:19 175:19
178:9,10,16
179:22 180:24
181:4 182:7
183:12,13,17
183:19,20,24
184:17,20
185:4,5,6,18,18
189:1,4 190:1
190:4 191:3
**depositions**
12:21 13:17
14:3,7 36:5
41:13 51:20
54:4,14 57:4
59:5 64:5,19
76:7,10 77:1
77:13 79:6,16
97:5 133:18
134:1 148:14

175:19,24
176:16,24
177:1,3,10,17
178:2,19 179:1
179:5,10
182:23 183:3
184:23 185:17
186:14,22
191:10
**deputy** 4:20
**derived** 96:8
139:24
**describe**
138:21
**described**
21:24 38:17
138:20 157:8
**description** 5:2
21:13
**descriptions**
166:6,17
167:21
**design** 21:17,18
22:3
**designated**
144:24 181:18
**designee**
181:17
**designer** 21:11
21:22
**designers** 21:5
**desire** 119:6,10
**desk** 190:23
**despite** 142:9
178:23

**detail** 31:1
40:21
**details** 61:22
**determined**
105:21
**developing**
136:22 150:24
**development**
141:9 150:24
152:6
**dial** 9:24
**different** 10:12
49:10 54:5
68:10 69:1
79:22 105:11
165:23 167:21
**differently** 83:4
**difficult** 45:3
189:8
**digital** 193:8
194:3
**diligence** 27:15
185:14 186:16
**direct** 89:7
109:23 152:15
**direction**
162:11,13
**directly** 87:2
92:16 119:7
123:16 170:6
**disagree** 11:5
43:21 70:11
97:12 106:9
133:4 160:12

**disagreed**
  25:13 133:7
**disagreements**
  157:21
**disclose** 30:1
  83:2,6 84:5
**disclosed**
  130:22 187:15
**discloses**
  126:10
**disclosing** 90:1
**disclosure**
  101:14 106:19
**disclosures**
  73:13,14 74:11
  76:23 97:12
  181:12 183:9
  185:24
**discoverable**
  52:14 148:17
  154:13
**discovery** 6:22
  8:20 9:7 13:2
  13:10,18,21
  15:8,14,17,20
  15:21 16:6,7
  16:17,19 18:12
  23:10 25:1,12
  28:7 30:24
  33:17 37:13,15
  37:16 40:8,9
  41:1,6,12,14,14
  41:19,22 42:18
  42:19,23,24
  43:7,10 44:8

44:14 45:12,16
46:4,6,8 51:9
53:4 56:7 58:5
58:12 60:12
61:5,10,12
63:1,9 64:18
66:11,19,22
67:15 68:3
69:1,2 73:16
73:17,24 74:14
77:14 78:4,11
87:7 95:1
97:15 98:2
103:2 124:1
132:7,8,24
133:8,9,15
140:16 142:10
142:18,20,21
142:22 143:1
143:15 146:11
146:18 149:12
153:3,19
154:21 155:4,7
155:17 156:6
158:12 170:21
172:24 174:8
175:17 176:4,7
176:12,18,21
177:11 178:1
178:13,15,18
179:2,18 180:5
183:1,8,19
186:5,6,15
189:7,11

**discreet** 20:12
  69:9
**discretion**
  177:9
**discuss** 39:21
  117:7 163:11
  166:9 191:2
**discussed** 29:21
  30:2,4 115:1
  122:6 144:8
  170:8 174:13
  191:9
**discusses** 107:2
**discussing**
  83:14
**discussion**
  60:24 103:9
  134:24 141:22
  144:14 147:9
**discussions**
  23:4 37:2
  51:13,18 80:3
  83:1 86:11
  146:5,23 147:3
  149:17,19
  150:10,12
  151:9 155:21
  156:17 178:23
**disfavored**
  113:10
**dishonest** 35:21
**dismiss** 35:7,9
**dismissed**
  132:10 133:11

**dispute** 8:22
  25:1 26:21
  30:24 31:14
  36:2 46:8 56:3
  58:18 60:9
  68:11 95:11
  113:3,13
  121:10 123:7
  153:1 157:3
  158:15 159:7
  161:11,12
  163:21 167:1,3
  170:21 174:8,9
  175:14,24
  176:12 178:14
  183:5 184:8
**disputes** 6:22
  8:21 9:7 12:22
  23:10 40:14
  58:5 68:3,15
  69:11 146:12
  158:20 164:20
  171:2 191:15
  191:19
**disputing** 69:17
**distance** 124:1
**distinct** 38:13
**distraction**
  64:11
**district** 1:1,2
  41:4 75:18
  152:16
**divested** 61:20
**divestment**
  61:23

**[doc - eleventh]**

**doc** 120:10,14
159:4 161:6
164:11 169:21
**docket** 67:13
148:6
**docs** 68:18 69:8
69:15,16,22
70:2 131:17
161:10,12
162:19 164:7
164:20 165:4,7
165:11 167:8
169:19 170:24
171:12,16
172:2,3 173:1
173:8 174:6
**document**
21:12,14 35:12
56:8 57:14
70:5 71:11
80:24 81:4,4
117:23 118:9
118:14,17,23
119:4,19 120:1
120:19,21,22
121:1,4,15
133:19 142:9
161:22 166:16
166:16 169:24
172:10 187:24
**documentation**
44:23
**documented**
58:12 182:12

**documents**
10:21 16:15
21:4,23 25:22
25:24 26:5,24
27:2 35:16,17
44:17 45:21
58:21,21,23
59:5 68:20
69:23 71:2,4
104:5 105:20
117:14,15
118:22 120:15
129:3 131:14
139:16 140:18
142:16 145:9
149:9 150:3
151:10 157:4
158:24 159:12
159:21 160:15
160:17,17
161:16 162:1,3
162:8,9,9
164:6,16
166:14,20,21
167:10,11,15
168:1,5 169:3
169:9 170:9
171:9,20
172:20 173:12
173:16 174:10
174:11 183:10
187:16,18,19
187:24 188:2,3
**doing** 140:6

**dollars** 29:16
**door** 100:6
114:18
**double** 154:6
**doubt** 153:18
**doubtlessly**
181:16,17
**dozen** 20:23
**draft** 142:12
145:6
**drawing**
134:13
**drawn** 92:12
**dropped**
188:18
**dual** 188:11
**due** 27:15
162:22
**duly** 178:8
193:5
**dykstra** 41:22

**e**

**e** 2:1,1 3:1,1 4:1
4:1 5:1 6:1,1
**earlier** 16:13
36:6,10 38:10
39:13 41:18
56:22 58:8
60:10 94:8
110:12 115:11
131:23 132:5
132:10 133:7
**early** 12:19
20:17,21 62:16
136:16,23

188:6
**earn** 72:21
76:16 80:17
137:1
**earned** 123:24
125:18 129:12
129:24 150:22
153:14
**earns** 153:12
**easily** 165:1
**ed** 28:14
**edit** 161:21
**edited** 163:4
170:12
**edits** 162:5
**effect** 31:19
101:6 144:14
**effort** 54:11
**efforts** 45:16
52:2 55:5
58:22 148:16
**eight** 137:10,17
**eighth** 10:15
**either** 13:16
14:18 15:17
25:15 29:15
33:15 51:18
74:12 77:16
79:14 83:12
87:7 135:19
183:12
**elected** 185:3
**elements** 141:8
**eleventh** 4:9
167:17

[elicited - examples]                                                    Page 18

elicited   142:15
elliott   4:3 8:3,6
  32:23,24 33:4
  33:5 34:4
  36:19 37:5
  38:23 39:2
  42:7,11,15
  43:22 47:7
  48:24 50:8,14
  51:24 53:2,9
  53:24 54:6,17
  54:19,24 56:20
  58:14,19 59:18
  59:21 60:4
  62:5 65:14
  68:1 84:12
  89:9 131:23
  139:8,11
  140:20 141:6
  147:12,15,16
  152:10,13,14
  154:15 157:14
elm   148:4
else's   80:11
email   25:11,15
  25:18,18 61:4
  61:6 132:3,6,8
  132:23,24
  133:2,8,9,15
  142:18,20
  143:1 145:11
  179:15
emails   60:12
  131:24 132:1
  133:6,12,16,17

133:21
embarrassing
  169:5
employed
  193:11,14
  194:8,11
employee   18:5
  27:3,6,9 57:2
  193:13 194:10
employees   17:9
  20:16,18,24
  28:24 43:1
  56:13 97:8
  162:14
encompassed
  159:18
ended   13:3,24
  14:24 46:24
  77:13
ends   7:2
endured   32:4
enforcement
  19:21 22:1
  48:1 94:6
engage   110:4
engaged   150:23
engaging   27:3
enmeshed
  18:19
ensure   22:12
  166:16 178:1
  178:24
entered   60:21
  154:5

entire   8:13 20:4
  137:4
entirety   138:24
entities   44:3
  127:11
entitled   76:20
  77:11 98:1
  123:21
entity   16:1,3
  41:23 94:7
  110:19 115:14
  138:8
equal   77:8
equity   61:24
equivalent
  33:15
es   193:4
esi   161:18
  183:9 186:1
  187:10,11,15
  187:17
esquire   2:3,4
  2:12,13,14,15
  3:3,4,14 4:3,4,5
  4:6
essential
  151:12
essentially
  14:12 17:19,22
  18:3,6 19:3
  26:4 53:5
  74:23 88:13
  127:16 176:9
establish   168:3

established
  85:21 115:3,7
et   6:19 10:16
  11:21 24:10
  27:9 29:10
  71:12 78:22
  148:13 150:8
  168:16
ethe   84:6
evd   5:2
event   134:2
everchanging
  166:6
everybody
  55:21 192:2
evidence   88:24
evidenced
  37:10
evident   173:15
  176:3
evolving
  168:21
exactly   67:11
  121:5 139:20
example   15:13
  39:4 42:21
  52:6 60:16
  74:2 77:19
  79:8,17 86:5
  86:20 94:6
  104:19 126:10
  129:7 154:22
  156:7
examples
  142:15 145:9

exception
 47:22
excerpts  64:5
exchange
 104:19
exclusive
 160:15
exclusively
 179:11
excuse  35:3
excused  8:14
executive  49:18
 49:19 57:21
executives
 76:13 79:4
 125:21 135:17
exhibit  87:21
 89:7 101:8
 104:12,13,18
 109:13 118:8
 118:10 126:10
 126:22 129:6
exhibits  126:8
 126:15 142:14
 169:1 172:16
existence  86:5
 123:11 136:23
 137:5
exited  31:11
expect  18:17
expected  76:16
 184:22 185:2
 187:1
expects  35:16
 72:21

expediency
 25:14
expert  46:6
 78:4,5,6,9,20
 78:21 79:3,3
 79:10,18,23
 80:3,4,7 86:21
 87:4,13 89:3,4
 89:19,22 90:6
 90:20,21 91:2
 92:9,17 94:14
 94:14,20,23
 95:3,21,22,23
 95:24 96:8,13
 97:5,7 98:2,7
 98:12,20 99:2
 99:3 106:24
 107:21,23
 109:16,24
 113:21 119:21
 121:3,4 124:1
 126:15 127:7
 184:13,13
expert's  79:7
 96:2 107:16
 113:24 119:15
 120:2
expertise  21:17
experts  55:6
 118:24 184:11
expiration
 143:15
expire  25:23
expired  25:23
 143:14 184:5

explain  189:2
explained
 98:24 99:3
explains  62:5
exploration
 39:7 51:8
explore  87:6
 97:8 124:7
 140:16
extemporane...
 170:17
extend  177:5
 186:18 189:10
extended
 177:24 178:15
 178:17
extension  176:4
 176:21 177:20
 178:13 184:22
 186:8,9,21
extensive
 168:18
extensively
 170:8
extent  11:1,2,3
 13:20 26:9,16
 29:18 62:6
 66:10 70:3
 75:13 80:14
 82:6 90:13
 97:6 98:13,14
 112:11 114:16
 117:1,4 130:19
 131:11 138:11
 140:13,24

141:7 151:6
 154:20 155:9
 155:20 157:2
 165:4
extra  88:23
 107:6 169:16

**f**

f.3d  93:22
face  29:9 119:1
 173:15
facebook
 152:15
faced  41:23
facially  60:6
 115:24
fact  15:7 31:17
 31:21 40:4,11
 41:11,14 42:18
 45:9 49:9
 57:13 73:17,23
 74:14 77:14
 85:21 86:8
 87:6 89:13
 93:3,19 95:1
 97:15 100:7,14
 106:6 115:12
 140:3,10
 158:10 162:7
 166:17 176:7
 177:11 178:8
 178:15 179:2
 180:4 181:9
 183:1,19 186:5
 186:6,15

**factor**  65:12
  119:8 136:13
  137:10,17
**factors**  10:13
  10:15 33:15
  43:14 47:3
  66:6 67:15
  72:5 96:12
  112:22 119:9
**facts**  46:2,2,3
  59:14,16 60:10
  63:6 71:19
  79:18 81:23
  82:3,4 83:5
  86:4 103:12
  106:13 123:23
**factual**  27:16
  35:24 52:10
  80:6 87:8
  89:14 93:3
  100:17,18
  101:5 110:10
  176:18
**failure**  140:18
  176:2
**fair**  14:1 34:11
  37:5,12 38:24
  39:14 121:11
  128:15 141:11
  142:4 148:22
  151:14 156:7
  156:14,24
  189:16
**fairly**  12:7
  116:20 155:21

175:23 176:3
  178:7 182:7
**fairness**  101:16
  106:16 109:6,7
  110:17 115:4
**faith**  157:15,19
**falls**  12:13
  160:19
**false**  81:21
**familiar**  102:6
  103:9
**far**  16:12 27:14
  44:9 118:18
  127:2 129:19
  138:21
**farnan**  3:3,9
  7:22,23
**featured**  16:15
**february**  13:12
  183:7 186:8
**federal**  1:16
  51:16
**fee**  49:3 122:9
  122:22 123:11
  126:9,14
  128:12 129:17
**feel**  185:12
**fees**  125:10,14
  126:13 127:12
  128:1 130:15
**fifth**  34:16,24
  36:12
**fights**  146:12
**figure**  10:19
  75:1 138:18

139:1 164:15
  165:3 173:24
  174:1
**file**  158:22
  174:7
**filed**  31:18
  51:19 114:13
**filing**  72:9
  187:5
**final**  77:13
  171:10
**finances**  76:14
**financial**  136:6
  183:7
**financially**
  193:15 194:11
**find**  39:22
  41:11 46:5
  87:19 151:1
**fine**  70:2,19
  110:8
**finger**  3:5 4:24
  7:23
**finish**  174:22
**firm**  17:11,16
  18:6 20:5
  31:13 32:3
  41:8 53:19
  59:12 61:16
  108:8 110:2,6
**firm's**  53:12
**first**  6:18 7:6
  9:5,8 13:1
  24:18 28:5
  29:17 41:2

43:24 54:7
  68:9,12,24
  69:11 71:9,10
  71:13,18,18,22
  72:15,17 80:12
  81:10,11 87:11
  101:4 105:13
  108:3 112:7,7
  112:9,17,20
  120:24 130:5
  139:17 145:20
  152:14 154:19
  164:1,4 166:3
  166:4 168:15
  171:5 179:2
  183:11,14
  186:7
**five**  19:4 34:5
  36:14 41:16
  55:15 165:23
  166:15 167:19
  176:21 178:15
**flavor**  24:6
**flipside**  43:5
**floodgates**
  54:14
**floor**  2:18
**flourish**  151:1
**flush**  135:4
**focus**  11:14
  33:10,12 87:16
  134:23
**focused**  8:22
  9:1 31:3 42:6,9
  122:21 147:18

[focused - funding]

Page 21

156:13
**focusing**
131:15
**foley** 20:5
88:10,14 90:18
103:12 105:24
108:21 109:5
115:4,14
122:10,23
123:12
**folks** 22:21,22
64:19,20 96:1
**follow** 86:11
108:18 113:2
**followed** 57:15
85:20
**following** 35:10
57:7 83:20
84:12 123:13
154:19 171:4
**follows** 155:8
**footing** 90:4
**footnote** 94:16
**footnotes** 98:8
107:18
**force** 22:8
**foregoing** 85:2
193:3,4 194:4
**forget** 87:18
**form** 27:20
131:24 133:21
**formatting**
169:4
**formed** 79:6

**former** 18:10
31:12 57:2
**forth** 43:24
78:6 168:18
**forthcoming**
163:17
**forward** 67:20
114:5 176:1
191:18,22
**found** 36:10
77:2 152:17
186:17
**four** 10:24
11:15 18:4,8
19:4 20:18
32:16 33:20
34:5 36:13
179:7 180:11
**fourth** 11:22
**framing** 17:2
**frankly** 20:1
21:11 45:6
57:4 61:3 67:5
180:21 190:22
**frantom** 135:16
143:24 185:18
185:23 187:9
**free** 97:8
**frequently** 12:1
**friedman** 33:15
65:12 66:8
**front** 13:23,24
41:4 44:7
45:14,24 61:22
89:19 90:20

116:12
**fruitful** 11:6
14:11 15:12
**fry** 4:5 8:3,7
70:15,16,19,20
71:15 72:16
73:2,6,11 74:8
76:5 77:12,22
78:2 79:2 80:5
80:13,22 81:3
81:9,22 83:8
83:20 84:10
85:3 86:3 89:6
91:2,9 92:15
93:20 94:19
95:17 96:4,5
101:3 108:2,5
109:12 110:7
110:23 111:20
112:3,6 117:23
118:4,10,19,22
120:6 122:5,19
123:9 124:15
124:23 125:2,7
125:17 128:16
128:21 129:21
131:8,19
132:19 133:3
134:12 135:6
136:20 138:16
139:11 151:15
151:19 152:4
159:9 160:13
165:16

**full** 171:23
182:10
**fully** 44:7 70:4
**fulsome** 46:14
76:22
**functionality**
184:4
**funder** 30:5,8
134:19 135:23
137:23,24
138:24 144:1
146:21 153:15
**funders** 22:23
22:24 23:12
24:15 29:4
30:13 49:8
50:17 122:13
131:7,20,21
132:19 134:8
134:14 135:7
135:12,18
136:4 140:24
141:19,20
146:5 147:5
149:19 151:7
151:18,21
155:12,20
156:16
**funding** 11:20
23:17,18,20
24:10 27:24
28:1,4,10,20
29:13 33:23
56:2,19 68:17
68:20 69:7

136:3 146:2,8
146:15,16
147:22 148:16
148:21 149:3,8
149:13 150:18
152:18 154:4
154:12 156:7
157:5 164:20
**fundraising**
21:5 122:4
144:4
**further** 7:4
13:10 35:21
42:2 58:16
66:4,23 67:21
85:2,6 86:24
86:24 99:10
106:21 108:3
111:18,21
112:5,21 113:1
114:20 116:4
116:23 117:5
120:13,18
121:14,21
130:5,23
133:14 155:18
157:11 158:2
164:2,10 165:2
165:12 171:5
173:14 174:5
174:16,17
181:6 188:15
191:4,10,20
193:13 194:9

**future** 117:7
158:3 163:17
191:18

**g**

**g** 6:1
**gain** 119:6
**gambling**
149:13
**game** 34:11
141:11 142:4
156:8 157:1
175:20 189:5
**garnered** 50:20
**gather** 150:14
**gatos** 3:17
**general** 17:3
145:12 155:15
**generally** 29:21
35:22 53:10
113:10
**generated** 51:2
**generating**
62:17 153:11
**georgia** 119:8,9
137:10,17
**getting** 15:1
16:23 59:15
98:1 116:13
166:15 180:10
**gist** 48:18
161:5
**give** 21:7 23:1
32:18 42:9
59:19 67:17
69:20 84:20,21

84:23 93:12
103:1 105:2
112:10 145:11
159:1 164:21
173:4,11
174:20 180:1
191:13
**given** 47:14
74:7 89:20
121:23 132:9
133:18 167:2
176:16
**gives** 69:21
**giving** 161:6,9
**gjohnson** 2:22
**glean** 23:15
**gleaned** 13:6
**gleans** 121:5
**go** 6:14 7:4
8:18 9:4 11:6
13:10 24:11
25:10 36:15
48:23 60:5
68:23 72:5
78:23 91:11
97:19 99:18,20
99:22 135:9
139:3 166:8
167:8 176:1,24
192:1
**goes** 17:2 37:20
51:3 54:9 56:4
119:7 120:10
132:3 136:5
157:16,22

**going** 8:14 9:9
12:4 14:6
15:12,24 22:19
23:6 25:24
32:21 36:23
40:21 64:18,20
69:21 70:14
73:10 74:23,24
75:2,3,7,11
82:15 84:14
95:10 97:22
99:15,19 100:7
112:10,11,23
112:24 114:14
114:17,23
117:13 121:13
132:24 133:1
134:21 142:9
142:24 146:11
150:13 153:13
155:1 157:13
157:19 158:11
158:21 164:6
164:11 165:1
165:22 166:8
166:16 168:19
170:19 171:1
171:15,16
172:1,2 173:1
173:21 174:20
174:24 175:5
175:24 176:4
176:11,13,17
176:19 177:5
180:2 188:23

188:24 190:8 191:1,18
**goldman** 2:4 7:11
**good** 6:9 7:9,22 9:2 32:23 70:15 75:19,19 76:2 78:16 95:12,15 118:21 157:15 157:19 165:19 172:24 185:14 186:17 192:2,2
**google** 176:2 185:7
**gotten** 45:12 53:4 56:24 77:5,10 113:16 144:7
**grant** 2:14 7:13 64:9 107:7 114:9,23 117:6 121:13 130:4 131:2 155:8 157:10 175:3 188:23 191:1
**granted** 158:3 176:20
**graphic** 21:5,11 21:17,18,22 22:3
**great** 11:1,2 33:6 158:17 163:19 169:6

**gregory** 179:6
**grimes** 4:20
**gripe** 182:2 189:5
**gripes** 175:16
**ground** 64:21 76:18 78:11 112:24 135:21
**grounds** 120:12 135:20 153:3,5
**grouped** 38:14
**grouping** 70:10
**guess** 12:24 29:17 48:10 53:10 56:4 81:20 87:10 103:7 134:3 136:17 140:20 146:14 159:23 169:20 175:15
**guidance** 141:4 164:22
**guys** 81:17 175:18 180:3

**h**

**h** 5:1 109:18
**half** 8:21 32:16 186:18 188:12
**hall** 8:12 22:18 30:12 46:11 58:10 177:5,8 177:19,24 178:17 182:13 185:15 186:17 189:10,12

**hall's** 68:18 148:2 184:21
**hand** 66:9 67:3 134:4,7 172:8 178:16
**handle** 8:7 54:15 190:8
**handling** 9:13
**hanging** 64:10
**hanna** 2:13 7:13
**happen** 23:6 150:13 188:12
**happened** 13:24 18:22 24:2 42:17 43:12 44:5 67:15 85:17,21 113:2 131:18 138:13 180:7 182:8
**happening** 29:3 160:8,9
**happens** 59:23 117:20
**happy** 64:4 65:9 102:11 105:14 117:15
**hard** 134:12 153:14
**haroun** 32:3
**haste** 185:1
**hate** 57:5
**head** 65:3 67:7 76:6

**heading** 100:3
**hear** 33:2,4 35:7,8 38:13 40:11 60:9 62:4 63:19 68:24 69:10,17 70:17,18 87:14
**heard** 45:15 60:4 61:9,12 65:14 93:2 96:17 101:3 120:7 151:10 168:15 184:12
**hearing** 1:12 9:14 10:3 41:3 44:2,11 59:24 76:1 139:17 164:4 168:14 191:23
**hearings** 8:17 8:24 58:10
**held** 24:20 67:21
**helen** 178:9
**help** 87:16,18 89:4 95:5 99:23 128:1 139:12
**helpful** 15:6 39:23
**helps** 143:8
**hereto** 193:15 194:11
**herman** 4:22

hesitant  156:6
hey  88:1
  110:16 169:17
hicks  102:21
  180:24
hide  169:6
high  124:5
highlighted
  143:18
highly  119:4
  133:20 135:8
  145:10
hindsight
  100:16
hint  21:7
hire  17:10
hired  53:12
hiring  21:21
history  11:19
  22:17 29:22
  64:2 182:13
hit  76:5
hitters  46:18
hodgepodge
  122:1
hold  96:3
  101:18
holding  16:2
  20:14
holzen  181:15
honor  7:10,22
  8:10 9:12 11:7
  12:6 13:9 14:2
  15:19 27:6
  32:23 34:4,5

34:14,17 36:16
37:6,11,12,22
39:3,12,24
40:12,16 42:2
42:3 43:23,24
44:7,11,20,24
45:2,5,10,14,20
45:23 47:7,13
48:24 50:14
51:24 54:6,8
54:24 56:21
57:4 58:19,24
59:8 60:1 64:8
67:24 68:1
70:15,17 71:3
71:15 72:16
73:6,11 76:5
76:12,21 77:12
78:2,8 79:2
80:13 81:3,22
83:8 84:10
85:7 86:3,21
89:6,18,20
91:5 92:15,24
93:20 94:19
95:12 96:5,15
99:21 100:5
102:12 104:17
107:14 108:6
109:12,15
110:8,24
111:20 112:7
117:11,16
118:4,19,22
119:1,20 120:6

120:20 122:19
123:9 124:15
125:2,7,17
126:4,24
127:13,20
128:21 129:6
131:19 133:3
134:15 135:6
136:10,20
137:15 138:16
139:9 141:6
144:11 145:19
146:1 147:12
148:22 149:7
151:19 152:10
153:1,9,22
154:1,15
159:10,17
160:14,20
161:3,14
165:18 168:6,9
170:4 175:3,7
175:22 180:13
182:9 184:3
185:8,23 186:3
188:17 192:5
honor's  7:15
  8:13 16:9
  38:13 44:5
  58:1 65:7 71:3
  139:20
honorable  1:15
hope  8:15,18
  163:23

hoping  42:8
  76:6 92:15
host  146:11
hour  8:19,20
  8:21 167:17
hours  35:18
  97:2,4,16
  191:6,12
house  18:7
  19:10,11,13
  20:12 21:20
  44:3 47:16
  59:11 60:23
  74:22,24 75:22
  97:21 102:16
  102:18
how'd  75:14
hundreds  17:9
hurried  60:13
hypothetical
  49:2 50:3 51:5
  79:9 105:1,2
hypotheticals
  108:14

i

i.e.  10:21 98:6
ianuzzi  57:2,14
  61:3,10
ianuzzi's
  133:19
idea  46:24
  69:10 74:21
  75:16 115:15
  167:8 172:1

[ideal - information]                                                    Page 25

| | | | |
|---|---|---|---|
| **ideal**  78:14 | 43:14 54:23 | 122:12 126:13 | **inequitable** |
| **ideally**  171:7 | 55:2 94:4 | 130:13 141:19 | 34:17 35:19 |
| 173:19 | 139:13 142:22 | 148:16 151:8,8 | 36:4,13,23 |
| **ideas**  128:7 | **importantly** | 173:9 176:1 | 37:4,23 38:7 |
| **identified** | 55:1 | 179:5,22 190:4 | 38:16 63:10,12 |
| 55:16 99:4,5 | **imposed**  60:11 | **inclusive**  164:8 | **inexcusable** |
| 158:24 162:10 | 61:13 | **inconsistencies** | 63:16 |
| 171:13 172:16 | **impossible** | 123:22 | **infer**  28:21 |
| 181:11 183:5 | 189:8 | **incorrect** | 29:2,12 56:17 |
| 183:12 185:24 | **improper**  60:6 | 166:19 | 150:12 153:9 |
| 186:1 187:11 | 61:3 70:22 | **incredibly** | **inference** |
| **identify**  7:5 | 135:20 | 124:5 | 138:12 141:16 |
| 86:13 | **imu**  16:1 | **independently** | 141:16,21 |
| **identities** | **inappropriate** | 39:6 | 150:20 156:15 |
| 135:12,18 | 132:7 153:5 | **indicate**  121:5 | **info**  81:18 92:6 |
| 136:4 | **include**  28:13 | **indicated** | **info's**  123:1 |
| **identity**  122:13 | 86:18 126:13 | 179:17 | **information** |
| 131:7 135:23 | 127:14 128:22 | **indicates**  66:23 | 11:3,4,16,16,18 |
| 144:1 | 160:18 163:2 | 88:24 90:21 | 11:20,22 12:7 |
| **iii**  2:4 | 164:15 171:11 | 92:10 107:19 | 13:4,6,14 |
| **immediate** | 172:2,7,20 | 128:11 | 14:14,19,20 |
| 119:7,12 | **included**  19:10 | **indicative** | 16:4,23 22:13 |
| **immediately** | 70:5 102:19 | 127:24 | 23:23 24:20 |
| 178:17 179:12 | 106:12,24 | **indicia**  62:14 | 26:21 30:1,8 |
| **impacts**  163:8 | 107:22 126:15 | 136:14 | 33:13,21,22 |
| 169:19 | 159:12 170:13 | **indifference** | 34:3 35:14 |
| **implicate**  18:2 | 171:14 172:20 | 38:2 | 36:1 37:18 |
| 157:5 | **includes**  16:7 | **indistinguish...** | 38:18 39:14 |
| **implicated** | **including**  16:14 | 59:13 | 46:10 51:22 |
| 159:22 | 23:21 26:5 | **individuals** | 57:14,17 59:2 |
| **implication** | 28:13,24 29:5 | 109:21 | 59:4,7 64:9 |
| 101:5 | 29:15 30:4,11 | **inducement** | 65:22 68:16 |
| **imply**  169:2 | 60:16 72:21 | 132:11 133:11 | 69:5 74:11 |
| **important** | 77:19 80:1,16 | **industry**  49:23 | 76:11,20 78:9 |
| 14:17 35:2 | 86:11 96:1 | | 79:14,24 80:6 |

85:22 87:1,5,6
88:5,8,12,15
89:2,23 90:5
90:10,17 91:18
92:8,18,19,22
92:24 93:3,9
94:3,3,22,24
96:8 98:15,19
99:9 103:20,22
107:20 108:15
111:13,22,23
113:6,14,16,17
115:1,8,13,19
115:21 116:4,9
116:16,16,17
116:20 117:13
118:2 120:3
121:21 122:9
123:8 126:9
127:15,18
128:22 129:2
130:2,7,13,22
131:13 132:2
133:24 135:24
136:9 137:8
138:18 140:2
145:5 147:21
148:15 151:6
154:23 155:17
181:13 183:7
184:10,15
**information's**
121:6
**informed** 51:6
179:10

**infringement**
29:10
**initial** 175:15
181:12 185:24
**initiating** 61:21
**innovations**
148:5
**input** 132:2
**insisted** 25:11
101:13 178:24
**insistence** 63:2
169:9
**insisting** 121:9
**instance** 28:10
102:3 154:6
**instances** 40:7
40:19
**instruct** 152:22
**instructed**
153:4
**instruction**
141:3 145:5
146:7
**instructions**
70:22 98:17
100:12 140:18
165:8 191:17
191:22
**integral** 34:12
47:23
**integrated**
18:15
**intellectual**
135:1 142:3
155:22 156:18

**intended** 99:5
**interact** 17:15
**interacted**
109:21
**interest** 30:17
30:21 61:24
136:6 147:7
**interested**
193:15 194:12
**interesting**
50:16
**interests** 30:14
**interfere** 155:3
**internal** 23:5
151:8
**interrogatories**
73:8 97:11
113:7
**interrogatory**
73:18 74:9
75:4,19 76:2,7
76:22 78:24
79:15 98:24
181:12
**interrupt** 13:19
54:20 77:4
132:20 145:17
**intertwine**
40:14
**interval** 12:21
13:2
**interviews** 79:3
86:23 91:4
98:19 119:21

**intricately**
18:19
**introduced**
184:5
**invalidity** 50:4
52:13 55:9
**invest** 47:2
48:20 94:5
153:13
**invested** 15:9
16:3,12,12
48:12,22
**investing** 15:2
33:23 48:3
62:7 145:23
**investment**
11:17 14:20,23
15:23 16:10,22
16:23 33:22
34:8 46:21,23
46:24 47:4,19
48:5,7,18
49:20,24 52:5
61:20 62:2,20
143:24 144:17
145:23 153:17
**investments**
48:11 56:1
94:8 104:6
122:4,4,12
131:6 144:4
**investor** 11:21
12:10 16:17,18
24:10 26:6,17
27:1,15 41:20

| | | | |
|---|---|---|---|
| 41:22 48:2,16 | 141:18,19 | 34:3,18 37:8 | 162:23 163:7 |
| 49:16 101:21 | 142:13,16 | 40:15,23,24 | 163:12,14,18 |
| 101:24 102:3 | 144:17 145:11 | 43:17 55:14 | 163:19 164:17 |
| 102:14 104:21 | 146:4 151:8,17 | 56:18 57:11 | 165:22 166:24 |
| 104:24 105:3 | 151:22 152:20 | 58:1 62:8,11 | 168:20 169:15 |
| 122:16 131:12 | 155:11,19 | 66:18 67:12 | 170:6,20 171:4 |
| 131:13 136:3 | 156:16 | 70:8 71:8 | 171:18 172:6 |
| 138:24 153:13 | **invitation** | 72:14,15,17 | 172:19 173:2 |
| **investors** 15:1 | 108:11 | 80:10,12,14,17 | 173:10 174:1 |
| 16:5,8,11,14 | **involve** 159:24 | 80:24 81:1,11 | 174:12,18 |
| 22:21,23 23:11 | **involved** 17:14 | 81:12,14,16 | 175:1,6,15 |
| 23:18 24:14,18 | 17:23 31:21 | 84:4,4,14 85:9 | 178:5,8 185:17 |
| 24:19 25:3 | 32:1,15 47:24 | 85:10 86:2 | 189:13 190:22 |
| 26:7 27:4,22 | 60:23 61:23 | 87:11 91:15 | **issued** 32:5 |
| 27:22 34:11 | 162:7 | 95:14,18 99:13 | 37:9 124:18 |
| 37:18 38:20,21 | **involvement** | 100:24 101:3 | 177:6 |
| 46:23 47:11,12 | 122:15 158:9 | 108:4 111:6 | **issues** 8:8 22:1 |
| 49:8,8,18 52:4 | 160:1 | 114:9,11,21,22 | 24:11 36:4 |
| 52:4 56:7,10 | **involves** 23:4 | 116:2,14 117:9 | 37:4 38:12 |
| 57:9,19,22 | **ip** 15:4 23:21 | 117:22 118:9 | 40:17 46:1 |
| 62:23 94:4 | 23:21 29:15,15 | 118:13,15 | 48:12,14,14 |
| 101:12 102:19 | 29:16 38:9 | 119:7,14 | 50:4 55:20,20 |
| 102:24 103:16 | 48:20 49:1 | 121:13 122:7 | 69:11 82:21,22 |
| 103:18,23 | 50:13 93:15 | 122:18 124:17 | 100:19 106:21 |
| 104:9 105:22 | 128:2 134:24 | 130:4,15 134:3 | 112:4,10,16,20 |
| 108:12 111:22 | 139:3,4 141:10 | 134:20 135:1,8 | 114:3,6 117:20 |
| 116:11 123:21 | 146:24 149:18 | 136:6 141:1,15 | 121:16 122:16 |
| 123:23 125:20 | 150:17 151:23 | 142:3 143:20 | 123:15 125:5 |
| 126:11 129:8 | 153:16 157:9 | 149:2,23 | 133:12 138:6 |
| 129:10,14 | **irrelevant** | 151:18 154:5 | 138:13 144:9 |
| 131:16,21 | 23:13 123:14 | 154:18 155:7 | 147:20 156:23 |
| 132:14,15 | 127:21,22 | 155:13,18,22 | 159:7 161:1 |
| 133:21 134:6 | **issuance** 31:22 | 156:2,18,20 | 164:1,9 165:9 |
| 134:13 135:7 | **issue** 23:22 | 158:4,15,18 | 168:11,18 |
| 140:3,4,8,22,23 | 28:4 33:11 | 159:1,17 161:1 | 171:10,12 |

173:8,18
174:13 181:14
**it'd** 122:11
**it'll** 87:18 95:5
158:17
**items** 126:13
**iteration** 166:7
169:8
**iterations**
165:24 167:19
167:19 168:22

**j**

**j** 118:10
**jacobey** 194:2
194:15
**january** 188:5
**jlh** 1:8 6:24
**jo** 31:12
**job** 1:20
**johnson** 2:14
7:13,16 175:2
175:3,4,13,22
176:15 177:8
177:16,22
178:6 179:23
180:13,19
181:5,8 188:15
**joined** 7:10,24
8:3
**jointly** 174:7
**joseph** 179:6
**judge** 8:11
22:18 30:12
35:1 36:10
41:3 46:11

58:10 68:18
74:19 75:16
97:20 113:8
132:10 148:2
149:15 174:10
177:5,8,19,24
178:6,17
182:13 184:21
185:15 186:17
189:10,12
**judges** 149:23
**july** 1:13 12:19
78:3
**jump** 10:8 33:7
53:1 72:24
99:22 139:8
144:12
**jumping** 81:7
**jury** 84:15 85:4
140:17
**justice** 185:14
**justify** 51:23
97:1 100:4
**justifying**
12:13

**k**

**kantaros**
109:23
**keep** 8:23 31:3
32:18 146:4
174:22
**keeping** 121:9
**keeps** 55:21
**kelly** 3:3 7:23

**kenneth** 102:21
180:24
**key** 10:20,21,23
49:18,18 57:20
66:5 78:18
98:2 181:14,21
187:23
**kind** 10:19 11:5
17:2 24:5
29:12 42:9
43:14 51:21,23
51:23 56:9
64:13 68:5,10
68:11,12,15
71:10 72:13
75:3,24 76:1
96:16 103:11
103:13,14
118:17 121:24
122:18 134:10
142:5,9 156:19
157:6 176:10
179:19
**kinds** 34:2 54:2
**king** 1:17 2:6
3:7 20:6
**knew** 88:2
184:9
**know** 6:10 8:19
9:21 10:11
11:1,2,15,18
12:10,18,18,22
13:17 14:10,13
14:16,17,22,23
15:4,6,8,11,11

15:14,14 16:15
16:21,23 17:2
17:4,6,8,10,11
17:13,14,16,18
17:20 18:1,7
18:10,10,11,15
18:18,18,20,23
18:24 19:8,9
20:2,11 21:3,6
21:8,10 22:4
22:11,13,14,16
23:4,7,11 24:1
24:5,8,9,14
25:14 26:4
27:9,9,16,18
28:6,11,21,23
29:2,6,6,8,8,9
29:11,20,22
31:7,19 32:6
33:10,11,14,16
33:17,21 37:23
38:20 40:21
42:6 45:4
46:24 48:15,21
48:21,22 51:22
53:7,14,16,18
53:22 54:3
56:2,8,16
57:24 63:17,23
64:1,5,8,21
65:5 66:10,17
66:20 68:9
69:8 70:1,11
71:6,10,12,19
71:24 73:24

74:3,4,6,16,19
75:14,22,22,24
78:5 81:16
82:21 83:22
84:20,21,23
85:10,11 87:14
87:14 88:13,17
88:18,22 90:14
90:15,22 91:11
92:4,4 93:13
94:17 96:12
97:16,19,20,21
97:24 98:9,22
98:24 99:2,9
99:16 100:1
101:1,20
102:23 103:15
103:18 105:19
107:6 109:1,8
109:9 110:17
110:19 117:24
118:13 125:8
125:10,19
127:23 128:12
128:17 129:19
129:20 138:3,4
138:6 140:22
144:18 146:7
147:1,4,6
148:1,10 150:9
153:15,22
154:10,12
156:5 157:18
160:6,6,7,10,19
162:19 168:13

169:5 174:18
174:19 175:10
175:16 177:12
179:23,24,24
182:4,15
186:13 187:21
189:15 190:15
190:23 191:5
**knowledge**
16:16 28:9
44:10 47:2
56:14 63:20
64:22 65:16,18
66:24 193:10
194:6
**knowledgebase**
65:21
**known** 185:20
**knows** 52:23
66:21

---

**l**

**l** 109:18
**labeling** 112:16
**laches** 37:7,21
38:1,6,17 39:6
63:14,15,20
**lack** 99:13
131:10 185:13
186:16
**lacked** 186:17
**laid** 45:17
**lardner** 20:5
88:10,14 90:18
103:13 106:1
109:5 115:4,14

123:12
**large** 17:9
25:18 67:3
156:5
**largely** 13:7
17:11 42:18
80:15 117:13
179:4
**larger** 164:24
**lastly** 158:19
**late** 37:15
175:20 176:10
188:6 189:4,7
189:12
**latham** 4:8 8:2
32:24 70:16
**laurie** 3:14,18
8:5
**law** 4:22 10:13
20:5 30:10
35:3 93:5
130:12 142:21
152:21 153:1
156:4 177:13
**lawsuit** 72:9,22
76:16 184:6
**lawyer** 18:5,5
18:13,14 54:3
59:11 88:11,14
88:19 90:12,18
91:20 92:7
93:2,12,15
97:21 106:2
160:10 161:5,9
169:14,18,18

190:8
**lawyers** 32:14
74:24 75:15
110:4 115:4,5
125:11,21
137:7 140:15
**layer** 57:5
**laying** 58:12
**layton** 3:5 4:23
7:23
**lead** 7:12 17:16
39:20 54:3
59:10,11
**leader** 152:15
**leading** 18:16
**leads** 23:14
**leaning** 141:11
**learn** 76:20
**learned** 86:24
88:5 133:19,24
136:21
**leave** 143:10
184:20 189:22
**led** 17:11,16
60:15
**left** 183:18
**legal** 18:3
20:10 21:6,9
21:20 22:10
26:9,11,14
49:23 55:20
82:19,22 88:21
89:13 93:24,24
106:5,18 109:7
110:5,17 115:5

[legal - litigation]                                              Page 30

115:23 126:13
142:11 145:6
160:10 161:6
161:10 162:5
166:13 170:12
**legally** 31:20
**letter** 53:21
68:9,10,14
71:6,19 81:2
81:15,18,24
82:7,18 83:23
84:3,3,9,15
85:1,5 89:8
99:13,14,17
100:9,12
109:13 110:22
114:19 118:5
118:11 120:22
123:14 128:10
128:22 129:7
147:19,20
148:8 152:21
159:12 169:13
170:5 174:14
190:14,17
**letters** 60:19
68:8 83:11,15
96:19,22 109:4
120:24 142:9
161:5
**level** 33:11
65:15 135:23
**liability** 1:9
156:23

**license** 34:10
50:22 52:10,11
55:7 60:21
72:8 81:13
83:13,24 99:5
99:9 114:13
119:6 130:1
**licensees** 51:14
120:24
**licenses** 54:11
54:12 99:4
123:4
**licensing** 11:19
17:6 33:24
34:9 47:20
49:3 50:20
51:11,17,21
52:1 53:8,15
53:18 54:15,22
55:5 57:10
60:17 82:14,18
100:9 119:5,13
137:13 150:16
153:11 156:14
**lifeline** 48:6
49:13,14
**light** 6:14
114:14 151:22
158:10 163:19
176:3 179:20
**likely** 18:12
60:15 138:12
141:21 150:9
150:12,17

**limine** 100:3
**limit** 117:17
**limitations**
60:11
**limited** 1:9 26:9
58:1 137:12
183:18 184:21
**limiting** 146:22
**limits** 61:8
142:19 146:9
**line** 7:11 8:5
65:22 101:10
101:10 104:20
109:15 126:13
134:13 136:24
**lines** 27:19 89:9
144:6
**linger** 67:6
**lingering** 12:23
**linh** 4:6
**list** 11:13 68:13
69:16 77:23
159:22
**listed** 21:3
171:20
**listen** 9:22
**listening** 9:19
10:5
**lit** 28:20 149:3
164:20
**literally** 73:3
**litigating** 18:18
150:16 156:14
**litigation** 11:20
16:24 17:7,10

19:21 22:22,24
23:2,12,19,22
24:10,14 25:16
27:17,23 28:1
28:4,9 29:13
29:23 30:5,8
30:13 33:23
34:19 37:24
38:11 49:8
50:13,22 51:12
51:13 53:14,20
55:4 56:1,18
60:20 65:19,19
68:17,19 69:7
118:24 122:13
131:7,20 134:8
134:14 135:7
136:3 137:23
138:3,24 139:4
139:23 140:14
140:23 141:19
141:20 142:23
144:1 145:12
146:2,5,8,15,16
147:5,11,22
148:16,21
149:8,13,19
150:9,18 151:2
151:3,17
152:18 154:4
154:11 155:12
155:14,20
156:7,16 157:5
162:12

**litigations** 36:8
50:21 61:21
63:7 124:19
125:1 144:16
**little** 18:14,17
21:15 28:17
56:2 191:6,7
**live** 133:12
170:21
**llc** 148:5
**llp** 4:8
**loan** 61:24 62:1
**location** 1:16
**log** 21:4 46:1
68:15,21 69:8
69:13 71:7
86:12,13,18
87:7 135:23
136:1 149:2
157:3 158:20
159:13 161:1,7
162:6 163:24
165:24 167:19
168:23 170:20
171:4
**logged** 68:18
68:20 86:17
149:3,4,4
157:4 159:13
**logical** 11:8
**long** 99:14
100:6 157:14
182:12,15
185:13,19
190:24

**longer** 53:11
118:1 122:24
131:10
**longstanding**
167:3
**longwinded**
57:24
**look** 10:20,23
14:22 17:4
20:19 22:8
42:22,24 43:2
43:3,7,10
46:22 55:7
67:22 69:15
74:21 75:3,6
76:2 77:23
78:17 81:18
82:15 85:15,19
86:16,17 88:1
88:4 97:18
99:14 100:11
103:9 110:16
110:18 111:7
116:6 124:12
142:1 149:16
161:5 162:20
163:13 168:10
168:24 174:4
182:3 190:11
191:20,22
**looked** 21:12
33:9 72:2
**looking** 72:18
143:17 148:8
148:18 165:10

**looks** 90:9
91:12 99:23
101:23 117:23
131:8
**los** 3:17
**loss** 126:12
127:14
**lot** 10:15 12:21
15:5 39:2
51:20 53:17,19
54:3 64:20
169:4 186:2
**lots** 14:24
17:13,14 18:2
21:8 51:11
56:13 103:22
191:15
**love** 111:14
**lumpsum** 79:12
119:11,14
**lunch** 134:22
**lw.com** 4:11,12
4:13,14

**m**

**made** 15:16
16:22 35:2,9
44:9,12 45:7
46:13 56:22
59:21 60:7
66:15 82:7
110:12 114:15
115:17 116:2
121:19 125:15
125:21 130:6
132:5 136:22

144:5 148:20
152:12 157:23
168:5 172:13
183:17 188:12
188:23
**mailchimp**
132:1
**main** 31:3
98:22 149:10
**maintain** 146:7
**maintained**
133:16 148:15
**maintaining**
21:21
**major** 16:8
149:8
**majority** 16:11
161:18 188:9
**make** 17:23
43:17,19,23
45:13 47:4
50:10 54:8
55:16 65:10
75:6 78:8
83:19 90:3
92:23 93:1,3
100:20 107:7
112:4 114:4,6
126:19 132:21
137:20 140:15
141:16,20
142:24 154:2
157:19 158:11
159:2,5 163:20
174:21 187:21

[makes - mischaracterizes]                                    Page 32

makes  9:7 45:2
 48:1,7 150:7
 190:15
making  13:7
 24:4,6 45:11
 55:1 56:12
 64:23 82:19
 90:21 114:3
 136:14 138:14
 150:15 173:22
management
 161:20
manhattan
 2:17
march  12:19
 13:12 42:13
 175:20 176:10
 177:7,18
 185:19,19,19
 186:3 187:6,12
 188:5,6,7
 189:6
marial  7:13
mariel  2:15
 95:13
marked  5:3
 168:1
marketed
 50:16 51:2
 57:20
martinez
 181:15
material  139:2
 154:12 159:5

material's  67:7
materials  25:4
 86:14,17 91:12
 122:16
matter  6:22 7:2
 7:3 8:10 43:1
 106:4 107:17
 122:24 130:23
 133:22 142:1
 152:16 153:7
 155:10 156:19
 157:8 158:7,10
 185:6 190:9
matters  6:18
 19:21 20:12
 26:10,13 38:16
 39:21 160:12
mc  6:20
mckool  2:16
 7:12 20:7
 95:13
mckoolsmith....
 2:20,21,22,23
mean  13:10
 16:5 20:9,19
 22:10 24:19
 27:7 28:2,2
 29:24 31:6
 65:18,19 67:11
 67:17 78:21
 82:11 100:16
 101:23 107:4
 107:11 110:10
 129:21 134:17
 134:20 138:10

 138:19 151:9
 177:20,22
 180:7 190:18
meaningfully
 163:11
means  120:17
meant  100:11
 155:3 188:11
meet  58:4 59:1
 164:2,10,14
 165:2,12,22
 166:2 167:18
 171:5 186:6
meeting  18:9
 20:1
meetings  23:6,8
 27:21 28:12
 49:16 71:12
 122:3,12 131:6
 131:16,18
 148:13 156:15
member  9:24
 49:18,19
members  10:4
memory  117:14
 185:22
memos  64:13
mention  12:4
 38:15 78:3
 107:15
mentioned  12:1
 39:10 60:10
 61:2,14 110:21
 136:12

merged  44:4
metadata
 161:15,21
 162:23 163:7
 172:19
metzer  8:12
metzler  3:4,10
 7:24
microsoft
 31:18 32:1
 34:20 35:15,22
 50:21 61:21
 126:22 140:1
microsoft's
 35:13 36:3
mid  47:9
 166:11,11
middle  46:5
million  47:11
 143:23 145:22
 153:15
mind  75:17
 91:18 134:3
mindful  35:19
mine  63:20
minimum
 29:12 77:23
 121:16 136:1
 156:20,24
minute  11:12
minutes  191:12
miscellaneous
 6:18 7:1 9:5
mischaracteri...
 148:14

**[misremembering - netflix]** Page 33

misremember...
  147:19 149:20
misrepresent...
  38:10
misrepresent...
  60:7
missing 59:6
  60:13 151:11
  187:23
mix 169:4
moments 40:12
monday 1:13
money 23:1
  48:21 50:12
  123:24 125:4,4
  125:9,12,20,22
  135:19 140:1
  140:15 145:24
  153:14
monies 127:10
  128:18
month 176:20
  186:4
months 64:10
  165:23 168:5
  168:20 186:19
  187:13
moot 114:14,21
morning 6:17
  7:9,22 32:23
  40:2 70:15
  95:12,16
motion 8:20 9:4
  9:6,8 28:19
  34:18 35:1,6

37:14 42:20
46:17 59:22
64:9 67:22
69:6 70:21
97:14 100:3
112:15 158:8
158:15,22,23
163:18,20
170:21 171:2
174:8 188:24
191:1,21
motion's 34:2
motive 16:21
  65:4
mouth 87:15
movant's 10:7
move 58:15,17
  59:22 68:2
  112:3 117:8
  167:24
moved 34:21
  63:24 182:17
movements
  9:10
mover 120:24
moving 8:23
  32:18 67:20
  114:5 166:1,5
mtalmage 2:23
multiple 63:6
  66:5 83:12
  94:8 132:3
  152:4 166:2
  167:17,18
  192:4

multiplied
  167:4
mute 9:11
  59:23
mutually
  154:23 160:15

**n**

n 2:1 3:1 4:1
  6:1
nail 76:6
name 109:18
  109:20 160:18
names 88:11
narrow 59:1
narrowed 40:5
  40:9
narrowing
  139:14,18
nature 150:11
navigating
  104:17
near 164:18
nearly 59:13
neat 164:11
necessarily
  134:19 138:23
  139:1 156:7
  161:23
necessary 64:8
  176:5,19,23
  178:3
need 8:14 11:2
  11:2 42:23
  58:15 66:3
  67:8 69:24

70:3 76:3
77:23 99:9
112:3 114:4,5
121:12 124:10
125:13 146:4
150:3 164:23
167:5,24
171:17 172:5
172:23 174:1
174:16 176:17
178:20 188:21
needed 26:9
  49:12 76:18
  121:6 183:20
  184:16 186:7
needle 64:1
needless 146:12
needlessly
  167:4
needs 17:10
  139:12 170:22
nefarious 169:2
negotiation
  49:2 50:4 51:5
  79:10
neither 130:11
  193:11 194:7
netflix 1:8 3:2
  3:15 4:2 6:19
  6:23 7:24 8:6
  12:8 16:16
  25:11,22 33:1
  41:19,23 60:11
  70:17 72:18,20
  72:22 73:13,22

**[netflix - obtain]**                                                      Page 34

73:24 79:10,19
80:17 81:4,17
81:22,24 82:2
82:7,14 83:10
83:23,24 84:9
84:16 85:5
86:9,11 87:2,6
90:4 93:7
94:21 96:17
97:6 100:6
101:11 104:20
105:5 107:23
119:17,24
120:21 123:14
123:17,21
124:6 129:22
132:6,8,13
133:8,10,15,15
135:15 138:9
142:8,16
143:12 145:9
148:13 151:11
154:7 159:14
165:20 177:2
178:8,10,16,18
178:22,24
179:10,14,16
180:15,20
181:18 183:5
184:5
**netflix's**  37:7
37:20 63:2
70:21 76:12
86:4 89:7
94:11,23 101:8

104:13 106:10
108:10 118:10
121:4 126:8,14
127:7 129:6
132:8 159:11
169:1,8 176:1
181:13 184:13
186:14
**netflix.com**
3:18
**netted**  123:3,18
125:21
**never**  19:22,24
20:9 27:5
58:22 78:18
101:22 102:5
103:16 108:24
110:12 142:19
166:18,18,22
181:2,18 182:5
183:22,24
184:19 190:23
**nevertheless**
128:17 171:22
**new**  2:19 34:16
41:4 70:21
129:10 174:6,9
**newer**  174:19
174:19 175:10
**nine**  53:15,23
**non**  9:21 35:13
35:24 38:15
59:16
**nondisclosure**
147:7

**nonfee**  125:15
**noninfringem...**
55:8
**nonlegal**  106:6
**north**  1:17 2:6
3:7
**northwest**  4:9
**notary**  193:19
**note**  16:5 34:24
107:15 129:5
150:21 151:24
152:21 181:8
**noted**  47:21
59:6 119:2
**notice**  81:2,17
83:16 84:9
85:1 175:18
177:10 178:9
178:11,16
182:17,18,20
185:16 186:13
187:4,5
**noticed**  176:6
177:1,17 178:9
179:1 182:2,23
183:2,15
185:17 186:22
188:5,6 189:4
189:6
**notices**  177:7
182:16
**notion**  63:9
**number**  6:20
6:24 40:1,13
42:9,23 44:12

67:17 74:6
75:23 77:1
112:23 113:5
118:8 119:9
128:12 148:5,6
**numerous**
57:15
**ny**  2:19

**o**

**o**  6:1
**o'clock**  8:11,12
174:15,23
**oath**  47:14
166:12
**object**  45:9
**objection**
120:11,13
121:18 148:20
157:22 158:6
159:9
**objections**  28:2
144:4
**objective**  62:13
136:14
**obligation**  36:9
**observation**
35:2,10 44:5
**observations**
44:1
**observed**  37:12
**obstruction**
41:24
**obtain**  78:10
80:6 119:6

[obtained - order]                                                    Page 35

obtained   13:21
  14:15 79:19
  94:8,24
obtaining
  79:20 93:24
  123:18
obviate   30:8
  76:3
obviously
  10:12 21:15
  52:2,3 100:6
  170:7 177:22
  177:24
obviousness
  137:16
occasionally
  150:8
occur   178:20
  178:21 184:24
occurred   13:11
  14:3 15:7
  178:24 179:7
  181:2
ody   4:23 8:1
offense   60:8
offer   41:8
  82:14 101:13
  180:8 190:12
  190:19
offered   101:11
  101:15 104:8
  180:5,7,12,14
  182:4 188:10
offering   166:13
  184:14

offers   179:20
office   7:24
  36:10
officer   193:2
official   75:5
oh   9:23 14:6
  59:23 61:19
  81:6,9 84:24
  91:7 101:20
  103:21 120:6
  136:20 188:20
okay   6:6,9 7:18
  8:15 9:2,15
  11:9 12:15
  14:4,18 17:1
  21:2 22:15
  24:13,17 27:11
  27:23 30:22
  31:2 32:17
  33:5 46:16
  51:10 55:23
  58:14 59:17,23
  65:23 67:20
  70:12,17 71:5
  71:17,22 78:13
  79:21 80:9,21
  81:9 85:1,8
  87:19 90:7
  93:17 94:12
  95:4,15 96:6
  99:12 100:22
  105:9,10,23
  106:20 108:1
  108:23 112:2,9
  117:22 118:7

118:12,20
  120:5,7 121:11
  121:22,24
  122:5,20
  124:20 125:24
  127:1,8 128:15
  128:15 129:15
  130:3 131:4
  134:2,16
  141:13 143:5
  146:22 147:16
  148:7 150:6
  151:14 152:9
  153:24 154:14
  154:18 161:4
  163:6,13 167:5
  168:7,12
  170:15,19
  174:4,11 175:4
  175:9 178:4
  181:23 185:16
  187:9 188:13
  188:20 189:1
  192:2
omnipresent
  18:15
once   58:20
ones   12:1 16:14
  28:22 68:12
  100:19 166:24
  180:10
ongoing   166:5
onus   168:2
open   100:6

opening   54:14
  78:4 86:21
  89:8 112:17
  114:18 118:11
  120:22 129:6
  169:13 172:14
operating
  17:20
opinion   78:6
  79:7 88:12
  95:2 101:16
  106:16 109:6,8
  110:17,18
  115:5,13
  184:14
opportunities
  167:17
opportunity
  43:2 56:21
  60:2,22 65:2
  69:21 100:17
  184:16
oppose   166:10
opposed   79:12
  117:14 119:11
  186:8
opposition
  106:12 109:13
  118:5 170:5
option   181:3
order   67:12,22
  69:22 70:3,8
  95:23 112:14
  115:11,23
  155:7 157:21

[order - parties]                                                      Page 36

158:2 159:18
167:24 184:21
188:8 191:20
**ordered**  31:20
46:11 191:5
**original**  175:17
189:6
**originally**
61:16 163:4
**outcome**  42:20
136:7 177:23
193:16 194:12
**outreaches**
52:7,19
**outset**  73:12
168:2
**outside**  17:15
17:21 18:5,12
19:14,20 22:14
25:12 28:6
44:2 50:22
51:11 59:12
85:19,22 86:14
89:23 92:20,21
94:9 101:17
106:14,17
107:20 110:19
117:2 146:10
151:2
**outsiders**  49:21
**outstanding**
176:18
**overall**  122:2
**overarching**
30:19

**overinclusive**
11:13
**overlap**  10:16
69:3,4,7
**overlaps**  39:3
**oversight**
128:14 163:10
**owe**  74:6,18
95:19
**owed**  112:22
**owes**  72:4
**own**  19:11
33:21 60:14
61:4 63:11,18
102:16,23
126:8

**p**

**p**  2:1,1 3:1,1
4:1,1 6:1
126:10 129:6
**p&l**  129:23
**p.m.**  192:7,8
**pa**  2:5 3:5 4:24
**pacific**  119:8,9
137:10,17
**page**  81:15
83:22 84:11,13
89:8,10 101:9
101:10 104:13
104:19 109:14
110:18 112:17
120:21 126:10
126:21 148:12
158:23 164:5
174:7

**pages**  85:10,15
85:20 87:21
91:13,17
151:10
**paid**  47:13,19
48:16 102:19
105:22 123:13
126:11 127:11
128:18
**papers**  34:23
37:13 39:17,19
44:6,22 45:11
68:4 108:24
139:16 148:24
156:3 163:12
**paragraph**
107:1,1 117:9
148:12 190:15
**parcel**  106:18
**parent**  32:1
**part**  14:11 20:6
27:21 34:12
39:1 52:14
54:17,21 56:13
68:10,14 78:19
84:2 87:12,19
101:16 106:17
114:2,24,24
131:11 148:11
155:8 162:4
163:10 164:16
170:21 171:10
181:21
**participate**
27:18 178:22

**participated**
51:13,17
**participating**
19:24 63:5
**participation's**
161:8
**particular**  27:8
37:14 40:22
41:18 49:6
50:21 54:11
57:2 58:1
59:20 76:13,24
88:11 110:11
116:5 119:5
156:10 166:23
187:18
**particularly**
47:1 52:22
72:18 91:13
104:14 135:1
152:19 156:10
179:20
**parties**  10:1,1
10:13 22:17
26:24 33:12
34:9 38:3
49:21 50:17
51:6,12 52:18
66:14 67:2,4
67:13 68:24
73:12 94:9
105:12,16
111:11,17
114:5 115:22
116:18 117:2,6

132:22 133:6,7
136:8 142:2
143:3,14 145:6
146:17 154:20
154:23 155:4
155:16 157:12
158:16,22
164:2,14,21
167:3 171:4
173:4,20 174:5
174:7 180:22
184:22 186:23
187:1 191:2,7
191:13,14,22
193:12,14
194:8,11
**partner**  17:12
17:16 20:5
**parts**  9:6,6
**party**  23:4 25:3
30:5 38:21
50:3 53:22
55:7 57:1 61:5
101:21 102:4,8
102:15 109:16
133:21,24
150:7 165:21
177:2 181:1
183:13 185:6
**passage**  41:10
**past**  58:10 64:2
100:10 113:9
**patent**  11:18
17:6 19:20
22:1 25:23

26:13 27:16
31:7,11,21,23
32:1 33:24
36:10 48:1
50:13 51:11,12
51:16,17,21
54:22 61:15
88:22 94:6
138:1,2,5,7
142:23
**patents**  11:23
27:17 29:5,5
29:22 31:16
32:5 37:8,9,20
51:14 57:10
63:8,16 83:24
124:13,14,16
124:21 128:7,8
135:8,10,11
141:1,23
143:13,15
144:9,10,15
145:12 147:10
150:11,16
151:21 152:8
155:13 156:14
184:5
**path**  24:7
**pause**  95:4
125:24 153:22
**pay**  125:11,19
127:12 128:5
**paying**  123:4
123:19 125:18

**payment**
130:14
**payments**
125:15 128:19
129:17 130:8
**pc**  2:16
**pending**  32:2
64:18 133:12
**pennsylvania**
193:20
**people**  15:2,5
17:13,19,20,22
18:4,8,16 19:4
20:16 22:24
43:2,8,11 47:2
48:12 53:5
104:1 140:14
**perceived**
135:10
**percent**  14:23
46:22
**percentage**
74:4,5,12
77:16,17
**perfectly**  11:8
**performed**
77:18 85:13
102:16 108:6
110:1
**period**  15:9
17:12 19:9,13
19:19 47:8,10
48:3 62:19
103:24 105:15
129:24 140:7

146:18 160:20
167:12 172:11
172:22 175:17
176:8,22
178:21 179:3
180:5 183:19
189:13
**permission**
7:16 8:13
**permit**  120:18
138:22
**permitted**
96:10 121:17
143:2 146:18
191:10
**permitting**
172:24
**persistently**
46:10
**person**  18:17
19:2 22:5,14
28:23 49:2
53:6 56:12
66:21 74:22
183:14
**person's**  74:24
**personal**  28:12
34:7 46:20
49:23 62:5
**personally**
13:15
**personnel**
28:13
**perspective**
47:4 56:9

[perspective - post]                                                    Page 38

66:10 122:4
141:5
**pertinent** 94:23
**ph** 28:13 31:10
31:10 181:15
**place** 31:22
33:7 37:13
44:22 128:11
130:21 147:4
**places** 98:18
145:3
**plaintiff** 1:6 2:2
11:17,19 34:20
38:22 46:21
47:2 50:10
53:13 56:5
66:13,15 69:17
69:20 70:2
72:4,8,11 73:4
81:1,12 87:20
95:7,11,14
99:15 101:2
109:4 112:22
114:12,17
115:6,17 116:2
116:10 117:4
118:1 122:10
122:23 127:11
130:20 131:7,9
136:13 137:22
141:17 142:23
145:24 150:14
152:11 156:11
158:23 159:1
160:5 161:2

165:4 172:9,15
172:18 173:11
173:12 174:18
189:3,12,17,20
189:24 190:20
**plaintiff's** 7:7
8:22 10:12
14:22 25:2,5
42:21 43:19
47:3 66:10,14
69:14 87:24
88:3 96:8
113:4 126:1
127:12 132:22
141:14 160:23
175:1,10
188:24,24
190:16
**plaintiffs** 9:10
**plan** 165:13
**plan's** 172:1
**planned** 99:3
**plans** 57:10
**platform**
161:20
**plausibly** 28:21
**play** 19:19
44:16
**played** 19:22
27:14 48:9
**playing** 12:12
118:18 123:6
**pleading** 63:11
**plenty** 126:8
142:21

**plethora** 57:13
**plus** 97:2,4
**point** 38:13
41:17 42:22
43:22 44:19,20
45:13 55:2
63:21 64:23
65:10 75:2
83:9 85:6
89:18 91:5
92:23 94:8
96:22 97:18
98:23 100:11
100:19 108:9
121:10 128:10
131:20 132:5
132:18 139:13
142:19 143:10
145:8 154:2
160:21 178:14
183:22 188:4
**pointed** 52:8,22
52:23 84:11
96:21 104:7
109:3 110:24
111:1 128:22
129:6 131:23
135:22
**pointing** 55:21
129:22 130:8
137:3
**points** 45:10
64:13 89:6
108:5 119:21
142:8 152:11

**ponce** 175:14
178:9 179:11
179:17 181:9
181:11,16
182:7 183:4,5
183:11,14,18
184:9,14
190:16
**ponce's** 175:19
189:1,19
190:21 191:2
**portion** 9:14
148:23
**portions** 142:8
143:18
**position** 25:2
25:22 45:1
55:9,9 60:5
64:6 74:23
75:5 113:4,15
114:10 132:6,8
133:8 142:17
151:20 152:7
154:7 178:5
**possession**
111:24
**possible** 23:15
155:6 177:4
186:22
**possibly** 91:22
130:16 191:14
**post** 28:5 62:11
137:9,14
143:15 146:17
146:21 154:8,9

**potential** 22:23
22:23 27:22
29:4 30:5 49:4
49:8 51:14
53:13 120:23
134:19 137:23
140:23,23
141:18,19
144:17 147:5
152:20 155:11
155:12,19
156:15 177:23
186:1 187:22
**potentially**
15:6 40:5
60:17 99:4
139:2 154:24
156:22 187:22
**pound** 182:5
**practice** 151:21
152:8
**practiced**
151:23
**pre** 20:22 137:2
137:12
**precedent**
54:13 119:6
179:18
**precise** 40:3
**precisely**
140:19
**precluded**
31:20
**predate** 172:22

**predicates**
115:7
**prefer** 119:14
**preferences**
79:11
**prejudice**
63:18 158:14
163:16 181:20
**prejudicial**
181:10
**prelude** 70:13
**premature**
64:14
**preparation**
162:8
**prepare** 87:22
117:15 162:12
174:16
**prepared** 30:12
30:24 39:22,23
44:23 45:9
87:17 105:19
150:4 194:3
**preparing**
174:22
**presence** 117:2
**present** 4:19
19:2 29:1
181:21
**presented**
140:4
**presenter**
57:20
**presenters** 63:6

**preserves**
161:21
**preserving**
161:23
**pressing**
101:13
**prestia** 61:15
61:15
**presumably**
52:23 56:11
93:14 104:10
134:18 186:17
**pretrial** 8:11
**pretty** 8:22
19:11 49:7
108:13 187:11
**prevented**
123:17
**previous** 34:19
36:13 37:24
**previously**
113:13
**price** 101:6,11
101:14 102:4
102:17 104:5
104:24 105:3
**prices** 104:9
105:20,21,21
**primarily** 36:8
**primary**
156:12
**principles**
79:24 140:5
**prior** 25:19
60:20 61:20

77:9 83:11
118:24 123:3
123:13,19,24
124:12,16,18
124:21 129:8
129:12,24
147:3 155:3,16
170:21 193:5
**privilege** 21:4
21:16 22:7
30:9,17 35:8
38:4 39:7
40:13,17,20
46:1 68:21
69:8,13 70:6
71:7 76:18
78:12 82:1
84:19 86:10,13
86:18 87:7
89:17 90:2
93:23 94:10
96:23 98:16
100:12 108:17
110:9 111:1
115:9,19
119:23 120:12
121:19 123:10
124:8 129:1
131:10 135:15
136:1 140:17
145:4 146:12
147:23 148:20
149:2,4 152:17
152:23 153:1
157:3 158:20

[privilege - prosecuting]                                                    Page 40

| | | | |
|---|---|---|---|
| 159:3,13 161:1 | 56:4 69:20 | 145:15 151:8,9 | 141:10 150:8 |
| 161:7 162:21 | 107:5 163:18 | 157:7 159:6 | 150:15,22,24 |
| 163:24 164:19 | **probe** 123:22 | 161:13,19 | 151:20,22,24 |
| 165:6,24 | **problem** 6:6 | 166:21 167:22 | 152:2,5,6,7 |
| 167:14,16,19 | 9:18 58:2 | 169:3,9,10 | **profit** 61:12 |
| 168:1,3,23 | 167:7 168:15 | 187:18 | 126:12 127:13 |
| 169:23 170:20 | **proceed** 11:8 | **producing** | **profitability** |
| 171:3,24 | 183:20,20 | 179:18 | 137:11 |
| 173:14,18 | 186:12 | **product** 29:20 | **prohibiting** |
| **privileged** 11:4 | **proceeded** | 30:3,9,14 | 111:2 |
| 21:4 23:6,12 | 185:1 | 40:17 70:5 | **prohibition** |
| 35:13,24 46:3 | **proceeding** | 130:16 135:14 | 61:4 |
| 59:14,16 65:17 | 45:15 152:24 | 135:22 136:5 | **project** 161:20 |
| 65:22 68:15,16 | 192:9 194:4 | 139:23 140:18 | **prominently** |
| 69:23 75:8 | **proceedings** | 141:9 147:8,22 | 16:15 |
| 82:4,5 83:7 | 167:4 193:3,5 | 148:1,20 149:5 | **promoted** 38:8 |
| 84:6 85:24 | 193:6,9 194:6 | 149:10 153:12 | 49:20,21,22,23 |
| 88:16 91:23 | **proceeds** 47:20 | 159:3 162:10 | 52:3,4 |
| 93:2,4,19 | 105:7 | 164:19 165:6 | **proper** 97:13 |
| 100:13,20 | **process** 165:3 | 166:18 170:10 | 98:16 |
| 101:15 102:2 | 173:21 189:16 | 171:24 172:12 | **properly** 170:9 |
| 104:22 105:4,8 | **produce** 25:24 | 173:14 | **property** 135:1 |
| 106:4,10 | 46:10 57:8,17 | **product's** | 142:3 155:22 |
| 115:16,22 | 57:18 133:17 | 137:8 | 156:18 |
| 116:21 118:2 | 153:12 154:9 | **production** | **proposal** 71:4 |
| 119:1,2 122:24 | **produced** | 25:21 57:15 | **propose** 159:10 |
| 130:16 160:3 | 24:19 25:5,17 | 133:19 159:14 | **proposed** |
| 161:9 170:10 | 25:19 26:4 | 183:9 | 122:12 131:6 |
| 172:12 174:10 | 37:16 41:15 | **productions** | 180:3 |
| 174:11 | 45:22 46:7,14 | 57:16 | **propriety** 45:8 |
| **probably** 13:20 | 46:15 52:16 | **products** 50:10 | **prosecuted** |
| 13:22 18:11 | 55:2 58:3,6,8 | 50:10,19,24 | 31:15 32:3 |
| 20:22 23:8 | 60:20 62:24 | 51:2 62:16 | **prosecuting** |
| 26:19 29:3 | 63:3 102:20 | 136:21,24 | 32:15 |
| 53:4,16,19 | 126:12 127:14 | 137:5,12 | |

[prosecution - questioning]                                                      Page 41

**prosecution**
  11:23 14:8
  31:7,11,13,19
  31:21 32:4,7
  32:11 33:21
  34:14 36:21,22
  37:1,7,19,21
  38:1,5,14,16
  39:6,9 61:15
  61:17 63:14,15
  63:20
**prospective**
  26:7
**prospects**
  147:10
**protect** 89:16
**protected**
  29:19 30:2,13
  70:6 93:6
  115:8 130:16
  135:14 136:5
  171:24 172:12
**protection** 30:9
  147:8
**protective**
  167:24
**protects** 82:1
**provide** 40:4
  52:9 55:12
  67:1,13 70:7
  73:14,19,20
  74:11 78:22
  83:16 86:7
  90:1 94:14,20
  95:20,23 107:3

108:15 110:5
111:9 115:23
133:2 148:3
150:4 158:23
160:6 173:13
175:11
**provided** 13:16
  13:17 16:5
  26:6,14 37:18
  47:15 49:14
  56:7 69:24
  72:11 79:24
  85:22 86:14
  87:20 92:9,24
  93:9 95:22
  98:20 101:16
  103:13 104:7
  108:22 109:5
  110:18,19
  111:4 113:14
  113:22 115:2
  115:13 116:10
  116:17 128:13
  130:11,24
  131:12 132:23
  135:24 142:14
  142:16 145:5
  147:22 155:2
  162:13 165:9
  183:15,16
  187:16 189:18
  191:17
**providing**
  83:10 88:21
  92:21 93:24

106:16 109:7
109:22 115:5
160:10 162:5
**provision** 83:5
  88:20
**proxy** 50:12
**pto** 35:21
**public** 9:24
  10:3,5 193:19
**publicly** 103:1
**pull** 107:1
  149:13
**pulled** 162:19
**purely** 89:14
  108:16
**purported** 88:9
**purportedly**
  184:15
**purpose** 93:24
  109:6 117:6
**purposes** 22:6
  23:18 99:8
  106:15 109:22
  127:7
**pursue** 16:7
  65:5 85:6
**pursued** 155:2
  155:17
**pursuing** 63:16
**pushed** 133:14
  176:13
**put** 9:21 31:19
  65:3 107:12
  117:16 123:14
  143:7 167:20

  171:8
**puzzled** 21:11

**q**

**q&a** 140:7
**qualified** 26:11
  193:7
**quarrel** 169:21
**quash** 8:20 9:5
  28:19 34:19,21
  35:2,6 67:22
  69:6 158:15
  163:18,20
  191:21
**query** 44:21
**querying**
  139:20
**question** 12:17
  17:2 23:14
  28:8 35:12
  37:5 39:13
  52:20 55:24
  60:22 71:22
  81:20 82:10,13
  83:23 84:7,12
  85:12 91:8
  92:16 94:13
  96:12 101:24
  105:1,17
  156:13 157:15
  157:17,22,23
  159:10 175:15
  182:13 189:15
**question's** 88:7
**questioning**
  79:15 85:2

120:18 121:12
130:23 135:16
144:7 180:2
**questions** 10:9
12:16 14:14
27:16,17 31:3
40:1 42:1,10
50:15 76:15
78:18 79:6,13
80:15 83:21
86:4 87:8 88:2
96:21 98:2
100:13,17,18
101:6 103:14
104:2 108:11
108:13,19
111:9,12,21
112:7 113:3,7
113:8 114:24
116:13 118:16
119:17 120:1
120:10,15
121:18,23
122:11,14
123:8 127:17
129:1 131:5,17
139:3 140:6,8
140:21,24
142:1,2,7,11
143:24 144:6
145:21 148:12
155:10,20
157:1 158:1
190:3

**quick** 46:18
67:9
**quickly** 51:10
67:8,16,18
144:12 154:3
**quite** 21:1 36:7
48:8 151:3
182:10

**r**

**r** 2:1 3:1 4:1 6:1
**rachel** 4:4 8:3
165:18 175:7
**rachel.cohen**
4:12
**radtke** 194:2
194:15
**raised** 47:11
62:14 81:11
115:11 158:3
163:23 164:9
169:13 170:22
171:10 172:6
174:17,18
**raising** 50:12
173:9
**ramy** 2:13 7:13
**range** 73:21
77:17 88:5
**rate** 77:7 78:22
**rather** 82:3
128:24 133:6
183:15 187:2
**rationale** 166:6
**ratner** 61:14,15

**ratnerprestia**
34:21,22 35:6
**reached** 133:6
178:18 179:12
**reactions** 43:23
**read** 85:14
91:21 102:4
107:2
**reading** 69:20
91:12
**ready** 45:19,22
101:19,22
186:5,10,12
**real** 58:2
189:15
**reality** 171:23
177:17 186:21
**realize** 150:3
**really** 15:1 20:2
31:7,14 33:13
34:2 46:14
60:8 64:8 65:4
65:20 66:12
68:16 75:11
84:8 91:15
97:13 100:2,14
101:7 103:16
113:3,12
143:20 158:8
161:15 162:23
163:11 167:1
167:10 168:1
174:1 178:7
185:9 190:13
191:13

**realm** 108:16
155:16
**reason** 28:6
40:24 74:15
85:4 98:5
114:9 145:13
146:3,6 147:21
153:6 154:11
160:2 161:8,12
162:21 163:20
166:10 167:23
173:23 182:15
190:7
**reasonable**
49:1 50:2
63:19 71:20
73:21 74:3
76:24 77:16
78:7 121:22
124:3 138:11
141:16,21
153:8,18
160:14 165:16
177:12
**reasonably**
29:12 36:2
87:17 177:21
**reasoning** 48:2
100:8
**reasons** 62:6
113:1,10
121:15 156:3
166:6 170:8
189:2

**rebuttal** 32:19
58:17 59:20
60:2 95:2
121:12 188:16
**recall** 28:10,15
31:24 32:10
62:6 63:3
90:10 96:19
102:2 105:13
109:23
**recalled** 85:24
**receive** 128:6
188:3
**received** 13:4
78:4 89:15
103:10 106:18
140:6 142:12
165:23 178:8
188:2
**receiving** 52:19
**recent** 37:6
150:23 168:20
**recipients**
132:4
**recognize**
182:22
**recognized**
182:24 184:24
185:15
**recognizes**
30:20
**recollection**
63:5
**recollections**
52:18

**recommending**
21:17 22:3
**record** 6:2,15
6:16 7:6 13:22
14:3,11 15:16
15:23 18:24
23:15 26:20,22
31:8 32:7 35:3
37:11 39:11
40:3 43:15,19
45:3,5 46:8,14
47:15 48:16
49:7,9 52:3,15
55:5,19 56:5
56:15,17 63:4
63:23 64:3
65:8 66:22
67:3 87:13
88:17,24 92:5
102:15 106:23
107:6,12
108:21 109:11
114:2,6 115:18
116:2 117:24
127:9,19
128:11,17
129:2,18 130:2
130:21 132:12
133:5 141:17
143:7 144:14
159:2 160:7
165:5 170:16
174:9 175:23
180:14 182:11
185:13 192:1,6

193:9 194:5
**recorded** 193:6
**recording**
193:8 194:4
**records** 39:24
55:11 57:3
114:3
**recouped** 138:8
**recovered**
144:16 147:10
**red** 6:8
**redirect** 91:17
108:7 109:3,14
115:3
**redlines** 167:20
**reduced** 193:7
**refer** 31:11
**reference**
108:23
**referenced**
81:14
**referencing**
140:14
**refers** 15:22
91:2
**reflective**
168:21
**reflects** 180:14
**refuse** 181:3
**refused** 55:12
58:24 73:16
86:7 101:5,13
154:9 178:22
**refuted** 63:10

**regard** 24:22
50:13 51:14
56:3,16 69:13
72:15 80:11
82:21 85:1
86:2 87:13
95:18 99:12
101:1 105:23
112:15 114:5
114:11,22,24
117:22 120:19
122:7,18
128:19 130:4,5
131:2 136:11
142:2 144:9
146:15 148:21
150:18 151:16
154:18 155:7
155:16 157:3
157:11,23
158:4,7,13,18
158:19 159:4
163:15,24
164:1,20 171:3
171:19 175:14
191:4
**regarding**
33:22 56:6,18
69:5 71:4,19
72:19 73:19
74:10,12 79:13
83:11 86:15,23
87:5 89:23
90:5 92:19
96:8 108:15,19

109:7 111:2,21
111:24 112:10
119:18,22
120:1 137:5
148:12 151:22
155:13,18
159:18 171:2
175:24 176:1
**regardless**
96:24 97:13
111:3,5
**regards** 72:17
**regular** 146:4
**reiterate** 65:10
**relate** 9:6 15:3
33:14 40:22
106:5 112:18
117:21 122:2
144:3 146:24
154:24 157:7
158:9
**related** 6:17,22
11:21 16:1
22:1 25:3
26:13 27:1,16
28:18 29:9,10
33:21 37:1
38:16 47:3
68:20 79:22,24
100:19 114:12
115:4 122:3,16
124:13 125:10
134:10,15
135:5 148:15
158:13,20

159:22 181:13
193:11 194:7
**relatedly** 157:2
**relates** 23:9
30:23 40:24
48:1 55:24
66:18 69:6
88:21 112:15
116:4 121:7
131:5 135:2
167:15 168:8
170:2 183:4,6
184:11
**relating** 11:20
11:23 21:23
23:1 27:17
32:4 56:1
74:17 86:4
121:23 122:12
122:15 129:17
130:8,13 131:6
131:16 140:21
154:24 169:22
171:9 172:21
**relations** 12:10
**relationship**
167:13
**relative** 94:4
193:13 194:10
**relatively** 20:20
67:16,18 173:1
**relaunches**
152:5
**release** 179:19

**released** 179:16
**relevance** 28:3
39:15 48:23
62:7 66:23
123:7 124:5
131:11 133:13
134:17 135:5
135:20 136:2
136:18 139:4
147:18 148:1
150:1 153:3,4
157:17 158:12
158:17 184:10
185:20
**relevant** 11:3
12:4 14:17
16:6,19 25:5
26:23 35:10
36:2,7,14,21,21
36:22 37:3
38:11 42:20
44:17 48:12,19
49:4 50:1,16
51:8,22 55:9
55:17 57:9
58:20 63:10,17
63:22 66:8
68:21 70:7
99:4 103:24
105:15 118:14
119:4,15
121:16 123:1,2
125:5 127:3
129:13 130:7,9
130:17 132:9

133:9,17,20
134:19,22
135:3,8,13
137:3,9,16,17
138:13 139:1,2
143:13,16
145:10 146:9
146:13 148:17
148:19 149:5,9
149:11,18,24
150:9 154:8,12
156:2,20,22
157:16 173:22
181:13 182:8
183:6,6 190:13
190:16 191:8
**reliability** 36:1
**relied** 19:3 79:3
79:10 80:8
107:22 118:24
126:15 145:9
184:14
**relief** 107:7
158:2
**relies** 79:23
**rely** 17:21 61:9
87:4 98:10
99:5 100:7
114:17
**relying** 80:4
92:17 98:21
99:2 120:2
127:2,6,8
141:7

**[remain - responding]**

| | | | |
|---|---|---|---|
| **remain** 36:5 | 107:8,16,22 | **representatives** | **resolution** |
| **remainder** | 113:21 116:5 | 22:20 28:24 | 163:19 |
| 159:7 174:13 | 121:4 126:16 | 66:14 | **resolve** 6:22 |
| 180:4 | 165:14 171:6 | **represented** | 67:8 69:12 |
| **remained** 31:22 | 173:4,19,23 | 46:7 49:17 | 95:8 108:3 |
| 41:7 176:18 | **report's** 79:23 | 96:16 181:1 | 158:15 160:12 |
| **remaining** | **reported** 1:19 | **representing** | 164:17,19 |
| 66:22 158:7 | **reporter** 6:2,12 | 49:16 53:20 | 170:23 173:2 |
| 160:24 163:14 | 6:12 192:6 | 95:13 166:12 | 173:17,17 |
| 178:21 179:2 | **reporting** 63:6 | **represents** | 174:10,12 |
| 186:23 | **reports** 87:13 | 35:15 168:19 | 191:16 |
| **remarks** 41:18 | 89:19 95:21,22 | **request** 9:23 | **resolved** |
| 44:1 | 98:7 106:24 | 21:19 64:2 | 121:10 171:3 |
| **remember** 88:1 | 181:15 184:13 | 68:18 71:2 | 191:19 |
| **remind** 118:8 | **represent** | 74:9 113:1 | **resolving** 26:20 |
| **removed** 40:19 | 51:12 53:13 | 114:9,20 116:3 | **resources** 20:2 |
| **renew** 158:14 | 61:6,17 147:3 | 117:6 121:14 | **respect** 21:20 |
| 163:16 | 165:20 173:8 | 130:4 131:2 | 22:12 24:21 |
| **reopen** 117:5 | 180:22 | 155:8 157:10 | 26:8 34:19 |
| **repaid** 48:17 | **representation** | 163:16 | 37:19 38:5,7 |
| 62:1 | 35:13 58:8 | **requested** | 44:8 110:13 |
| **repeated** | 85:7 183:23 | 46:12 52:15 | 132:13,16 |
| 178:23 179:20 | **representations** | 73:13 186:19 | 144:17 180:21 |
| **repeatedly** | 44:12,15 45:7 | **requests** 33:10 | **respectfully** |
| 183:8 | 46:13 51:6 | 35:12 133:23 | 106:9 |
| **reply** 110:15,21 | 56:22 57:11 | 158:13 | **respects** 189:12 |
| 118:5 159:12 | 58:2 114:15 | **require** 65:8 | **respond** 36:15 |
| 169:17 170:1 | 129:14 | 130:23 | 142:6 147:12 |
| 172:15 | **representative** | **required** 13:15 | 152:11 172:15 |
| **report** 36:9 | 27:3 99:6,7 | 73:15 | 189:24 |
| 78:5,20,21 | 164:21 168:10 | **requires** 54:8 | **responded** |
| 80:7 86:21 | 171:8,18 | **requiring** 83:5 | 52:11,12 190:3 |
| 89:4 90:20 | 173:10 186:16 | 106:19 | **responding** |
| 92:10,17,18 | **representativ...** | **research** | 148:11 |
| 94:14 98:12 | 164:17 | 150:24 | |

**response**  14:22
  21:7 29:18
  39:13 44:20
  47:6 52:21
  54:7 55:8
  58:22 73:19
  75:4,12 76:7
  76:22 77:5,15
  78:16 79:1
  98:24 101:3
  102:1,2 104:22
  106:7,8 126:5
  126:7 128:20
  180:11 185:9
  190:5
**responses**  73:8
  181:12 183:9
**responsible**
  36:8
**responsive**  25:4
  25:21 147:19
  169:15
**rest**  117:20
  191:19
**restriction**  61:4
  61:12 63:1
  147:9
**restrictions**
  60:14
**restrictive**
  65:11
**resubmit**  78:24
**resulted**  146:20
**results**  102:14
  140:14

**resume**  49:22
**retained**  61:16
**return**  47:19
  52:5 62:2
  153:16
**revealing**  105:4
**revenue**  50:20
  51:1 62:17
  72:21 76:15
  80:16 119:7,13
  129:12,24
  136:23 137:1
  150:22 153:11
  153:13 181:13
**review**  35:11
  70:8 71:2,4
  150:3 157:3
  159:4,15,19
  160:17 164:7
  167:2 168:17
  171:9,16
  173:16
**reviewed**  21:14
**reviewing**
  122:15
**rgolden**  2:9
**rhanna**  2:21
**richards**  3:5
  4:23 7:23
**right**  6:10 7:4
  9:2,4 10:6
  19:18 25:10
  32:17 33:6
  43:16 44:24
  53:8,12 65:23

68:2 70:13
71:18 72:3
73:5 75:1
80:23,24 82:11
84:1 89:21
96:4 98:1
103:4 104:2,4
108:2 110:14
110:21 112:2
113:5 117:8
122:17 125:1,6
126:23 129:20
130:3 134:9,20
138:15 140:9
141:13 143:19
149:5,7 151:15
160:22 166:15
174:15 175:9
176:12,14
181:5 188:13
188:20,21
191:11
**rigorous**  66:3
**rise**  96:2
**rising**  65:15
**rizzi**  2:12 6:19
  7:13,16 9:12
  9:13 10:8 11:7
  12:3,6 13:9
  14:1,6,19
  15:19 19:7,18
  20:17 21:10
  22:10 24:13,17
  25:7 27:5,10
  27:12 28:1

29:17 30:6,10
30:18 31:6
32:12,14 33:8
33:17 34:12
37:2,17 38:3
39:13 40:10
41:1,7,18
42:24 43:9
44:8,12 45:17
46:7 47:1,8,13
47:21,23 49:14
49:15 52:8,22
52:23,24 53:8
54:11 55:19,22
56:12 57:19
58:17,20,24
59:19 60:1
62:15,20 64:12
64:15 65:1
66:21,24 67:24
69:5 99:22
100:5 117:11
132:5 139:14
140:3 144:11
144:22 146:1
146:14,19
147:2,17,24
153:14 154:1,4
158:13 182:14
188:17,18
**rizzi's**  11:17
  33:21 34:7
  36:7 38:19
  39:8,15 41:5
  46:20 48:7

49:20 55:16
94:7 122:15
158:9 163:15
**rlf.com** 3:9,10
**robertiello**
28:14 144:2
185:18,23
187:10,17
**robinson** 74:19
113:8
**robinson's**
75:17
**robocast** 1:4
2:2 6:23 13:18
14:7,8,20 15:9
15:22,23 19:1
20:16 22:20
23:1,16,17,18
24:1 25:7,17
26:3,9 27:3,8
28:13,23,24
29:7 31:12
32:8 33:23
34:9 37:16
40:4,7,8 41:2,6
41:13 43:1,2
46:1 47:9,11
49:7,17 50:15
50:16 52:1,21
53:6 56:13
57:3,8,16
58:10 60:5
61:7,16 62:10
62:16 64:10
71:1 72:20

73:13,16,18
74:1 76:8,16
79:4,9,19
80:17 82:6,13
83:11,23,24
84:14 85:3,9
85:13 86:7,12
86:16 88:9,9
89:16 90:4,6
90:11,14,16,22
91:19,20 92:3
92:12,12,22
93:13,17 94:2
94:4,15 95:14
97:7 101:16,24
102:9,16,21
103:22 104:23
105:2,11,12,15
105:16 106:17
109:21,24
110:12,24
111:10,11,16
111:17,23
113:13 116:8
118:6 119:2,5
119:12,23
120:23 123:3,4
123:10,17,18
123:20,22
124:12,15
125:18 128:5
128:21 129:7
129:24 133:4,9
133:14,16,17
133:23 134:1

134:13 137:3
142:19 148:13
148:15 150:22
151:20 153:2
162:5,14
166:13 170:14
176:6 177:10
177:23 178:1
178:18,23
179:4,11,12
180:19 181:2
181:21 182:14
185:2
**robocast's** 15:3
23:21 29:14
71:20 76:12,14
78:4 79:3 80:7
81:23 83:15
87:4 89:22
91:2 92:2
94:19 95:1,3
98:16 102:23
109:13 110:4,9
114:10 116:17
116:24 119:10
119:21 126:9
134:24 135:16
136:21 137:11
159:13 176:24
179:20 181:10
**robust** 46:8
49:7
**rodney** 3:6
**rog** 77:14 78:16
79:14 183:8

**role** 12:12,12
17:3,6 19:20
19:23 20:3,9
24:22 26:8,16
27:13 36:7
39:8 44:2,2,9
48:8 49:22,24
55:20 59:12
62:22 115:20
158:13
**roles** 44:16
54:15
**roman** 71:6,6,7
71:7,8
**ronald** 2:4 7:11
**room** 57:18
**rough** 33:20
**roughly** 112:18
**round** 144:4
**routinely** 27:20
**royalty** 71:20
73:21 74:4,12
77:1,7,17,19
78:1,7,22 79:9
79:12,12 96:19
98:9 99:8
119:10,11,14
119:16,18,22
124:3
**rule** 45:3 54:9
73:12,15 74:10
76:14,22
135:21 140:21
153:5,6 167:7

**[ruling - seems]**                                                                          Page 48

**ruling**  159:17
**run**  18:4 19:8
**running**  46:17
  79:11 119:11
  119:14
**runway**  184:4

**s**

**s**  2:1 3:1 4:1 5:1
  6:1
**sale**  51:1
**sales**  137:14
**samantha**  4:20
**sample**  164:21
**samsung**  148:5
**sand**  65:4
  182:5
**sara**  3:4 7:24
**sat**  186:12
**saved**  131:24
**saw**  57:6
**saying**  27:11
  49:12 53:4,5
  54:21 59:9
  67:10 74:17
  75:23 78:17,19
  79:23 82:15
  85:15 88:18,23
  90:10,19 91:12
  91:21 92:5,14
  94:13 102:5,10
  102:13 103:9
  103:21 104:4
  105:9 109:11
  123:2,12
  124:12 125:13

127:9,17
129:16,18
132:24 137:21
162:18,19,22
164:2,4 170:16
170:17 176:10
188:7
**says**  6:4 10:22
  49:9 81:18
  84:5 85:19
  87:24 88:3,4
  88:10,12,13
  91:15 93:11,15
  94:16 99:14
  105:5 106:1
  109:4 116:6
  121:15 129:16
  131:11 180:3
**sbrauerman**
  2:8
**scenario**  17:17
  18:13,22 20:9
  157:18
**scenarios**  17:8
**schaszberger**
  4:6 8:4,7 70:24
  71:3
**schedule**
  178:18,19
  179:7,21
  180:20 181:4
  182:18 186:18
**schedule's**
  176:12

**scheduled**
  45:15 178:2
  179:10
**scheduling**
  179:1,5 191:2
**scope**  25:12
  28:7 40:6
  60:11 133:7
  146:10 155:4,6
  157:22 158:1
**screen**  6:5 9:21
**second**  10:13
  11:17 25:20
  58:24 68:12
  69:11 71:9,10
  71:13 72:7
  81:11 89:18
  96:3 99:13
  101:18 114:11
  117:10 120:21
  147:14 168:9
  190:15
**section**  98:7
**secure**  129:10
  148:16
**see**  6:5 13:2
  33:3 38:12
  39:20,24 40:16
  41:7 42:3
  56:11 57:6
  64:4 68:6
  70:19 78:14
  86:17 90:7
  101:8 106:19
  117:19 118:18

134:12 148:19
158:16 159:16
165:13 185:17
188:19 191:14
**seeing**  6:6
  33:19 96:19
**seek**  16:17 20:3
  41:6,19 58:23
  61:1 72:8,18
  81:13 112:20
  114:12 184:20
**seeking**  10:22
  18:12 33:13
  40:9 59:9,15
  60:15 69:2
  72:20 73:5,9
  73:21 76:9
  79:18 80:11
  81:23 82:3
  86:4 91:24
  116:14 124:1
  153:6
**seeks**  165:5
**seem**  12:11
  156:19 164:10
  165:16
**seemed**  11:24
  48:21 85:15
  122:14
**seems**  11:14
  18:10 42:19,19
  43:6,12 69:14
  72:7 79:21
  81:1 82:12
  83:21 85:9

**[seems - side]**                                                                    Page 49

88:7 91:22
97:10 103:19
115:21 120:10
121:9,15 122:7
122:11 131:5
143:11 158:9
160:13 162:21
163:17
**seen**  27:1 64:1
107:8 108:24
109:1 114:4
129:22 139:15
168:11
**selves**  187:7
**send**  75:3 81:1
81:17,24 82:7
82:14,17 83:23
84:8,15 85:5
99:16 167:20
**sending**  53:21
100:9
**sense**  9:7 22:16
22:18 47:5
102:23 125:15
133:5
**sensitive**  22:13
**sent**  60:19
83:11 142:12
172:11
**separatable**
165:1
**separate**  28:19
37:21 38:20
53:18 113:20
134:10 146:4

158:22 166:24
**separately**
24:14,15 40:22
107:3
**september**
187:15
**series**  57:23
**serious**  31:14
**seriously**
181:10 188:9
**serve**  112:14
182:16
**served**  18:7
73:12 182:19
**serves**  185:22
**service**  6:13
132:2
**services**  20:13
21:22,23 62:17
**set**  8:10 43:24
55:18 76:8
78:6 112:7
114:19 156:3
160:16 164:16
168:9
**setting**  119:6
**settled**  124:24
**settlement**
123:13 125:4
125:16 128:19
129:8 130:9
**settlements**
125:9 126:11
126:22 127:3
127:23 128:4

129:18 130:18
**seven**  97:2,16
165:14
**shape**  27:20
**share**  21:15
29:7 86:7,8
88:9 89:11,14
89:17 91:6,19
92:2,11,19
93:8,13,17,18
94:2,7,15,21
101:1,6,12,14
101:21 102:1,4
102:9 103:17
103:23 104:5,9
104:21,24
105:3,8,13,16
105:20 108:11
108:15,19
110:11 111:3
111:11,17,23
111:24 116:9
116:17
**shared**  23:7
30:5 89:2
92:11 101:20
103:1 106:17
**shares**  88:3
90:22 102:17
103:10 117:1
**sharing**  22:12
30:7
**she'll**  182:5
**shed**  163:19

**sheds**  151:22
**sheet**  143:23
145:22 146:2
**shelton**  10:15
65:11,12 66:7
**shield**  46:2
84:20 87:4
119:24 169:3
**short**  117:16
153:23 178:20
184:4
**shot**  43:11
96:14
**should've**
52:14 135:24
168:1,5,15
185:9 190:20
190:23,24
**show**  27:2
39:11,12 43:7
44:24 45:10,20
46:1,14 104:15
110:9 123:5
142:10 166:23
**showed**  81:5
89:3
**showing**  40:4
44:9 104:5
128:9 130:6
168:5 185:14
**shown**  111:1
**shows**  21:2
52:3
**side**  6:11 7:5,7
7:20 10:7,10

10:12 14:18
15:17 21:2
24:1 25:6,15
31:5 42:17,21
46:22 64:16
66:17 70:14
85:19 99:14
106:1 127:1,2
130:11 132:22
143:19 145:21
157:24 163:7
175:1,6 180:3
181:7,24
183:12 185:4
**side's** 23:10
118:16
**sides** 11:11
12:22,24 42:8
155:2 184:12
**signature**
193:17 194:14
**significant**
41:24 48:6
**similarly** 63:14
**simple** 178:7
**simply** 46:6
58:7 63:6
82:23 106:6
114:2 120:23
173:21 181:2,3
**single** 20:1
107:1 169:24
170:2
**sitting** 28:15

**situation** 77:2
87:4 119:23
129:11
**six** 77:9 165:23
186:23
**size** 188:12
**skills** 193:10
194:6
**slightly** 34:6
79:22
**small** 16:10
17:18 19:7
20:8,20 21:1
44:3
**smith** 2:16 7:12
19:10 20:7
47:16,22 52:7
60:23 74:22
76:13 79:4,11
80:1,6,15,20,21
81:5 82:3,6,12
83:10 84:4
85:15,23 86:7
86:24 87:1,5,8
89:2,9,24
90:10,16,24
91:3,4,15 92:1
92:5,13 93:1,7
93:11,16,18
94:17,21 95:13
96:1,10,10,14
97:2 98:6,11
98:15,21 99:10
100:13,15
101:5,10,17,19

102:5,13,17
103:9,19,24
104:8,23
105:14 107:19
108:6 109:15
109:16 111:12
111:21 113:23
115:1 116:7
119:18,21
120:2,3 145:1
145:3 159:13
159:22 160:16
161:16 162:1
162:11,12,21
163:2 166:11
169:22 170:3
170:13 172:10
**smith's** 80:3,10
81:16 83:22
84:13 85:11
86:22 87:19
89:8 91:14
101:9 107:17
108:10 109:14
109:17 116:15
117:14 128:23
159:24 160:18
161:5 166:21
169:13
**sofer** 31:13
32:3 37:2
179:6 180:23
**sole** 156:12
**solely** 98:21
106:14 117:2

151:3 153:10
**solution** 167:7
**solutions** 167:6
**somebody**
74:22 89:3
94:17 145:23
**somewhat** 24:1
44:4 176:19
**soon** 169:7
173:2
**sooner** 182:16
**sorry** 26:18
36:15 53:1
54:20 72:24
76:12 77:4,22
81:6,6 83:19
91:7 104:17,17
118:5 132:20
145:16 154:17
162:17 165:19
180:17 182:6
**sort** 12:12 26:1
27:20 36:13
40:14 54:13
136:24 161:19
176:4
**sorts** 142:10
**sought** 13:21
14:19 20:13
26:13 33:17
35:14 41:21
42:1 52:10,11
55:7 59:2
66:11,13,13,19
72:1 74:8,9

[sought - submit]                                    Page 51

| | | | |
|---|---|---|---|
| 76:11,17 77:16 | 153:3 | stepping 12:17 | 119:16,18,22 |
| 79:5 80:19 | speculation | steps 22:11 | struggling 48:5 |
| 83:12 93:7 | 150:2 | steve 7:10 | 153:12 |
| 94:21 113:17 | sphere 157:17 | steven 2:12 | stuff 21:6 24:9 |
| 130:22 134:5 | split 149:23 | 7:13 9:13 | 60:14 98:8 |
| 135:19 154:22 | spoke 139:14 | 188:17 | 122:1 149:3 |
| 159:14 178:19 | square 3:6 | stipulated | 170:2 |
| sound 21:6 | srizzi 2:20 | 182:24 | stuff's 107:6 |
| sounded 38:18 | stage 168:6 | stock 91:19 | sub 72:3,13 |
| sounds 19:18 | staging 41:5 | 106:15 | 81:11 84:4 |
| 23:3 36:24 | stand 65:1 | stood 41:8 | 112:20 |
| 77:24 82:14 | standard 154:7 | stop 24:23 | subcategories |
| 88:19 102:10 | stark 51:7 | 126:18 | 71:8 165:9 |
| 145:23 164:24 | start 7:6 33:7 | story 182:10 | subcategory |
| 191:5 | 111:15 | strategic 185:3 | 163:22 |
| southern 41:4 | started 44:13 | strategy 19:21 | subject 15:15 |
| space 110:16 | 85:11 | 37:19 65:19 | 36:2 43:1 70:6 |
| 169:16 | starting 104:20 | 94:6 119:5 | 82:9 85:2 |
| spalding 20:7 | starts 148:12 | street 1:17 2:6 | 102:11 106:4 |
| span 137:4 | state 152:6 | 3:7 4:9 142:20 | 122:2,24 |
| speak 29:14 | 154:19 | strength 29:16 | 133:22 142:1 |
| 36:23 48:13 | stated 84:12 | 138:5 | 147:7 153:7 |
| 127:23 165:20 | 110:11 | strengths | 155:10 156:19 |
| speakers 192:4 | statement | 135:10 | 157:8 158:7,10 |
| speaking 9:9 | 90:23 108:9 | stretch 20:1 | 190:9 |
| 32:21 95:10 | statements | strike 66:5 | submission |
| speaks 16:20 | 59:20 126:12 | 130:12 | 39:17 66:4 |
| 118:15,17 | 127:14 129:23 | strikes 42:12 | 171:15 173:10 |
| 120:14 | states 1:1 | 42:16 | 173:22 174:6 |
| specific 88:6 | status 173:4 | strong 25:22 | submit 16:18 |
| 102:3 129:22 | stay 157:20 | 29:4 | 44:6 45:4,9,23 |
| 145:14 | staying 81:10 | stronger 45:12 | 63:24 64:5,17 |
| specifically | stent 36:5 | struck 69:19 | 70:2 117:12 |
| 21:22 26:10 | stephen 2:3 | structure 79:9 | 146:3 150:1 |
| 71:23 129:23 | | 96:18 119:10 | 151:5 162:1 |

**[submit - suspect]**

185:8
**submitted**
37:14 44:7,22
44:24 79:23
163:12 166:22
184:13
**subpoena** 12:8
13:12 35:16
40:6 41:5,9
45:17 51:23
57:3,4 59:2,4
61:18 65:6
**subpoena's**
60:6
**subpoenaed**
34:22 35:6
42:2 61:5
136:8 177:2
**subpoenas**
10:22 33:11
51:15 64:17
66:7
**subsequent**
90:19 162:5
**subsequently**
78:20 170:12
**subset** 149:10
164:15
**subsets** 68:11
**substance** 80:3
83:2,6 112:14
115:20 116:13
122:2 130:6
**substantively**
61:11 137:6

**success** 23:24
24:12 48:14
49:12 50:5,7
50:11,11,12
62:9,10,14
123:5 135:9
136:12,15,18
137:4,9,11,13
137:13,16,20
138:19 139:7
139:15,24
140:5,13 141:9
143:12 153:10
**successes**
139:23
**successful** 48:4
48:22 50:18
139:21 140:11
**sue** 53:14 82:23
83:13
**sufficient**
113:14 115:18
160:7
**sufficiently**
116:1
**suggest** 115:20
156:6
**suggested**
113:11 115:12
116:15
**suggesting**
18:21 69:14
78:14 82:12,24
120:12

**suggestion** 57:5
76:2 113:20
158:21
**suggests** 32:8
113:22
**suit** 11:23 29:5
124:13,16
138:8 141:1,24
**suite** 2:6 3:7
4:9
**summarize**
90:8
**summarized**
72:16
**summarizes**
107:16
**summer** 4:23
8:1
**super** 71:17
**supplant**
118:23 129:3
**supplement**
39:22 43:20
64:2 67:2,14
73:14 75:21
86:12,18
**supplemental**
45:3 57:5
77:14 78:24
87:7 98:19
117:17
**supplementat...**
14:2 67:9
113:18

**supplemented**
63:22 73:18
**supplementing**
65:8
**supplements**
39:23 45:10
**support** 34:24
44:8,24 50:12
64:6 90:23
98:9 173:14
**supported**
40:18
**supports** 111:2
135:22
**suppose** 131:14
**supposed** 48:18
66:6 160:15
175:18
**sure** 21:10
24:16 36:19
39:3 42:7
48:15 53:2
83:20 90:3
91:9 100:21
101:4 104:16
106:22 107:10
107:14 112:4
126:19,20
132:21 137:20
139:10 143:9
176:7 178:6
187:21 191:7
**surprise** 61:17
**suspect** 158:17

**[suspenders - testified]** Page 53

**suspenders** 187:21
**sword** 84:19 87:3 119:24
**sworn** 48:6 193:5
**systemically** 46:2

**t**

**t** 5:1
**tables** 15:21,22 102:20 104:6
**take** 10:23 26:22 41:8 43:8 60:8 67:18 83:24 94:24 95:16 111:14,18 139:12 169:9 183:2 184:16 184:19 185:3 188:4 189:1,14 189:22 190:1 190:12 192:2
**taken** 12:21 13:2 15:8,14 22:11 37:13 44:21 66:23 123:22 147:4 151:20 152:7 185:5 190:21 190:24 193:3 193:12 194:9
**talk** 11:11 31:1 31:7 50:9 56:2

68:7,22 74:19 74:24 96:10 101:19 102:11 122:20 131:4
**talked** 38:17 50:19,19 75:15 103:16 104:1 163:6
**talking** 12:5 21:4 22:7 30:16 38:19 43:8 53:15 70:12 71:23 83:20 84:8 87:12,23 89:1 109:5 111:15 124:11 129:19 131:12 134:21 137:21 138:7 139:6 144:19 147:20 184:7
**talks** 68:10,15 126:22
**talmage** 2:15 7:14,16 95:12 95:13,15 96:7 96:15 97:17 98:14 99:21 100:11,23,24 101:4 102:12 103:6 104:3,12 104:16 105:18 106:8,20,22 107:5,10,14 108:9 120:9,20

126:2,4,7,20,24 127:5,13,20 128:3,13 129:5 129:16 141:15 142:6 143:5,9 144:12,23 145:2,16,19 148:2,4,7,9,22 149:7,22 150:21 152:5 161:3,4,14 163:1,9 164:2 164:4 168:13 168:17 169:12 170:4
**tara** 4:3 8:3 32:24
**tara.elliott** 4:11
**target** 166:5
**targeted** 133:23
**targets** 53:14 60:17
**team** 18:16 49:18,19 57:21 188:12
**tease** 76:24
**technology** 9:18
**techs** 152:15
**tee** 172:5 173:5
**teed** 145:21 171:12
**teleconference** 112:13

**teleglobe** 93:21
**tell** 11:9,12 12:20 14:13 18:23 56:15 70:11 72:2 82:12,15 84:15 85:4 90:15 101:11 104:8 104:22 105:13 109:10 111:6 140:16 143:7 158:5 160:5 173:21 178:5 187:2
**telling** 16:18 49:7 77:6
**temporal** 155:4
**ten** 53:13 85:14
**term** 53:11 143:23 145:22 146:2 164:18
**terms** 10:17 16:21 19:22 29:15,16 34:2 61:2,14,19 62:9,13,22 63:12 65:16 92:16 97:18 100:8 122:17 144:23,24
**test** 44:14 65:11,12 66:7 66:8,8 80:2
**testified** 91:3 101:17 102:17

102:22 104:23
109:17 141:8
166:12
**testify**  97:14
105:19
**testifying**  193:5
**testimony**
10:21 32:7
37:17 39:16
40:5 47:12,14
47:15 48:7
49:13 52:10
58:23 59:16
63:22 65:13
66:11 68:11
70:22 71:19,24
72:19 73:4
76:4 80:11
85:6 86:22
91:24 97:1,16
99:11 100:4
104:7,11
107:17 109:14
111:2,19
112:21 113:1,6
113:22 114:12
114:20 116:15
117:21 118:23
121:14 122:14
123:18 124:7
129:4 130:5,20
134:3,5 138:22
142:8,15 143:4
144:2,8,13,19
144:21 145:4

153:7 155:9
157:11 190:14
**thank**  6:12 7:18
34:4 56:20
59:17 60:1
65:23 67:24
68:1 70:20
100:23 108:1
120:6 141:13
153:24 154:14
181:23 188:13
192:4
**thanks**  66:1
96:15 126:4
**theirs**  188:6
**thing**  49:9
75:24 85:24
90:16 103:2
105:6 145:20
173:7 179:24
**things**  6:15
21:5,8 44:18
44:21 46:6
48:23 49:3
52:14 54:7
57:23 60:16
87:12 95:5
118:14,18
139:22 142:10
160:5 166:1
**think**  10:14
11:7,12 12:3,6
12:13,16,18,20
14:1 15:24
17:3,8 18:21

19:12 20:18,21
22:9 23:9 24:6
24:24 26:23
28:11,11 31:2
31:8 34:1,5,11
35:10 36:14
39:3,5 40:11
53:3 54:8,13
54:19 55:1
57:6 64:6,7,8
65:4 66:2 67:1
69:16 72:14,16
74:16,21 75:9
75:16,17 76:5
77:6,10 78:19
82:24 83:8,9
83:18 84:3,11
87:11,11,18
90:8 92:23
95:19 97:19,24
98:5,5 99:21
100:10 102:12
104:4 106:1
107:5 111:6,11
111:12 113:2,5
113:7,12,19
114:20,23
115:6,17
116:14,16,19
116:22 118:8
118:12,21
120:7 122:23
123:1,2,2,21
130:6 132:22
134:11,14,23

135:2 138:1,2
138:5,10,21
139:13,21
140:21 141:6
142:1 144:19
145:1,13
148:19 150:2
153:8 155:24
156:9,11,24
157:6 159:20
159:23 160:13
161:15 167:9
169:1 170:5
172:7 175:22
178:7 182:9,11
182:21 186:1
**think's**  67:14
72:14
**thinking**  15:2
17:17 53:11
85:17,23 88:4
134:4,9 159:23
160:4 173:7
**thinks**  75:18
**third**  11:19
23:4 25:3 30:5
38:3,21 45:13
49:21 50:17,21
53:22 57:1
61:5 68:12
69:11 71:9,11
71:14 72:10
93:22 94:9
101:21 102:4,8
102:15 105:12

**[third - towards]**                                                    Page 55

| | | | |
|---|---|---|---|
| 105:16 109:16 | **thrilled** 142:17 | **tiny** 18:15 | 36:12 39:6 |
| 111:10,17 | **tie** 6:7 140:24 | **titled** 6:18,23 | 66:20 86:9 |
| 114:22 116:18 | 155:10 | **today** 7:17 8:2 | 99:17 116:24 |
| 117:2 121:24 | **tied** 185:5 | 8:5,17,24 | 120:3 128:24 |
| 122:7,18 | **till** 8:10,18 | 12:22 28:15 | 129:4 155:15 |
| 133:21,24 | **time** 1:14 8:13 | 60:4 67:12 | **topics** 10:21 |
| 136:7 142:2 | 15:9 16:13 | 113:19 137:1 | 29:21 33:18 |
| 144:1 145:6 | 19:9,19 20:4 | 140:19 143:1 | 35:11 38:5 |
| 158:8 163:14 | 20:24 41:10 | 165:20 171:6 | 40:18 41:16 |
| 177:2 180:21 | 46:17 49:11 | 173:3,20 174:5 | 43:20 45:16 |
| 181:1 185:6 | 51:17 58:1 | 184:12 191:9 | 59:3 60:24 |
| **thirdly** 85:8 | 62:7,19 76:21 | 191:16,23 | 74:20 79:5 |
| **thought** 33:19 | 97:9 103:24 | 192:1 | 113:9 144:24 |
| 36:20 41:20 | 105:15 124:18 | **today's** 9:14 | 181:18 191:5,9 |
| 68:22 70:9 | 129:23 139:17 | 112:13 115:10 | **torres** 19:8 |
| 80:9 89:24 | 146:18 153:23 | 165:15 | 31:12 35:21,23 |
| 111:9 122:6 | 160:11,20 | **together** | 38:10 47:17 |
| 158:1,10 159:6 | 164:4 165:24 | 167:18,21 | 48:5 49:13 |
| 172:17 | 166:3,4 167:2 | 174:2 187:1,7 | 50:24 64:19 |
| **thoughts** 93:14 | 168:10,15 | **told** 41:3 73:7 | 79:4,11 80:18 |
| **thousands** | 172:22 174:3 | 74:3 76:18 | 80:21 97:3 |
| 151:9 | 176:2 177:6 | 77:7 88:11 | 128:23 135:17 |
| **three** 10:24 | 179:22 180:24 | 96:13 101:12 | 139:13,19 |
| 17:20,22 18:8 | 183:1,2 184:2 | 104:9 120:23 | 141:8 143:23 |
| 32:16 43:23 | 184:3,22,24 | 143:20 186:7,7 | 145:22 |
| 68:10 71:8,16 | 185:13 186:4 | 190:2,7 | **total** 173:24 |
| 72:3 95:16 | 186:21 187:4 | **tons** 46:23 | 177:9 |
| 99:4 100:24 | 187:12 191:14 | **took** 11:10 | **touch** 29:21 |
| 112:19 122:8 | **timeframe** | 25:22 43:1 | 59:21 |
| 122:14 126:10 | 31:10 117:17 | 60:5 132:6 | **touted** 123:20 |
| 126:21 181:18 | 137:2 170:3 | 133:8 154:7 | 129:7 139:24 |
| 186:18 | 191:8 | 180:8 188:8 | 153:10 |
| **threshold** | **times** 57:16 | **top** 11:24 | **touting** 140:4 |
| 124:4 | 105:11 111:16 | **topic** 12:3 | **towards** 100:3 |
| | | 28:18 34:24 | 130:15 |

**track**  169:1
188:11,11
**traditional**
18:11
**transaction**
106:15,16
**transcribed**
58:4
**transcriber**
194:1
**transcript**
84:13 89:8,24
101:9 108:10
109:2 112:12
143:18 194:3,5
**transcriptionist**
193:8
**transcripts**
45:19
**transfer**  41:3
**traveling**
189:21
**treat**  134:14
**trial**  66:7 84:14
99:15 100:3
114:19 140:10
158:6 187:23
**trials**  184:24
**tried**  43:10
46:2 86:10
135:15 168:22
190:20 191:13
**triple**  188:11
**true**  16:21
41:21 58:7,11

96:7 103:16
114:1,1 132:7
136:18 159:21
189:3 193:9
194:5
**truly**  63:24
**trust**  191:3
**truth**  107:4
190:22
**try**  8:23 10:19
31:2 42:5
58:15,17 59:1
67:8,19 68:6
69:12 75:1
84:23 91:10
95:7,8 112:11
117:8 122:21
164:19 170:16
170:17 174:2
175:11 191:16
191:18
**trying**  22:8
46:10 91:16
138:18,21
139:1 151:1
162:18 169:2
**turn**  10:6 20:22
31:5 32:18,20
58:16 126:1
127:11 141:14
175:13 181:6
181:24
**turned**  58:11
**turns**  57:17

**tweak**  34:1,6
**two**  6:17 14:24
17:19,22 19:17
25:8 26:3
35:18 37:7,20
37:22 38:12
39:10 44:20
51:5 52:18
54:7 60:9,12
71:6,7,7 89:6
95:16 112:17
122:11 124:16
129:17 130:9
131:4 134:10
139:22 141:8
148:12 160:14
171:13 172:4
177:11 179:2
185:17 186:14
187:6 191:6
**type**  143:2
166:5
**typewriting**
193:7
**typically**  70:1

**u**

**ultimate**  49:4
99:1
**ultimately**
25:13 80:7
82:22 113:2
128:6 130:14
176:20 177:14
178:12,14
189:10 190:6

190:11,18
**umbrella**  38:4
**unable**  181:9
**unclear**  130:1
**undated**  160:19
**under**  10:13
11:13 38:4,14
47:14 65:12
66:7 73:15
135:20 152:6
153:5,20 156:9
166:12,24
177:12
**underlying**
71:20 79:18
81:23 82:4
87:9
**underpinnings**
110:10
**underscore**
45:7
**underscores**
39:15
**understand**
10:2 17:5
30:22 43:22
61:23 68:8
83:4,9,15
86:10 91:8,14
97:18 111:6
121:6 124:11
125:14,14,18
125:22 131:23
132:21 134:17
134:23 137:20

138:10 139:4
143:6 156:4
157:18 162:18
182:1 189:5
**understanding**
48:11 77:17
106:10 118:3
126:19 130:12
130:17 187:14
**understands**
35:22
**understood**
36:20 84:22
92:18 137:6
142:19 176:10
184:21
**undisputed**
130:7 156:11
169:17
**unduly** 132:9
133:10
**unfortunately**
66:2 185:2
**unilateral**
179:19
**unique** 24:1,20
28:8 39:15
44:9,10 47:1
48:2,2,8 55:14
55:17,21 56:14
57:13 58:21
61:1 62:23
63:18,19 65:16
65:18,21 66:12
66:24 98:15

**uniqueness**
66:18
**unit** 1:17
**united** 1:1
**universe**
164:23 191:8
**unlimited**
110:16
**unmuted** 99:23
**unreasonable**
63:15
**unreliable**
35:23
**unresolvable**
163:21
**unusual** 18:14
**use** 15:13,13
20:3 66:9 74:5
74:13 84:19,23
**used** 33:16 39:4
74:19 77:20
119:23
**useful** 39:22
**using** 74:19
128:7
**usual** 59:9
**utility** 78:22
**utilized** 10:14
**utilizes** 10:14
**utmost** 178:1

**v**

**v** 1:7 148:5
152:15
**vague** 52:18

**valid** 34:14
120:13 178:16
**validity** 29:9
138:6
**valuable** 29:5
48:21
**valuation** 47:3
72:11 85:9,16
85:16,18,22
86:5,6,6,13,15
86:23 87:1,5
88:3,15 89:1
89:23 90:5,11
90:24 91:3,19
101:1,15 102:4
102:15 103:1
103:10,13
105:7,8,24
106:2,13,24
107:16 108:6
108:20,22
109:4,17,22
110:1,10
114:23 115:2
116:4,9,24
**valuations**
85:13 87:9
102:16,18
**value** 15:3,4
23:21 29:14
38:9,11 49:1,4
49:22 50:2
51:3 73:24
86:8 88:9,22
89:11,17 90:14

90:15,22 91:5
91:19 92:2,2
92:11,12,19
93:8,13,14,16
93:18 94:2,7
94:14,20
101:21 102:1,8
102:23 103:17
103:23 104:21
105:12,16
108:11,15,19
110:11 111:3,3
111:11,17,22
111:24 125:16
127:3,24 128:7
130:17 134:24
135:10 138:2,7
138:7 139:3,3
141:1,10,23
142:3 144:10
144:15,15
146:23 147:9
149:17 150:10
150:17 151:23
153:16 155:13
155:22 156:18
157:9
**values** 128:7
**various** 33:10
43:13 165:10
171:11
**vast** 16:11 19:5
65:18 161:18
**vehicle** 97:13

[venue - withdrawal]                                        Page 58

**venue**  82:21
**veracity**  44:18
**versus**  91:11
**vevo**  99:6 140:2
**viable**  121:19
**video**  9:18,20
  9:21 63:3
**videoconfere...**
  1:12 2:3,4,12
  2:13,14,15 3:3
  3:4,14 4:3,4,5,7
  4:21,22,24
  9:16 10:3
  112:13 192:1
**videos**  63:1
**view**  10:11,12
  23:10 65:8
  74:5 75:18
  92:2 93:12,18
  94:11 95:24
  96:2,11 103:17
  110:20 112:19
  116:2 120:17
  131:16 141:12
  143:7 157:16
**vis**  26:13,13
  28:9,9 66:12
  66:12 93:14,14
  138:6,6
**volumes**  16:20
**vs**  6:19,23

**w**

**wait**  39:20
  182:15

**waited**  182:17
  186:12
**waiting**  67:4
**waived**  172:9
**waiving**  21:16
**walk**  105:10,14
**walked**  59:3
**want**  9:20 14:5
  18:24 21:24
  31:4 34:24
  40:20 41:17
  42:3 57:24
  58:16 59:21
  90:3 101:2
  107:12 109:10
  111:18 116:7
  118:20 125:17
  125:22 132:21
  135:4 137:20
  143:6,7 151:16
  152:14 153:15
  159:10 171:5
  174:20 175:11
  178:5 181:6
  184:19
**wanted**  12:14
  27:15 41:1
  78:8 100:16,20
  108:20 110:15
  111:8 112:20
  119:12 120:9
  132:12 151:24
  159:16 160:20
**wanting**  103:15

**wants**  99:22
**warecorp**
  41:23
**washington**
  4:10
**watkins**  4:8 8:2
  32:24 70:16
**way**  3:16 9:5
  11:6,8 13:23
  14:17 15:16
  18:2 22:24
  27:20 43:7
  48:13 59:13
  60:4,18 68:7
  69:18 102:7
  113:5,15,17
  115:15 129:9
  138:6 141:23
  142:20 156:17
  159:2,8,9
  160:12 165:7
  172:21 188:16
**we've**  37:6 41:2
  44:9,22 46:12
  55:16 59:2,14
  86:1 99:4
  102:20 104:7,9
  106:12 126:12
  127:14 131:12
  133:23 142:14
  142:16 145:15
  151:9 161:18
  162:10 166:2
  168:11,18
  169:9 170:8

**weader**  1:19
  193:2,18
**weaknesses**
  135:11
**webinar**  63:4
**webinars**  57:18
  57:21 140:7
**week**  171:6
  173:3,20 174:5
  176:21 183:17
  191:23 192:2
**week's**  187:4,5
**weeks**  177:11
  178:16 179:2
  186:15
**went**  20:9
  21:12 127:12
**west**  2:17 35:3
**what'd**  103:18
**where'd**  88:8
**wholly**  153:5
**willfulness**
  132:11 133:11
**willing**  41:5
  86:12 102:24
  186:5,10
**wilmington**
  1:18 2:7 3:8
**window**  184:23
**wish**  173:13
  192:2
**wished**  159:2
**wishes**  117:4
**withdrawal**
  41:9 114:19

**[withdrawn - zero]**                                                           Page 59

| | | | |
|---|---|---|---|
| **withdrawn** | 104:15 | **writing**  75:12 | **z** |
| 119:2 123:10 | **work**  29:19 | **wrong**  12:20 | **zero**  169:15 |
| **withholding** | 30:2,9,14 | 82:13 111:7 | |
| 71:1 170:9 | 40:17 62:16 | 142:4 144:13 | |
| **withstanding** | 70:5 115:22 | 150:19 | |
| 170:11 | 117:7 130:16 | **wrongly**  134:4 | |
| **witness**  35:23 | 135:14,21 | **wyogotschell** | |
| 36:1 66:20 | 136:5 147:8,22 | 31:9,10 | |
| 75:11 76:14 | 148:1,20 149:4 | **x** | |
| 78:15 90:6 | 149:10 159:3 | **x**  5:1 14:15 | |
| 92:1 97:14 | 162:10 164:19 | 43:9 53:22 | |
| 120:19 121:17 | 165:6 166:18 | 66:20 74:5 | |
| 136:6,10,10 | 170:10,22 | 84:24 | |
| 152:22 179:14 | 171:24 172:12 | **y** | |
| 179:19,21 | 173:14 187:1 | **y**  14:15 84:24 | |
| 181:11,19 | 190:7,19 | **yeah**  14:1 25:7 | |
| 182:8 183:6,12 | **worked**  18:6 | 70:18 87:19 | |
| 187:7,8 188:1 | 180:20 | 103:15,21 | |
| 190:5,13 193:4 | **working**  19:14 | 126:7 169:21 | |
| **witnesses**  13:18 | **world**  78:15 | **year**  47:8,10 | |
| 14:7 40:8 41:2 | **worth**  51:8 | 143:13 | |
| 41:13 50:15 | 107:5 128:2 | **years**  14:24 | |
| 51:4 52:1,9,21 | 138:2 | 17:7,12,20 | |
| 78:11 80:1 | **would've**  23:16 | 19:1,17 20:7 | |
| 95:1 134:1 | 49:2 50:3 51:5 | 20:15 22:19 | |
| 136:21 153:4 | 64:1 102:11 | 46:24 77:9 | |
| 182:18,19 | 105:14 138:12 | 136:16 150:23 | |
| 185:21 187:22 | 145:2 147:6 | 152:2 156:13 | |
| 188:10 | 178:1 180:19 | 187:6 | |
| **wonder**  10:11 | 181:16,17 | **yielded**  51:5 | |
| **wondering** | 188:1,2 | **york**  2:19 41:4 | |
| 10:18 54:4 | **wrap**  188:21 | | |
| 92:3 136:17 | **writ**  156:4 | | |
| **words**  35:23 | **write**  44:13 | | |
| 67:11 87:14 | | | |